**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

JOHN DOE,

           Plaintiff,

        v.

KENYON COLLEGE,

           Defendant.

:
:
:
:
:
:   CIVIL ACTION NO.
:
:
:   **JURY TRIAL DEMANDED**
:
:

**COMPLAINT AND JURY DEMAND**

Plaintiff John Doe files this Complaint against defendant Kenyon College, and in support thereof alleges as follows:

## I.    NATURE OF THE ACTION[1]

1. This action arises from unlawful gender discrimination, unlawful retaliation, and breach of contractual obligations and promises by defendant Kenyon College, resulting in erroneous findings of responsibility and sanctions against plaintiff John Doe after he was falsely accused of violating Kenyon's Sexual Misconduct and Harassment Policy.

2. In September of 2019, John was a senior at Kenyon College.

3. John had been in an exclusive dating relationship with Jane Roe, also a Kenyon student, for 19 months, since February of 2018.

---

[1] With the filing of this Complaint, Doe also is filing a motion to proceed under pseudonym for himself, complainant (referred to as Jane Roe), and other students involved in the underlying disciplinary proceeding (referred either by a title or as Witnesses A, B, or C). Defendant knows the identity of the students and does not oppose the motion.

4.      John and Jane had an intimate and sexually active relationship, with Jane persistently initiating sexual activity and sexual banter, taking every opportunity she could to spend time with John, and telling John and other people how much she loved him.

5.      During the week of September 6, 2019, John told Jane he wanted to break up.

6.      Jane was upset at the prospect of being "dumped."

7.      Jane told a friend that she loved John, wanted to be with him, and was afraid that he did not want a future with her.

8.      On September 12, Jane sent John hundreds of texts, telling him over and over that she loved him, wanted to be with him, and wanted to have sex: "I really love you"; "You're so good to me"; "If you're looking for a girl to f**k later please choose me"; "v v v v down to f**k. If not I think ill[sic] make it."

9.      On September 13, 2019, according to Jane's own statements to Kenyon College Investigators, John and Jane had consensual sex between morning and afternoon classes. Jane found the sex "not particularly satisfying" and wanted to have sex again later that day.[2]

10.      On Jane's initiative, John and Jane went out together that evening.

11.      Before they went out, Jane sent John texts asking if they would be using a vibrating sex toy that Jane had purchased and liked to use as foreplay.

12.      Late that evening, John and Jane went to a party at a friend's apartment. Several witnesses saw them making out on the dance floor and being extremely affectionate with each other.

---

[2]      Kenyon restricts access to documents produced and generated during the disciplinary proceeding, including the Investigators' Reports. Accordingly, those documents, though referenced in this Complaint, are not cited specifically or attached as exhibits.

13.     At about midnight, Jane and John left the party to go to John's apartment, arriving there at about 12:15 a.m. on September 14.

14.     At about 12:45 a.m., John asked Jane to leave and go back to her own place.

15.     Jane (again according to her own statements) was angry because she wanted to stay and have sex with him.

16.     According to Jane, John told her they had already had sex, but she claimed not to remember it, purportedly due to a temporary blackout from the alcohol she had consumed.

17.     John walked Jane home. They argued about the fact that he wanted her to go home and she wanted to stay.

18.     As John later told a friend, Jane was pressuring him sexually and he was saying no.

19.     Several bystanders, including a female student who served as a Kenyon Community Advisor, overheard bits and pieces of John and Jane's argument and approached them.

20.     The Community Advisor claimed John "chest bumped" her, though she did not claim to have been injured, and she flagged down Kenyon Campus Safety officers who were passing by.

21.     The officers physically detained John and spoke to John and Jane separately. The sheriff's office was called, and a sheriff's deputy was dispatched.

22.      As recorded by the deputy's body camera, a Kenyon Campus Safety officer stated they had detained John and were not going to let him go until they figured out if he had assaulted Jane.

23.     Jane then had a completely lucid and coherent conversation with the deputy, saying she and John were arguing because he wanted her to go home and that he had not done anything wrong to her. In Jane's words, as recorded by the body camera: "I was mad because we haven't hooked up in like a week so I was asking him like why he didn't want to hook up with me and I think that's what they heard and he was mad at me and was trying to send me home."

24.     The Kenyon Campus Safety officer told the deputy John was being aggressive, speculated that John had a history of violence, and urged the Community Advisor to press charges against John for the alleged chest bump.

25.     As recorded on the body camera, the Kenyon Campus Safety officer said to the Community Advisor: "So if this is how this guy acts . . . he's doing this to other people. . . . So if he's doing it to you as a woman he's doing it to his girlfriend also. . . . So, in my opinion, he should go to jail. . . . He assaulted you."

26.     As a result, the Community Advisor decided to press charges against John, and he was arrested.

27.     The Kenyon Campus Safety officers then took Jane back to their office and, according to her, told her they "felt they had enough evidence based on that one interaction to tell me I was in an abusive relationship," even though she had told them John had done nothing wrong.

28.     In texts to her friends that night, Jane told them John had been arrested for rape and "they wanna expelled him" [sic], but that John had not raped her. She also texted John to say she had told the truth – that he had not done anything to her.

29.     Jane called John's mother to get money to bail John out and then drove John's car to the jail with his friends to bail him out.

4

30.     At some point over the next few days, Jane decided she no longer wanted to pursue a relationship with John. On September 16, she went to Kenyon's Title IX Coordinator, claiming sexual misconduct by John.

31.     On or about September 20, Jane submitted a written complaint to Kenyon's Title IX office.

32.     In the complaint, she recast her entire relationship with John as a "pattern of abusive behavior, physical, emotional, verbal, and now sexual." She has stated repeatedly that this narrative of abuse is the foundation of her complaint, and that the September 13/14 incident was "simply the most recent on the list of atrocities" John committed against her.

33.     With respect to September 13/14, 2019, Jane acknowledged in her written complaint and in statements to the Investigators that before she and John went to John's apartment, she had wanted to have sex with him. She acknowledged that when he asked her to go home she was angry because she wanted to stay and have sex. She reported that she had been drinking and did not remember anything between the party and finding herself outside John's apartment feeling "bitter" because he was making her leave.

34.     Despite her purported lack of memory, she claimed John had raped her, saying she could not have consented because she had been incapacitated by alcohol and did not remember having sex.

35.     A number of witnesses saw Jane and John that night, both before and after the alleged rape. Not one of them – including people who saw them at the party, the Community Advisor, other bystanders, or the Campus Safety officers – thought Jane was incapacitated or exhibiting signs of incapacitation.

36.     In handling complaints of sexual misconduct, Kenyon is bound to follow federal law, including but not limited to Title IX of the Education Amendments of 1972 (Title IX), related regulations, and case law.

37.     Kenyon is also bound to follow its own procedures and promises, including the provisions of its 2019-2020 Student Handbook (attached as Exhibit A) and its 2019-2020 "Sexual Misconduct and Harassment Policy: Title IX, VAWA, Title VII" (referenced here as the Policy and attached as Exhibit B).

38.     Under Kenyon's Policy, Title IX disciplinary proceedings are assigned to two investigators who are required to collect relevant evidence, produce an initial report that summarizes the evidence but does not include findings or a decision, allow the parties to review and comment on the initial report, then determine whether there is sufficient evidence to support a finding of responsibility, and explain their findings and rationale in a final investigative report. If the respondent is found responsible, a Kenyon "Adjudicator" then decides on a sanction. Both parties have a right of appeal.

39.     In its Policy and its Student Handbook, Kenyon promises, among other things, that it will conduct disciplinary proceedings with "fundamental fairness" and will comply with Title IX, related statutes, and other state and federal law; will not discriminate based on sex or gender (stating that discrimination occurs when "a behavior or policy has the purpose or effect of restricting or denying an individual's or group's access to opportunities, programs, or resources in relation to sex, gender, gender identity, gender expression, or sexual orientation . . ."); will assign trained and impartial investigators; will conduct an "adequate, reliable, thorough, and impartial investigation"; will produce an investigative Report that "summarizes the relevant information gathered and synthesizes the areas of agreement and disagreement between the

parties and any supporting information or accounts," based on a review of "all facts gathered to determine whether the information is relevant given the allegation"; will apply the terms and definitions set forth in the Policy; and will make findings of responsibility only if supported by a preponderance of "all relevant and admissible information." *See* Section IV.C below.

40.    As Kenyon applies its Policy, students accused of sexual misconduct are denied important rights Kenyon gives to students accused of other kinds of serious misconduct, including physical assault. Among other things, Kenyon's Student Handbook gives students accused of nonsexual misconduct the right "to an unbiased hearing and one based on evidence presented at the hearing," to review "all relevant written documents prior to the hearing," "to present evidence and witnesses" at a hearing, and "to question all evidence and information, as well as witnesses and the complainant." (Student Handbook at 33-34, 42, 45.) The Student Handbook further provides that respondents are not presumed responsible and have the right to remain silent, and that silence will not be construed against the respondent. (*Id.* at 33-34, 42.) John was not given those rights here.

41.    The Sixth Circuit Court of Appeals has held that a school's failure to allow cross-examination before a neutral fact-finder is sufficient to cast "articulable doubt on the accuracy of the disciplinary proceeding's outcome," supporting a claim for violation of Title IX. *Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018).

42.    John has consistently denied, and continues to deny, any sexual or physical misconduct toward Jane.

43.    He was, however, in a difficult situation. He already had criminal charges pending against him from the Community Advisor (instigated by a Kenyon Campus Safety officer, who also, according to Jane, pressed Jane to conclude her relationship with John was abusive). The

rape allegations Jane was making against him were extremely serious, and he had seen her behave vindictively. He therefore decided to exercise his right not to provide further details about the night of September 13/14.

44.     In addition, when the investigation began, John was back at his home in California.

45.     John consulted Kenyon's Title IX Coordinator concerning how he could best participate and present his defense.

46.     Kenyon's Title IX Coordinator told John that he could submit his position in writing rather than sit for an in-person interview, and that is what he did. He provided factual information and extensive, objective evidence clearly contradicting Jane's allegations, including written evidence proving that Jane's overall narrative of an abusive relationship was false, that she had made other specific false statements, that she persistently sought sexual contact with him, that she was not incapacitated on the night of September 13/14, and that he had no reason to believe she was incapacitated.

47.     John was not told that his decision to submit his position in writing and to decline an in-person interview would be viewed as diminishing his credibility or would be used against him in any way.

48.     John also did not know, until he reviewed the Investigators' Initial Investigative Report (dated October 24, 2019), about texts in which Jane told a friend "they wanna expelled him" [sic] (with "they," on information and belief, referring to Kenyon officials who spoke to Jane after John was arrested). According to that Report, a witness told the Investigators John was "'definitely unaware of the sexual case being built against him.'"

49.     On December 21, 2019, the Investigators issued their Final Investigative Report. Most significantly, the Investigators rejected Jane's foundational claim of ongoing and persistent abuse, stating that "[u]p until the September 13, 2019 incident, [Jane] seemed to be taking [John's alleged] negative behavior in stride, keeping her grades up, and ***actively and enthusiastically participating in the relationship***."

50.     Notwithstanding that determination, the Investigators found John responsible for Policy violations in connection with three incidents: alleged nonconsensual sexual intercourse and contact on the night of September 13, 2019; an incident eight months before (on January 18, 2019), where Jane claimed John had been drunk and pushed her down a hill and John said he had accidentally fallen into her, causing her to fall with him; and an incident seven months before (on February 2, 2019) stemming from an argument between John and Jane, where Jane claimed John had hit her, John denied this, and the Investigators concluded he had "attempted to strike" Jane.

51.     With respect to these findings, the Investigators stated that they accepted Jane's version of events over John's because they found Jane more consistent, credible, and reliable than John.

52.     The credibility determinations Kenyon made against John and in favor of Jane were not rationally based on the evidence and not consistent with Kenyon's obligations under the Policy.

53.     The Investigators did not explain how they could reject Jane's foundational claims of abuse and still repeatedly say she was consistent and credible.

54.     The Investigators failed to probe or justify the obvious inconsistency between Jane's acknowledged, persistent pressure on John to have sex on September 13/14 and the finding of a nonconsensual sexual encounter.

55.     The Investigators' conclusion that Jane was incapacitated on September 13/14 and that John should have known she was incapacitated was sheer speculation, contradicting all the witnesses who saw Jane and John as well as other objective evidence. The Investigators failed even to acknowledge that within half an hour of the alleged sexual encounter, Jane had a completely lucid, coherent, logical, and calm videotaped conversation with Kenyon Campus Safety officers and a sheriff's deputy where she said she was mad that John was trying to send her home, she had wanted to "hook up" with him, and he hadn't done anything wrong.

56.     In each of their findings of responsibility, the Investigators' reasoning reveals they started with an assumption Jane was telling the truth; selected and interpreted evidence with the goal of supporting that assumption; disregarded other facts contradicting her claims (including evidence about the patterns of their relationship, which the Policy confirms was relevant); claimed to be relying on corroborating evidence but instead based findings on speculation and mischaracterization of evidence; put the burden on John to refute Jane's claims; denied John access to information he needed to do so; denied John the opportunity to test Jane's and other witnesses' narratives before an impartial decisionmaker; found John incredible based on illogical speculations; and ignored the role of the Kenyon Campus Safety Officers who improperly detained John, instigated criminal charges against him, pressured Jane to consider John abusive even when she said he had done nothing wrong, and thus infused prejudgment and bias against John from the outset of the process.

57.     In stark contrast to their deferential treatment of Jane, the Investigators speculated that John's decision not to specify whether the parties had sex the night of September 13 must mean he was denying it, and cited that as the only specific reason to find him incredible. This

violated the Policy, which gave John the right to withhold a statement without having it held against him, and which requires decisions to be made based on evidence, not on speculation.

58.    A Kenyon Adjudicator issued a sanction decision on January 11, 2020, dismissing John from Kenyon and barring him from campus.

59.    The Adjudicator's sanction decision was based on the Investigators' findings and was thus infected by the same flaws and errors.

60.    John filed an appeal pursuant to the Policy, and his appeal was denied on February 27, 2020.

61.    When John reminded the Appeals Officer of Kenyon's obligation to follow the law, including the Sixth Circuit precedent requiring schools to allow respondents to question complainants and witnesses in a live hearing before impartial factfinders, the Appeals Officer responded that this was "irrelevant, since the College is only obligated to follow its Policy, and the Policy does not allow for cross-examination in its process."

62.    The Policy specifically commits, however, that the College will conduct all proceedings in compliance with state and federal law. See below, Paragraph 97.d.

63.    Contrary to Kenyon's Policy, the Appeals Officer refused to acknowledge or correct the Investigators' material procedural errors and the clearly erroneous outcome, and did not address John's specific arguments and evidence.

64.    All of the Kenyon officials involved in this matter demonstrated a presumption that John was responsible. This is consistent with the approach Kenyon supports on its website: that people who claim to have encountered sexual misconduct are "survivors" who have "experienced a horrific and traumatic event," that their claims should "NEVER" be disbelieved, and that "[a]sking questions regarding details of the assault/harassment, why the individual was

11

at a specific place, doing a specific behavior, etc. only works to place blame on the survivor for the violence/harassment of the perpetrator. No matter what their behavior prior to the assault, they are NOT responsible - the perpetrator is." https://www.kenyon.edu/directories/offices-services/ocr/title-ix-vawa/additional-resources/how-to-help-a-friend-or-family-member/.

65.     Kenyon applied this approach only when it considered claims by Jane, a woman, against John, a man. When John reported that Jane had engaged in "Prohibited Conduct" under the Policy, Kenyon took no action.

66.     During the investigation, John gave the Investigators evidence that Jane had sexually harassed, pressured, and coerced him, and indeed, that he had been resisting Jane's sexual pressure on the night of September 13.

67.     John also gave the Investigators evidence that Jane had blatantly lied to the Investigators about both the overall nature of their relationship and specific incidents, and had engaged in a pattern of vindictive behavior and exaggerated reactions.

68.     All of this is Prohibited Conduct under Kenyon's Policy.

69.     Kenyon does not require individuals alleging potential violations of its Policy to make formal complaints, but commits to actions it will take in "*every case*." (Policy, Section XI) (emphasis added).

70.     Under the Policy, Kenyon was obligated to take John's reports as seriously as they took Jane's, give him the support and protections it gave her, consider her patterns of behavior, and investigate and resolve his reports just as it did hers.

71.     Kenyon did not, however, open an investigation of Jane's Policy violations or consider them in deciding the claims against John.

72.     When John raised this point in his appeal, the Appeals Officer's response was that he could make a complaint now. She did not address Kenyon's failure to honor its Policy obligations when he first reported Jane's misconduct.

73.     The Investigators also retaliated against John for exercising his right to defend himself and report Policy violations by Jane. When he submitted personal and intimate evidence to contradict Jane's false narrative of abuse, they chastised him for sharing materials that showed her in "vulnerable and compromising situations," falsely said the evidence was not relevant, and refused to consider it.

74.     Both as written and as applied, Kenyon's policies and procedures are deliberately designed to protect and favor women. Kenyon knows that the vast majority of students who allege sexual assault are women and that its policies and procedures have a disproportionately negative impact on male students. On information and belief, motivated by its knowledge of the negative impact on men, Kenyon discriminated against John because of his gender and in violation of Title IX.

75.     Kenyon's erroneous findings and sanctions against John, unjustifiably labeling him as a sexual offender, have caused him irreversible financial, social, and reputational harm, including irreversible damage to his educational, post-graduate, employment, and earning prospects.

76.     Kenyon has continuously discriminated against John in violation of Title IX, retaliated against him for his protected activity under Title IX, and breached its contractual obligations and promises to John.

## II.     JURISDICTION AND VENUE

77.     This Court has original jurisdiction over Counts I and II, John's Title IX claims, pursuant to 28 U.S.C. § 1331 because those claims arise under the laws of the United States. This

13

Court has supplemental jurisdiction over Counts III and IV pursuant to 28 U.S.C. § 1367 because those claims are so related to John's Title IX claims that they form part of the same case or controversy under Article III of the United States Constitution.

78.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because the Plaintiff and the Defendant are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

79.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this district and the Defendant is a resident of the state in which the district is located.

## III.    PARTIES

80.     Plaintiff John Doe is a citizen of the state of California and resides in California.

81.     Defendant Kenyon College is a private educational corporation organized under the laws of the State of Ohio, with its main campus located in Gambier, Ohio.

## IV.    FACTS COMMON TO ALL CLAIMS

### A.    Federal statutes and regulations forbidding gender discrimination and retaliation and requiring prompt and equitable disciplinary proceedings

82.     Title IX provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

83.     Defendant Kenyon College is a recipient of federal funds and is therefore bound by Title IX and its regulations.

14

84.     As interpreted by federal courts, Title IX protects students attending federally-funded educational institutions from sexual harassment and assault, discrimination based on gender, and retaliation for having exercised rights protected by Title IX.

85.     A federally-funded educational institution violates Title IX if it subjects a male student to adverse treatment because of his gender.

86.     A federally-funded educational institution violates Title IX if it retaliates against a student by taking adverse action against the student in response to the student's exercise of a protected right under Title IX, including but not limited to the student's right to file a report of sexual assault or a report of gender discrimination or defend himself against accusations of sexual misconduct.

87.     Complementing Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act is a federal statute requiring federally-funded educational institutions to maintain and disclose campus crime statistics and security information. 20 U.S.C. § 1092(f).

88.     Under the Clery Act, as amended in 2013, school disciplinary procedures for alleged sexual misconduct must "provide a prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa).

89.     The United States Department of Education's regulations implementing Title IX, as issued in 1975, require federally-funded educational institutions to "adopt and publish grievance procedures providing for prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited" by Title IX and implementing federal regulations. 34 C.F.R. § 106.8(b).

90.     Regulations implementing the Clery Act require that campus Title IX proceedings:

     a.   "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result";

     b.   be conducted by trained officials;

     c.   be conducted in a way that is "consistent with the institution's policies and transparent to the accuser and accused";

     d.   give "timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings";

     e.   be "[c]onducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused"; and

     f.   include in "any initial, interim, and final decision by any official or entity authorized to resolve disciplinary matters" "the rationale for the result and the sanctions." 34 F.R. § 668.46(k).

91.     The regulations also prohibit retaliation: "An institution, or an officer, employee, or agent of an institution, may not retaliate, intimidate, threaten, coerce, or otherwise discriminate against any individual for exercising their rights or responsibilities under any provision in this section." 34 CFR § 668.46(m).

**B.     OCR's 2001 Guidance affirming the requirement that disciplinary proceedings be prompt and impartial**

92.     In 2001, after a public notice and comment period, the U.S. Department of Education's Office for Civil Rights ("OCR") issued a document entitled "Revised Sexual

Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance") (https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf).

93.     OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable." *Id*. at 20. These elements apply to private and public colleges and universities and include "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence," and "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process." *Id*.

94.     OCR's 2001 Guidance further stated that *"[a]ccording due process to both parties involved, will lead to sound and supportable decisions*." *Id*. at 22 (emphasis added). Title IX's "due process" requirement applies to both public and private colleges and universities. *Id*. at 2, 22.

## C.     Kenyon's governing policies and procedures

95.     At the time of John's disciplinary proceeding, Kenyon handled Title IX complaints under its Sexual Misconduct and Harassment Policy, 2019-2020 (Exhibit B). The Policy was published on Kenyon's website and thus provided to students.

96.     Kenyon also published and provided to students a Student Handbook, which sets forth the overall rights and responsibilities of Kenyon students (Exhibit A).

97.     The Sexual Misconduct and Harassment Policy commits to the following:

a.   "[F]ostering a climate free from sexual and gender-based discrimination, harassment and violence, intimate partner violence and stalking through clear and effective policies, a coordinated education and prevention program, and prompt and equitable procedures for resolution of reports of conduct prohibited under this policy." (Ex. B, Policy, Section I.)

17

b. That the College will not "discriminate in its educational programs and activities on the bases of . . . sex [or] gender." (*Id.*, Section III.) Section VI.B, Sex/Gender Discrimination, states:

> Discrimination occurs when a behavior or policy has the purpose or effect of restricting or denying an individual's or group's access to opportunities, programs, or resources in relation to sex, gender, gender identity, gender expression, or sexual orientation in a manner that interferes with an individual's working, academic, residential, or social environment or athletic participation or performance.

The examples of discrimination it provided included: "[t]reated differently in determining whether such person satisfies any requirement or condition for the provision of any aids, benefits, or services"; "[p]rovided different aid, benefits, or services"; "[p]rovided aid, benefits, or services in a different manner"; "[d]enied any aids, benefits or services"; "[s]ubjected to separate or different rules of behavior, sanctions or other treatment"; "[d]iscriminated against by providing significant assistance to any agency, organization or person which discriminates on the basis of sex in providing any aid, benefit, or service to students, faculty or employees"; or "[o]therwise limited in the enjoyment of any rights, privileges, advantages or opportunities with regard to aids, benefits or services."

c. "[T]aking all appropriate steps to eliminate prohibited conduct, prevent its recurrence and address its effects." (*Id.*, Section I.)

d. That "[a]ll College proceedings under this policy are conducted in compliance with the requirements of Title IX, the Clery Act, as amended by the Violence Against Women Act, the Family Educational Rights and Privacy Act (FERPA), and state and federal law." (*Id.*, Section I.)

e. "Best efforts . . . to complete the process in a timely manner by balancing principles of thoroughness and fundamental fairness with promptness." (*Id.*, Section XI.F.1.)

f. A "prompt and equitable response to reports of Prohibited Conduct," "guided by principles of fairness and respect for all parties." (*Id.*, Section XI, XI.A.)

g. That "[a]ny investigator used by the College must have specific training and experience investigating reports of Prohibited Conduct. . . . The investigators will be impartial and free of any actual conflict of interest." (*Id.*, Section XI.F.1.)

h. An "adequate, reliable, thorough, and impartial investigation." (*Id.*, Section XI.)

i. Giving the parties "[a]gency and autonomy to decline to participate in an investigation or resolution under the policy." (*Id.*, Section XI.A.) The Policy does not notify respondents that investigators may hold silence against them or guess what a respondent would have said if he spoke.

j. Giving the parties the right to "provide evidence during the investigation." (*Id.*, Section XI.A.)

k. An investigative Report that "summarizes the relevant information gathered and synthesizes the areas of agreement and disagreement between the parties and any supporting information or accounts," based on a review of "all facts gathered to determine whether the information is relevant given the allegation." (*Id.*, Section XI.F.2.)

l. "[A] determination, by a preponderance of the evidence, whether there is sufficient information to support a finding of responsibility. . . . The preponderance of the evidence is the standard whereby all relevant and admissible

19

information is found to support, more likely than not, the allegations." (*Id.*, Section XI.F.3.) Kenyon's Student Handbook defines "preponderance of the evidence" as "based on the more convincing evidence and its probable truth or accuracy, and not on the amount of evidence. Thus, one clearly knowledgeable witness may provide a preponderance of evidence over a dozen witnesses with hazy testimony." (Handbook at 38.)

98. The Policy's provisions regarding consent include the following:

a. "Individuals who choose to engage in sexual activity of any type with each other must first obtain clear consent. Consent is clear, knowing, and voluntary permission. . . . Consent is demonstrated through mutually understandable words or actions that clearly indicate a willingness to engage freely in sexual activity." (Policy, Section VII.A.)

b. "Withdrawal of consent should be outwardly demonstrated by words or actions that clearly indicate a desire to end sexual activity." (*Id.*, Section VII.A.)

c. "Individuals with a previous or current intimate relationship do not automatically give either initial or continued consent to sexual activity. Even within the context of a relationship, there must be mutually understandable communication that clearly indicates a willingness to engage in sexual activity each time." (*Id.*, Section VII.A.)

d. "[I]f the existence of consent is at issue, the sexual history between the parties may be relevant to help understand the manner and nature of communications between the parties and the context of the relationship, which may have bearing on whether consent was sought and given during the incident in question.

However, even in the context of a relationship, consent to one sexual act does not, by itself, constitute consent to another sexual act, and consent on one occasion does not, by itself, constitute consent on a subsequent occasion." (*Id.*, Section XI.F.1.)

99. The Policy's provisions regarding incapacitation include the following:

a. Incapacitation – not simply intoxication – negates consent. (*Id.*, Section VII.D.)

b. "Evaluating Incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects an individual's . . . [ability to] appreciate the who, what, where, when, why, or how of a sexual interaction." (*Id.*, Section VII.D.)

c. "Evaluating Incapacitation also requires an assessment of whether a respondent was or should have been aware of the reporting party's Incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the respondent's position." (*Id.*, Section VII.D.)

100. The Policy prohibits false statements: "All parties and witnesses are expected to provide truthful information. Knowingly providing false or misleading information is a violation of College policy and can subject a student or employee to disciplinary action." (*Id.*, Section XI.F.1.)

101. The Policy prohibits retaliation: "Kenyon College policy prohibits any form of retaliation and community members engaging in retaliation will be subject to disciplinary action, whether such acts are implicit or explicit, or committed directly or indirectly." (*Id.*, Section I.) Prohibited retaliation includes "presenting knowingly false information in an investigation . . . .

Any individual or group of individuals, including but not limited to a complainant or respondent, can be held accountable for retaliation under this policy." (*Id.*, Section VI.K.)

102.    When a student reports conduct that could violate the Policy, as John did to the Investigators regarding Jane's conduct and false statements, the following provisions apply:

    a.   "Any individual can be a reporting party or complainant, even if the complaint the person is making regarding prohibited conduct is against someone who has brought a complaint against that person. . . . Regardless of when, where or with whom the conduct occurred, the College will offer resources and assistance to any individuals who have been affected by Prohibited Conduct." (*Id.*, Section II.)

    b.   No particular formalities are required for making a report, and all College employees are responsible for notifying the Title IX Coordinator when they learn of conduct that could violate the Policy. (*Id.*, Section IX.B.)

    c.   The Title IX Coordinator will "be informed of all non-confidential reports of Prohibited Conduct, and will manage the College's centralized review, investigation, and resolution of those reports to ensure the College's compliance with Title IX and the effective implementation of this policy." (*Id.*, Section IV.)

    d.   The Title IX Coordinator is "[k]nowledgeable and trained in College policies and procedures and relevant state and federal laws." (*Id.*, Section IV.)

    e.   "At the time a report is made, a reporting party does not have to decide whether or not to request any particular course of action, nor does a reporting party need to know how to identify what happened. Choosing to make a report, and deciding how to proceed after making the report, can be a process that unfolds over time.

*The College provides support that can assist a reporting party in making these important decisions*. . . ." (*Id.*, Section IX (emphasis added).)

f.  "In *every case*, the College will conduct an assessment and determine the most appropriate manner of resolution under the policy." (*Id.*, Section XI (emphasis added)).

g.  The complaining party is entitled to all of the procedural protections of the Policy – notice of rights, resources, and procedural options; a prompt initial assessment ("consider[ing] the interest of the reporting party" (*id.*, Section XI.B)); an assessment for "pattern evidence or other similar conduct by respondent"; a written notice of the manner of resolution the Title IX Coordinator concludes is appropriate; an investigation (unless the Title IX Coordinator declines to pursue the investigation and so notifies the reporting party in writing); a determination regarding responsibility; and, where applicable, sanctions and "[p]rompt remedial action if Prohibited Conduct is determined to have occurred" (*id.*, Section XI) – all of which Kenyon gave to Jane when she complained about John, but not to John when he told the Investigators of her conduct and her false statements.

103.    Kenyon's Student Handbook describes the overall rights and responsibilities of Kenyon students.  (Ex. A, Handbook).

104.    The Student Handbook provides that dishonesty in any form, including misrepresentation or false statements, "is an extremely serious offense that may result in suspension or dismissal from the College" (Ex. A, Handbook at 14); that Kenyon "is committed to fostering a climate free from sexual and gender-based discrimination, harassment and violence, intimate partner violence and stalking through clear and effective policies, a

coordinated education and prevention program, and prompt and equitable procedures for resolution of reports of conduct prohibited under this policy" (*id.* at 23); that Kenyon "will not tolerate retaliation against an individual who makes a report or participates in any proceedings under this policy"; and that "community members engaging in retaliation will be subject to disciplinary action, whether such acts are implicit or explicit, or committed directly or indirectly" (*id.*).

105.    The Student Handbook provisions for students accused of non-sexual misconduct (including physical assault) include specific rights the College denied to John: "to an unbiased hearing and one based on evidence presented at the hearing"; "to remain silent; silence is not construed as culpability"; "to review all relevant written documents prior to the hearing"; "to present evidence and witnesses" at the hearing; "to question all evidence and information, as well as witnesses and the complainant"; and "not to self-incriminate." (Handbook at 33-34, 42, 45.) The Handbook further provides: "Respondents will be considered not responsible until determined otherwise, and it shall be the responsibility of the complainant to establish the facts supporting his or her claim." (*Id.* at 37.)

106.    The Student Handbook defines physical assault to include some of the conduct of which John was accused, in particular the allegations regarding January 18 and February 2, 2019. (*See* Handbook at 3-4.)

107.    Kenyon acknowledges on its web site that "Kenyon College Campus Safety Officers do not have the right to physically detain anyone, except as provided by law." https://www.kenyon.edu/directories/offices-services/campus-safety/crime-statistics-2/security-and-crime-reporting-information/.

24

108.    Kenyon publishes an annual Security and Fire Safety Report pursuant to the Clery Act.

109.    In the Report for 2019, https://www.kenyon.edu/files/resources/20190924_asr-2.pdf, Kenyon included many of the same representations it made in its Policy, including representations that it does not discriminate on the basis of sex or gender (p. 5); that campus safety officers do not have the right to physically detain anyone (p. 8); that Kenyon does not tolerate sexual misconduct and is committed to preventing it through "clear and effective policies, a coordinated education and prevention program, and prompt and equitable procedures for resolution of reports of conduct prohibited under this policy" (p. 13); that no formal steps are required in reporting prohibited conduct and that Kenyon "provides support that can assist a complainant" in deciding how to proceed (p. 14); that employees involved in implementing the policy "will receive regular in-depth training to ensure a timely, sensitive, respectful and effective institutional response"; and that "[t]he Civil Rights/Title IX Coordinator is responsible for oversight, coordination and assessment of prevention and training programs on campus, in collaboration with appropriate departments and personnel." (p. 23).

### D.    Jane and John's relationship

110.    In September 2019, John and Jane had been in an exclusive dating relationship for 19 months, since February of 2018.

111.    Their relationship was serious and was not limited to the campus or school year. They traveled together, met each other's families, and spent substantial time together.

112.    Both John and Jane asked the Investigators to consider the history and context of their relationship when making their decision.

113.    Jane cited "the entire relationship . . . as part of a constellation of evidence of domestic abuse and an abusive relationship."

25

114.    The only evidence she submitted of this, apart from her own self-serving statements, was a few carefully selected texts she had sent to her friends.

115.    In contrast to Jane, John gave the Investigators extensive evidence from their relationship: pictures, videos, love notes from Jane, and 32,000 texts stored on his phone starting March 2, 2019 (the date he got a new phone).

116.    The evidence established that Jane's foundational narrative of abuse and unhappiness was completely false. Specifically, it showed Jane had repeatedly and consistently initiated sexual contact with John and at some point became the primary initiator of sex, introduced sex toys into their relationship, professed love for him, and took every opportunity to be with him, even after incidents she later included in her Title IX complaint as examples of "atrocities" John had allegedly committed.

117.    There is nothing in the parties' communications to support Jane's claims of abuse, either in general or on any specific occasion.

118.    The evidence also provides context regarding the week leading up to the events of September 13/14, 2019.

119.    In Jane's Title IX complaint, she stated that John told her on September 7, 2019, that he wanted to break up with her, then took it back, and that this left her "sad and confused and sobbing." In texts within the next few days, she told him she was afraid he was going to dump her and was emotionally fragile and scared about that.

120.    The day after the discussion about breaking up, Jane told her friend "Witness A" about it in a series of texts. Witness A observed, "you guys are young and in love." Jane said, "I love him. And for the most part like being with him. Like almost always. Except for times like last night." Several days later Jane told Witness A she was furious because John had an ex-

26

girlfriend's name stored in his phone and a message from the ex-girlfriend saying he should "dump" Jane. Jane concluded: "Like if I honestly assess it it's bc he sees a future with her and not me."

121.    In Jane's Title IX complaint, she said that for the rest of that week she did not want sex, that John tried to hook up with her at the river on September 12, and that she declined "over and over again."

122.    John and Jane's September 12 text messages prove she was making false statements. Texts John shared with the Investigators show they had friendly exchanges all day, starting with John apologizing for being grumpy and Jane saying she was not mad. She urged him repeatedly to go swimming and he agreed to pick her up around 6 p.m. eastern time. Later that evening he went to a party and she texted him at about 9 p.m., saying "If you're looking for a girl to f**k later please choose me." She then told him repeatedly that she loved him and that he was "so good" to her, acknowledging that her texts "seem[] like a weird response to such a noncommital text by you." At 9:23 p.m. she told him she is "v v v v down to f**k. If not I think ill [sic] make it." At 10:49 p.m. she asked: "Would you be interested in getting f**ked or is sleep the best option?" After she sent multiple follow up texts that he did not answer, she said she actually did not want to, to which he responded "Haha ok baby." She then said "I kinda wanna have Sex but not enough to leave my room," then said she did not want John to go to another girl, then said "Idk j don't think I've ever turned down sex before."

    E.    **Events of September 13/14, 2019**

123.    Regarding September 13/14, 2019, below is a timeline of events, based on Jane's own admissions and other undisputed evidence.

a. *September 13*

  i. During the day: Jane said in her Title IX complaint that she and John had sex briefly between morning and afternoon classes, and it was her idea for them to go out together that evening. Per the Report, she told Investigators sex was "not particularly satisfying" and they "talked about trying to have sex again sometime later that day, but nothing worked out."

  ii. 7:30 p.m.: Jane and John texted about him coming to pick her up. Jane asked: "Are we using toys?" and "Is that something I leave wearing?" As confirmed by other texts John provided, the reference was to a vibrating sex toy that Jane bought and liked to use as foreplay; it can be controlled by John's phone.

  iii. Approximately 10-11 p.m.: Jane and John went to a party at a friend's apartment. Several witnesses saw them making out on the dance floor and being extremely affectionate with each other.

b. *September 14*

  i. Approximately 12 a.m.: John and Jane left the party to go to John's apartment.

  ii. Approximately 12:15 a.m.: They arrived at John's apartment.

  iii. Approximately 12:15-12:45 a.m.: They were in John's apartment. Jane later alleged a sexual encounter occurred which she did not remember.

  iv. Approximately 12:45 a.m.: They left John's apartment. Jane acknowledged she told John's roommates she was being kicked out, was "bitter," and wanted to sleep over, especially "considering how weird our last week had been" (i.e., according to Jane's Title IX complaint, a week in which they discussed the possibility of breaking up and "didn't hookup or even get sexual once").

  v. Approximately 12:55 a.m.: Jane and John argued about the fact that John wanted Jane to go home when she wanted to stay with him and have sex. Several bystanders, including a female student who served as a Kenyon Community Advisor, overheard a few words from the argument and approached them. The Community Advisor claimed John chest bumped her, though she did not claim to have been injured, and flagged down Kenyon Campus Safety officers who were passing by. One of the Campus Safety officers physically detained John, in violation of Kenyon policy. The officers spoke to John and Jane separately, and the sheriff's office was called.

vi. 1:07 a.m.: A sheriff's deputy was dispatched. Per the deputy's ten-minute body camera recording, a video of which is in the record of the disciplinary proceeding, the following then happened:

- A Kenyon Campus Safety officer told the deputy they had detained John and were not going to let him go "until we figure out what's with [John's] girlfriend, if she's been assaulted or whatever's going on."

- The deputy stopped Campus Safety from leaving with Jane and talked to her. She said "nothing" was going on. "We got into an argument, but it's not a big deal. I don't know. I think he's a good person and he didn't do anything wrong to me. . . . He just didn't want me to sleep over and then we got into an argument, and that's what – that's like the issue." The deputy asked her to explain the argument and she said, "He didn't want me to sleep over because it's really hot and I wanted to sleep over, and so he was walking me home to my dorm, which is right up there."

- Asked again by the deputy to "tell me about the argument that everybody else has witnessed," Jane said: "Like I don't think he did anything wrong to me. I was mad because we hadn't hooked up in like a week so I was asking him like why he didn't want to hook up with me and I think that's what they heard and he was mad at me and was trying to send me home." Her voice was clear and calm.

- Jane also said she did not see John push the Community Advisor (a story she later changed after deciding to make a Title IX complaint against John).

- A Kenyon Campus Safety officer told the deputy John was a "f**king asshole."

- The Community Advisor told the deputy she overheard Jane and John talking about consent and heard the terms "didn't get consent," though she did not say who used those terms or give any other context for them.

- The deputy asked the Community Advisor if she wanted to file charges on John and when she asked for advice said he could not give her legal advice.

- The Kenyon Campus Safety officer told the Community Advisor that John was being aggressive, speculated that he had a history of violence, and urged her to press charges. Specifically, the officer

29

stated: "So if this is how this guy acts . . . he's doing this to other people. . . . So if he's doing it to you as a woman, he's doing it to his girlfriend also. . . . So, in my opinion, he should go to jail. . . . He assaulted you." As a result, the Community Advisor said she would like to press charges against John and he was arrested.

vii. Between 1 and 1:30 a.m.: After John's arrest, the College Campus Safety officers took Jane back to their office, in Jane's words, "to be talked to about my relationship and the fact that they were scared for me." According to Jane, the officers told her they "felt they had enough evidence based on that one interaction to tell me I was in an abusive relationship." A female College Safety officer then took Jane back to her dorm to change clothes.

viii. 1:15 a.m.: Jane texted her friend Witness A that John "just got arrested. For raping me. Idk what's going on. *He didn't tho*."

ix. 1:14-2:39 a.m.: Jane texted her friend Witness B that John was arrested "for assault and rape," that "[t]hey wanna expelled him" [sic], and that "[t]his is all my [Jane's] fault."

x. Between 1 and 2 a.m.: Jane called her friend Witness C, who, according to the Report, told Investigators Jane said she wanted to stay with John and have sex, John told her he did not want her there, Jane had told John they didn't have sex, and "that's when [John] said he raped her."

xi. 1:20-1:40 a.m.: Jane sent John continuous messages saying that she was sorry, that "I told them you didn't do anything to me," that "J told them the truth," and that she loved him.

xii. Around 5 a.m.: Jane called John's mother to get money to bail John out. Jane then drove John's car to the jail with two of his friends to pick him up. Jane told friends John had ignored her, and told the Investigators John had said to her "'Why are you here? I thought you were too blacked out to take my call.'" One of the friends who was with her said otherwise: John greeted Jane with three big kisses and said "'I love you baby.'"

**F.      Jane's Title IX complaint**

124.    According to the Final Investigative Report, Jane met with Kenyon's Title IX Coordinator on September 16, 2019, and reported alleged violations of Kenyon's Policy.

125.    On information and belief, the Title IX Coordinator provided Jane with support and assistance in determining whether to file a formal complaint, as set forth in Kenyon's Policy.

126.     On or about September 20, 2019, Jane submitted a written complaint to Kenyon, more than 10 single spaced pages in which she claimed her entire relationship with John had been a "pattern of abusive behavior, physical, emotional, verbal, and now sexual." She said that he had subjected her to "constant verbal and physical abuse," that she had been miserable and terrified of him for their entire relationship, and that the events of September 13/14 were "simply the most recent on the list of atrocities he has committed against [her]."

127.     With respect to the night of September 13, Jane claimed "[John] raped me," though she also said she did not remember what occurred and acknowledged again that she had wanted to stay with him that night after the alleged rape. She also acknowledged that she realized in the days before the alleged rape that John was planning to break up with her.

128.     On October 10, Jane went to the Sheriff's Office to submit a written statement to support the Community Advisor's criminal charges against John. Though Jane said on camera on September 14 that John did nothing wrong and she did not see him bump the Community Advisor, she said in her October 10 statement that John "pushed [the Community Advisor] with [his] body," even returning to the statement to add in the word "aggressively."

**G.     The College's failure to follow its own procedures during John's disciplinary proceeding**

**1.     The investigation**

129.     On September 21, 2019, Kenyon's Title IX Coordinator notified John of Jane's complaint and told him he was immediately being placed on Restricted Access.

130.     By separate letter the same day, the Title IX Coordinator notified John she had decided to initiate a formal investigation of Jane's allegations against him.

131.     The notice identified potential Policy violations based on a list of "experiences" reported by Jane, which included the alleged events of January 18, February 2, and September 13/14, 2019.

132.     On September 21, 2019, Kenyon assigned two Title IX investigators to investigate the allegations made against John, gather any evidence, draft a report, and make a determination.

133.     The investigators interviewed Jane and others, including some of Jane's friends, some of John's friends, people who had observed John and Jane as they walked back to Jane's place in the early morning hours of September 14, and various Kenyon officials.

134.     As noted above, John was concerned about the criminal charges he was already facing and the possibility of further vindictive actions by Jane, and he exercised his right to remain silent with respect to the alleged sexual encounter with Jane on September 13/14, 2019. He otherwise participated in the investigation by submitting written statements and extensive evidence.

135.     The Investigators issued an Initial Report on October 24, 2019, and John was allowed to review a copy.

136.     The Initial Report included an introduction (including a list of witnesses and exhibits); a summary of Policy provisions and potential violations; and a "Summary of Information." The Report purported to be "a summary of the facts as agreed upon by the parties and the witnesses. When there is a difference in the accounts, it is noted in the report."

137.     In fact, the Report did not adequately summarize the facts or clarify what the parties and witnesses actually said in their interviews.

138. The Investigators included snippets of statements from witnesses who overheard a few words of Jane and Jane's conversation the night of September 13 or to whom John talked after Jane claimed she had blacked out.

139. Not one of those witnesses was a first-hand observer of any encounter between Jane and John or part of any conversation between them.

140. According to the Investigators' summaries, several of the witnesses who saw Jane and John the night of September 13 heard them make references to "rape" and "consent."

141. The summaries of those witness's testimony were so vague and incomplete that John could not discern exactly what the witnesses told the Investigators or what questions the Investigators asked to elicit their statements.

142. Notably, the limited information the Investigators did provide showed that the witnesses had contradicted Jane's account. Jane insisted John had screamed "I raped you!" over and over again. The witnesses heard only a few words and said John was talking in a "conversational" or "apologetic" tone.

143. The Investigators' references to the testimony of witnesses to whom John spoke after the alleged September 13/14 encounter, and those interviewed in connection with the alleged incidents on January 18 and February 2, 2019, were similarly vague and incomplete.

144. John asked Kenyon's Title IX Coordinator for more complete records of the interviews to enable him to understand the full context of what the witnesses were asked and what they said. She refused.

145. The information John submitted during the investigation included the following.

146. John submitted an initial statement denying Jane's allegations of abuse and rape; noting his need to review the evidence, including statements of Jane and other witnesses; and

saying Jane had violated Kenyon's policies "by knowingly filing false allegations against me" and had "knowingly abused the College's policies in an effort to jeopardize my future at Kenyon College and beyond."

147.    John submitted the deputy's body camera footage from September 14, 2019.

148.    John submitted a 57-page response to the Initial Report. Among other things, he:

a.    Stated that he had never physically abused Jane or engaged in sexual conduct or contact without her consent.

b.    Stated, and provided documentary evidence, that Jane had persistently demanded sex and eventually became the sole initiator of sex; harassed, pressured, and coerced him when he was not willing; disparaged and berated him when he could not perform; engaged in controlling and manipulative behavior; and introduced handcuffs, blindfolds, a sex toy that could be controlled with a phone app, and a crop/whip into their relationship.

c.    Provided evidence of multiple specific false statements Jane had made.

d.    Provided evidence that Jane's claims of abuse, misery and terror in the relationship were false.

e.    Provided evidence of a pattern of vindictive behavior by Jane.

f.    Stated that his efforts to end the relationship during the week of September 6, 2019, had motivated Jane to make false accusations against him.

149.    John submitted a statement explaining that the things he had said to Jane and to friends after Jane told him she blacked out were a shocked reaction to Jane's claim, not an admission that she actually had blacked out or that he had done anything wrong. "I was explaining to her that if [her statement that she had blacked out] were true, then we could not be

together sexually and I should not stay at her house. I never stated that I raped anyone . . . Any reference to her as having blacked out in my text message to her was based solely on her statement that she had blacked out. I saw no signs of significant intoxication and she was certainly not impaired or incapacitated."

150.     John submitted reports by an expert toxicologist who stated - based on the information that Jane provided, the body camera video, and the observations of witnesses - that she was not incapacitated or even noticeably intoxicated; that alcohol intake "can impair memory whether one is over the legal limit or not"; and that a person can have a memory lapse without being "unconscious in any way and will often appear to be perfectly fine."

151.     In Jane's response to the Initial Report, she stressed repeatedly that her case was "first and foremost about the pattern. . . . [H]is abuse of me is not limited to the 3 incidents you outline in the summary of my statement [the alleged incidents of September 13/14, January 18, and February 2, 2019]. His abuse of me was psychological, emotional, and mental – as well as physical and sexual. . . . I can tell the sexual assault is being treated as the number one priority, however it is because of the domestic abuse that came before that it is so significant. . . ."

152.     As John pointed out in his final "summary statement" to the Investigators, Jane's "evidence," in addition to her own statements, consisted of selected texts she sent to her friends, curated to paint John in a negative light.

153.     In contrast to Jane, John gave the Investigators extensive documentation, which established that both Jane's overall narrative of abuse and many of her specific statements were false.

### 2. The Final Investigative Report and findings

154.    The Final Investigative Report was issued on December 21, 2019. In addition to the sections included in the Initial Report, it included a separate section titled "Analysis," which included findings on the charges against John.

### a. The Investigators' representations that they made their decisions in accordance with the Policy

155.    The Investigators represented in the Final Investigative Report that they had incorporated all relevant information into the report and had "followed the evidentiary standards outlined in the Policy," specifically, making "'a determination, by a preponderance of the evidence, whether there is sufficient information to support a finding of responsibility' . . . based on a review of all relevant and admissible information."

156.    The Investigators acknowledged that resolution of Jane's claims turned on credibility, and represented that they had reviewed evidence of the parties' relative credibility as well as the presence or lack of corroborative evidence.

### b. The Investigators' irrational credibility findings

157.    As set forth above, the Investigators rejected Jane's foundational narrative of ongoing and persistent abuse, stating that "[u]p until the September 13, 2019 incident, [Jane] seemed to be taking [John's alleged] negative behavior in stride, keeping her grades up, and actively and enthusiastically participating in the relationship."

158.    Nonetheless, Investigators stated that they found Jane "more credible and reliable" than John and found him responsible on charges relating to the alleged incidents on September 13/14, January 18, and February 2, 2019.

159.    As a threshold matter, the Investigators' credibility findings had no rational basis and were fundamentally inconsistent with the preponderance of the evidence standard.

160.    The Investigators failed to consider the impact of Jane's false recasting of the parties' relationship and specific false statements she made, disregarding the common-sense principle applied in legal proceedings that a witness who makes false statements should be considered not credible on any matter.

161.    Rather than consider the presence or absence of corroborating evidence, the Investigators selected and manipulated pieces of evidence to benefit Jane and ignored it when it contradicted her.

162.    In stark contrast to their deference to Jane, because John did not state whether or not he and Jane had sex on the night of September 13, the Investigators decided he was taking the position that they did not have sex. They then said that was a "significant change in [his] narrative," and used this manufactured inconsistency as a basis to find him incredible across the board.

163.    Throughout the Report, the Investigators focused more on what John did not say and what they inferred from his silence than on the information John did give them: that Jane persistently wanted to have sex with him; that he never sexually assaulted Jane; that he did not say he raped anyone; and that things he said to Jane and to his friends after Jane claimed she had blacked out were a shocked reaction to her claim of amnesia, not an admission that he had done anything wrong.

164.    Nothing in the Policy or in John's discussions with the Title IX Coordinator on how to proceed put him on notice that Investigators would hold his silence against him and make adverse credibility findings based on speculation. And the Student Handbook, which governs the rights of Kenyon students, expressly says a respondent has the right to be silent without having it construed against him.

### c. Flawed and erroneous finding regarding events of September 13/14, 2019

165.    In analyzing Jane's claims based on the events of September 13/14, 2019, the Investigators concluded first that it was more likely than not that Jane and John had sexual intercourse that night.

166.    They then said they would address three questions: whether there was consent, whether Jane was incapacitated and thus unable to consent, and third, whether John knew or should have known Jane was incapacitated.

167.    In addressing these questions, the Investigators failed to follow the Policy and reached an outcome with no rational basis.

### *Consent*

168.    With respect to consent, the Investigators first stated that the information John provided regarding the parties' history and patterns had "no relevance to this Investigation."

169.    Indeed, they condemned him for providing it, saying it "depict[ed] Complainant in vulnerable and compromising situations, that was likely meant to be kept inside the relationship and not released to third parties."

170.    Because John himself was concerned about the personal and sexual nature of that information, John did not provide it initially. He shared his concerns with the Title IX Coordinator, who advised him to review the Policy sections he was accused of violating: "After such review, if [John] determines he is in possession of evidence (text, voicemail, etc.) not yet submitted, and such evidence will, in his opinion, support that he is not responsible for the violation/s for which he is accused, [John] should submit the information in his response to the Updated IIR."

171.     Because the information directly contradicted Jane's fundamental claim that the relationship was abusive and unhappy and supported John's reports that Jane herself had violated Kenyon's Policy, he submitted it.

172.     The Investigators then penalized and retaliated against John for exercising his right, confirmed by the Title IX Coordinator, to submit evidence in his defense.

173.     The Investigators justified their rejection of John's evidence by saying the existence of a relationship "does not grant automatic consent for sexual acts" and citing the Policy's provision that "'even in the case of a relationship, consent to one sexual act does not, by itself, constitute consent to another sexual act, and consent on one occasion does not, by itself, constitute consent on a subsequent occasion.'"

174.     John has never claimed, however, that his relationship with Jane granted "automatic consent for sexual acts." The evidence he submitted regarding his history with Jane was relevant: first, to show that Jane's complaints against him were false and that she herself had violated Kenyon's Policy, and, second, under the Policy's provision that "if the existence of consent is at issue, the sexual history between the parties may be relevant to help understand the manner and nature of communications between the parties and the context of the relationship, which may have bearing on whether consent was sought and given during the incident in question." (Policy, Section XI.F.1.)

175.     John also submitted evidence relevant under the Policy's provisions that "[c]onsent is demonstrated through mutually understandable words or actions that clearly indicate a willingness to engage freely in sexual activity," and that parties may withdraw consent, but "[w]ithdrawal of consent should be outwardly demonstrated by words or actions that clearly indicate a desire to end sexual activity." (Policy, Section VI.A.)

176.    This evidence included Jane's own texts and statements to John, to friends, and to Campus Safety and police officers on September 13-14 that Jane was upset because John had previously suggested they break up, that she repeatedly expressed her desire for sex that day and night, that she was angry when John did not want to have sex with her, and that she said on that night that he had done nothing wrong.

177.    The Investigators consciously disregarded this evidence in making their findings, saying falsely that there was "no evidence that [Jane] consented to sexual activity on the night of September 13, 2019."

178.    Notably, Jane never denied her "willingness to engage freely in sexual activity." Her claim was that she could not remember what happened.

179.    The Investigators concluded that Jane's professed lack of memory, combined with out-of-context snippets of testimony from other witnesses regarding alleged references to rape and consent, was enough to conclude that Jane was incapacitated and thus could not have consented to sexual activity.

180.    This conclusion had no rational basis. The Investigators repeatedly selected evidence to support Jane's claims while ignoring evidence that supported John's.

181.    First, the Investigators did not reference the body camera video which was taken shortly after the alleged sexual encounter and shows Jane having an articulate, calm, and logical conversation with Campus Safety officers and deputies, telling them she and John had argued because she wanted to hook up and John wanted her to leave, and that John had done nothing wrong.

182.    Second, the Investigators relied on Jane's claim that John told her he had raped her. Jane's actual claim was that John repeatedly screamed "I raped you!", and the Investigators

ignored the evidence showing that was false. According to the Investigators' summary, the third-party witnesses to whom the Investigators gave "particular weight" – and who, as noted above, heard only a few words of John and Jane's conversation on the night of September 13 – said John was talking in a "conversational" or "apologetic" tone. Moreover, the excerpts of all the witnesses' testimony regarding what John said that night and the next day were fully consistent with John's statements that he was reacting in shock to Jane's claim that she had blacked out and was resisting Jane's sexual pressure; he was not accusing himself of rape.

183.    Third, the Investigators ignored specific evidence of false statements in Jane's complaint regarding the parties' relationship and her desire for sex. As set forth in paragraphs 121-22 above, Jane said in her complaint that John pressed her for sex on September 12 and she repeatedly declined. John submitted a series of texts between the parties showing that in fact Jane had repeatedly pressed *him* for sex. The Investigators took part of one page out of a lengthy exchange to support a statement that "Complainant tells Respondent on September 12, 2019 she doesn't want to have sex because she does not want to take another shower," and attached that excerpt as an exhibit which they labeled "September 12, 2019 text messages between Complaint [sic] and Respondent regarding having sex that night provided by Respondent." John did not select this text – he submitted the entire exchange. The Investigators highlighted what they thought supported Jane and ignored evidence showing her statements were false.

184.    Fourth, and similarly, the Investigators selected one page of a text exchange between the parties on September 13 to show the time John picked Jane up that evening and attached it as an exhibit, but ignored the texts showing her desire to have sex with him.

185.     Fifth, the Investigators used texts Jane sent to friends on September 14 to bolster her credibility, but ignored her texts to her friend Witness A at 1:15 a.m. on September 14, where Jane said John had been arrested for raping her and added: "He didn't tho."

186.     Sixth, during the investigation the Investigators obtained text messages from Jane's friend Witness A in which Jane told Witness A, shortly after Jane's conversation with John about breaking up, that she loved John, wanted to be with him, and was concerned that he saw a future with someone other than her. Though John had repeatedly asked for and received assurances that the Investigators had given him all the evidence they had gathered, the Investigators did not give him these texts until December 20, the day before they issued the final Report. John submitted a lengthy response on December 21, noting that the texts were only excerpts and pointing out in detail how the texts contradicted Jane's claims. Less than four hours later, the Investigators issued their 135-page Final Investigative Report without addressing John's arguments and, on information and belief, without taking the time to consider them. Indeed, they said Jane "told [Witness A] everything going on between her and Respondent," and apparently considered that to bolster Jane's credibility, leaving out the fact that what Jane told Witness A *contradicted* Jane's false narrative of abuse.

187.     There is no indication the Investigators questioned Jane on the inconsistency between her repeated expressions of desire for sex and their conclusion that sexual activity must have occurred without her consent because she said she did not remember it. There is no indication the Investigators questioned Jane on why, when she was separated from John and talking to law enforcement, and after John had allegedly used the term rape, she told them he had done nothing wrong. There is no indication the Investigators questioned Jane on why she told friends John had been arrested for raping her, which was not true, or that they considered the

evidence that Kenyon's Campus Safety officers wanted John expelled and pressured Jane to say the relationship was abusive.

188.     Because John was denied full records of Jane's and the witnesses' interviews and an opportunity to question them, he was unable to evaluate what Jane and the witnesses were asked or what they said in response, whether the Investigators adequately explored the context of what the witnesses heard or considered their statements in light of John's explanation of what he said, and whether the Investigators characterized their statements correctly.

### *Alleged incapacitation*

189.     With respect to incapacitation, the Investigators based their conclusions on speculation, not on evidence.

190.     The Policy provides that incapacitation is an inability to "appreciate the who, what, where, when, why, or how of a sexual interaction. . . . Where alcohol or other drugs are involved, Incapacitation is a state beyond intoxication." (Policy, Section VII.D.)

191.     The Policy states that "warning signs that a person may be approaching Incapacitation may include slurred speech, vomiting, unsteady balance, strong odor of alcohol, combativeness, or emotional volatility." (Policy, Section VII.D.)

192.     The evidence definitively established that Jane was not incapacitated the night of September 13.

193.     The body camera footage showed Jane's ability to communicate clearly with law enforcement officers.

194.     The Investigators did not even mention the video.

195.     Kenyon Campus Safety officers did not think she was intoxicated, much less incapacitated.

196.    The Investigators noted that testimony by the Kenyon Campus Safety officers in their summary of information, but did not address it in their analysis.

197.    None of the witnesses who saw Jane that evening thought she was incapacitated or exhibiting signs of incapacitation.

198.    The Investigators noted that testimony but then said: "Even though Complainant was not exhibiting the common signs of nearing incapacitation, it does not mean she could not be incapacitated."

199.    This statement by the Investigators directly contradicts the Policy and improperly turns the burden of proof on its head: decisions are supposed to be based on a preponderance of the evidence, not on speculation about what "could" have happened.

200.    John submitted reports from an expert toxicologist who stated based on the information that Jane provided, the body camera footage, and the observations of witnesses that she was not incapacitated or even noticeably intoxicated, and that a person can have alcohol-induced amnesia without it being physically apparent to others.

201.    Neither the Investigators nor Jane provided any evidence to dispute the scientific analysis performed by the toxicologist or the conclusions contained in his reports.

202.    The Investigators dismissed the expert reports without discussion, saying the "[t]he most relevant and persuasive evidence regarding Complainant's intoxication comes from witnesses who were present that night."

203.    That contradicts the Policy, which provides that decisions are to be based on ***all*** the evidence.

204.    *All* the evidence, including the body camera video and all the "witnesses who were present that night" corroborated the toxicologist's conclusion that Jane showed no signs of impairment or incapacitation.

205.    As the Investigators acknowledged, "[t]he only people who know what happened during that roughly thirty-minute period when Complainant says she blacked out are Complainant and Respondent."

206.    In reaching their conclusion that Jane was incapacitated, the Investigators simply accepted her statement that she did not remember what happened and looked for evidence to support it.

207.    For instance, the Investigators cited one witness's report that Jane's eyes were "red, glassy, and her face was puffy like she'd been crying," and witness statements that she was "very emotional" after they left John's apartment.

208.    Those statements are irrelevant to the definition and signs of incapacitation set forth in the Policy.

209.    They also ignore the evidence: Jane herself said she was upset because she wanted to have sex and John wanted her to go home.

### Alleged knowledge of incapacitation

210.    The Investigators' conclusion that John should have known Jane was incapacitated suffered from all the same flaws as their conclusion on incapacitation, and more.

211.    The same evidence that established Jane was not incapacitated also shows that John had no reason to believe she was incapacitated.

212.    As stated by John's expert toxicologist, a person can have alcohol-induced amnesia without it being physically apparent to others.

213.    The Investigators acknowledged that the evidence supported John's statement that he was not aware during any alleged sexual activity that Jane had blacked out.

214.    But then, instead of basing their decision on that evidence, the Investigators engaged in a string of speculations to conclude he should have known.

      a.  They questioned why Jane and John left John's apartment and why John seemed "pissed," ignoring Jane's own explanation – that John wanted her to leave and they argued because she wanted to stay and have sex.

      b.  They said John "presumably" was aware of Jane's alcohol intake and should have assessed whether Jane was "capable of consenting to sexual activity," ignoring John's testimony – corroborated by other witnesses and the expert toxicologist's assessment of Jane's blood alcohol level – that she showed no signs of incapacitation.

      c.  They seized on Jane's reference to a "name game" and John's failure to comment on it, as if a "name game" was the only way to determine whether someone can and does consent to sex, and considering Jane's allegations about their "pattern" while ignoring John's.

215.    All of this is completely contrary to the Policy, which states that incapacitation – not simply intoxication – precludes consent, and that the relevant assessment is "whether a respondent was or should have been aware of the reporting party's Incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the respondent's position." (Section VII.D.)

216.    With no evidence of "objectively and reasonably apparent indications of impairment," proper application of the preponderance of the evidence standard required a finding in John's favor.

### d. Flawed and erroneous findings regarding January 18 and February 2, 2019

217.    The Investigators' assessment and findings regarding the events of January 18 and February 2, 2019, are infected by the same basic flaws as those regarding September 13-14: they assumed Jane was telling the truth despite ample reason to question her credibility, they selectively used evidence to support findings in her favor, and they placed the burden on John to defend himself without giving him a complete record or the chance to question Jane and the witnesses before a neutral fact-finder.

218.    Regarding January 18, 2019, Jane said in her complaint that John "grabbed [her] and threw [her] down the hill."

219.    As John told the Investigators, he was drunk that night, and fell several times. Jane fell when she was trying to help him get out of a bush, and at one point he accidentally fell into Jane and she fell with him. John did not intentionally grab or push her.

220.    The Investigators' conclusion that "the incident on the hill was not an accident, and Respondent intended to cause her harm by pushing her down the hill" was not rationally supported by evidence and was not consistent with proper application of a preponderance of the evidence standard.

221.    To support their conclusion, the Investigators cited out-of-context snippets of statements of people who were not firsthand observers, but even those snippets were completely consistent with John's account.

222. Even according to the Investigators' summaries, none of the witnesses testified Jane had told them John hurt her intentionally.

223. The Investigators selected two pages from a series of texts Jane sent to her friend Witness B, focusing on one text saying, "He like threw me down a hill idk what's up it's wack man" and another saying he would not let her leave his room after the incident. The Investigators did not cite other texts in the same exchange where Jane said: "I know he was blacked out but it still hurt . . . . I mean I know he was super trashed and he doesn't mean it."

224. There are no texts or other evidence suggesting Jane expressed any concern about the incident to John.

225. The Investigators noted one witness's comment that Jane later "diminished the event, almost like it didn't happen."

226. The Investigators did not, however, address that comment in their analysis or consider how Jane's inconsistent statements contradicted her complaint.

227. As one example of how the Investigators mischaracterized evidence to support their conclusion, the Investigators said it was significant that Jane "got very drunk [the next night] and distanced herself from Respondent," saying that was "uncharacteristic of Complainant at this point in their relationship because the information provided suggests that she seemed to take every opportunity to see Respondent," and that "[t]his departure from Complainant's normal behavior further supports Complainant's account" that John intentionally caused her harm.

228. The Investigators cited no evidence Jane was distancing herself from John. The conclusion was pure speculation from statements of witnesses who said they wanted to take care of Jane when she was drunk and had a vague "impression" that she did not want to see John that night.

48

229.     The Investigators did not acknowledge the inconsistency between Jane's interest in taking "every opportunity" to see John and her claims of abuse.

230.     They also did not acknowledge their own inconsistency in saying that John's evidence about the patterns of their relationship were irrelevant to assessing Jane's conduct and consent, while using those patterns to make inferences against John.

231.     Regarding February 2, 2019, Jane claimed that John "struck [her] around her head and neck with his right arm."

232.     The evidence showed that John and Jane got into an angry argument and were yelling at each other.

233.     John acknowledged that he damaged some items in his room, but told the Investigators he did not direct any aggression toward Jane.

234.     While the Investigators once again included only snippets of witness statements in the Final Investigative Report, even the snippets they provided showed no witnesses or evidence corroborating that John hit Jane or tried to. The witnesses reported what Jane told them and her statements were inconsistent: sometimes she said John had hit her and other times that he tried to. For example, she texted one friend: "he never hit me though he tried once."

235.     The Investigators nonetheless said Jane's account was consistent, found her "more credible and reliable" than John, and found it more likely than not that John "***attempted*** to strike" Jane, making no finding on her actual claim – that he "struck [her] around her head and neck with his right arm."

### 3.     The sanction

236.     The Adjudicator's sanction decision was based on the Investigators' characterizations of the evidence and their flawed findings of responsibility, and is invalid for the same reasons.

### 4. The appeal

237. Pursuant to the Policy, John filed an appeal based on "procedural error(s) that materially affected the outcome" and the fact that "the decision of the investigators and/or adjudicator was clearly erroneous based on the evidential record." (Policy, Section XI.G, https://www.kenyon.edu/directories/offices-services/ocr/title-ix-vawa/kenyon-policies/title-ix-policy/.)

238. While John was preparing his appeal, he again asked the Title IX Coordinator for complete records of the Investigators' interviews. The Coordinator again refused, saying that the documents which are reviewed in an appeal are limited to the Final Investigative Report and Exhibits, the outcome letters, the letter of appeal, and the response.

239. Without the underlying records, neither John nor the Appeals Officer – nor this Court – could evaluate what the witnesses were asked or what they said in response, whether the Investigators adequately explored the context of their testimony or probed their credibility, and whether the Investigators characterized their statements correctly.

240. Kenyon gave Jane a copy of John's appeal, but refused to allow John to review a copy of Jane's response to his appeal.

241. On February 27, 2020, the Appeals Officer rejected John's appeal.

242. As an initial matter, she said the College's failure to provide the right of cross-examination "is irrelevant, since the College is only obligated to follow its Policy, and the Policy does not allow for cross-examination in its process."

243. She focused on John's decision not to sit for an in-person interview and suggested that due to the volume of material he submitted in response to Jane's sweeping allegations of abuse "the Investigators were limited in their ability to consider your information."

244.     She failed to address most of John's specific evidence and arguments, including his point that the Investigators could not reasonably find Jane credible after rejecting her foundational narrative of abuse; had disregarded the credibility issues posed by Jane's many inconsistent statements and the other witnesses and evidence contradicting her allegations; had looked through the voluminous evidentiary record to find evidence supporting Jane but ignored evidence showing her statements were false; had refused to consider relevant evidence regarding the patterns of their relationship; had not probed the inconsistency between Jane's acknowledged and persistent desire to have sex on September 13 and their conclusion that she could not have consented to alleged sexual acts; had not addressed the evidence that definitively established Jane was not incapacitated and John had no reason to think she was; had given him selected snippets of testimony rather than the whole record, then based key findings on those snippets without advance notice of or an opportunity to challenge how they would use the snippets; and had disregarded the role the College's Campus Safety officers played in instigating complaints against John.

**H.     Kenyon's failure to follow its own procedures requiring it to investigate John's reports of prohibited conduct by Jane**

245.     When Jane raised John's alleged Policy violations, Kenyon gave her the protections promised to a complainant under the Policy, promptly placed John on Restricted Access, assisted Jane in determining whether to file a formal complaint, and then investigated and decided all of the claims Jane made with respect to John. These ranged from claims that John had used the term "stripper" in discussing how she dressed, pressured her into foregoing a study abroad opportunity, caused her to miss classes, and prevented her from attending parties, to the claims of alleged sexual harassment and assault.

246.    John gave the Investigators information and evidence that Jane regularly harassed, pressured, and coerced him into sex even when he was unwilling (as she was doing the night of September 13), and disparaged and berated him when he could not perform adequately.

247.    John also gave the Investigators information and evidence that Jane had "knowingly abused the College's policies in an effort to jeopardize [his] future at Kenyon College and beyond," had falsely miscast their relationship as abusive, and had made numerous other false statements to the Investigators, and that this was part of a pattern of exaggerated reactions and vindictive behavior.

248.    The College's Policy provides that "[k]nowingly providing false or misleading information is a violation of College policy and can subject a student or employee to disciplinary action." (Section VI.K, XI.F.)

249.    Kenyon did not provide John with the protections promised to a complainant under the Policy, did not assist him in determining whether to file a formal complaint, did not investigate or decide John's claims against Jane, and did not assess the "pattern evidence or other similar conduct" John provided, all in violation of Kenyon's promises under the Policy.

250.    The "pattern" evidence John presented to investigators included evidence that on September 12, 2019, just the day before the events of September 13, Jane ranted about a professor who had taken points off on one of her assignments, using a string of expletives to describe him, wishing he would "die alone in a ditch" and go to "f**kign [sic] hell", and suggesting she was going to "blow up his spot," submit an "anonymous complaint" and "f**k up his wholeee scene."

251.    John also produced evidence of Jane's rants about a coach who asked her to give up a piece of exercise equipment so that he could work with a group at the gym, again using a

string of expletives and saying among other things that he "DESERVES DEATH AND PAIN AND SUFFERING," "HES RUIONED [sic] MY LIFE", "I'M GOKNA [sic] KILL HIM", and "I HOPE GE [sic] ROTS IN HELL."

252.    This pattern evidence should have been considered in evaluating Jane's credibility and in determining whether statements she made to friends about John's alleged behavior were reliable.

253.    The Investigators repeatedly relied on texts Jane sent to friends as evidence of Jane's credibility. The texts cited in paragraphs 250-51 further support John's position that the Investigators' reliance on Jane's texts to make credibility determinations had no rational basis.

254.    John raised these issues in his appeal.

255.    In response, the Appeals Officer stated only: "If you believe that your rights were violated by the Complainant, you have the opportunity to file a complaint against her under College Policy."

256.    The Appeals Officer did not address Kenyon's obligation, under its Policy, to address John's reports when they were first made.

## COUNT I - VIOLATION OF TITLE IX
## OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681-1688

257.    John repeats and realleges each and every allegation set forth above as if fully set forth herein.

258.    Kenyon's disciplinary proceeding against John, as detailed above, violated Title IX.

259.    Kenyon discriminated against John and deprived him of the benefits of its education program through its discriminatory, gender-biased implementation of its disciplinary

process, by expelling him as a result of that process, and by refusing to investigate his reports of misconduct by Jane.

> **A.** **Starting in 2011, the federal government pressured educational institutions to provide more protection to students alleging sexual assault, focusing on protection of women.**

260. In the years leading up to the incident in question, colleges in the United States, including Kenyon College, have been subjected to pressure from the federal government, the public, and members of college communities to take campus sexual misconduct more seriously, provide more protection to purported victims, and crack down on purported offenders.

261. On April 4, 2011, the OCR issued a "significant guidance document" commonly referred to as the 2011 "Dear Colleague Letter." *Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights* (Apr. 4, 2011) at n.1, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "2011 Dear Colleague Letter").

262. Although the letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. *See* Administrative Procedure Act, 5 U.S.C. § 553.

263. The press release announcing the letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence," and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented

coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college"; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages." *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence* (Apr. 4, 2011), https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administration-effort-help-nations-schools-ad.[3]

264.    The 2011 Dear Colleague Letter itself explicitly focused on protection of women, repeating the claim that "about 1 in 5 women are victims of completed or attempted sexual assault while in college" and stating that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol." *2011 Dear Colleague Letter* at 2 & n.3.

265.    The 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an

---

[3]    The "one in five" "statistic," regularly cited by government officials and many others as the basis for government policy decisions, disciplinary processes, training materials, and advocacy efforts, has been thoroughly discredited. *E.g.* https://www.washingtonpost.com/news/fact-checker/wp/2014/12/17/one-in-five-women-in-college-sexually-assaulted-an-update/?utm_term=.7f211e30541e; https://www.washingtonexaminer.com/no-1-in-5-women-have-not-been-raped-on-college-campuses; http://www.slate.com/articles/double_x/doublex/2015/09/aau_campus_sexual_assault_survey_why_such_surveys_don_t_paint_an_accurate.html. The Bureau of Justice Statistics' National Crime Victimization Survey reports a much lower rate of sexual assault: 6.1 per 1000 female students from 1995 to 2013, with the rate trending downwards. https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf. Similarly, advocates for reported victims often suggest false accusations of sexual assault are rare. These claims too have been disputed, have been undermined by some high profile cases, and do not appear to take into account the wide spectrum of situations in which complaints can be made. But regardless of the accuracy of these claims, the decision in any particular case should be based on the facts of that case, objectively and fairly assessed. One sexual assault is too many; one false accusation is too many.

adequate, reliable, and impartial investigation; similar and timely access to any information that will be used at the hearing; and adequately trained factfinders and decision makers.  *Id.* at 9-11.

266.    The letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent.

267.    Among other things, the 2011 Dear Colleague Letter directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant" (*id.* at 12); directed schools to take interim steps to protect complainants and "minimize the burden on the complainant" (*id.* at 15-16); "strongly discourage[d]" schools from allowing cross-examination of parties (*id.* at 12); and urged schools to focus on victim advocacy (*id.* at 19 n.46).

268.    The 2011 Dear Colleague Letter also stated that schools "must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred)," and must not use the "clear and convincing standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred)." *Id.*

269.    Given the fact that campus disciplinary proceedings lack key procedural protections provided in court litigation (including discovery, the right to active representation by counsel, rules of evidence, and independent judges and juries to make decisions), the existence of other governmental and public pressure discussed in more detail below, and the severe and lasting consequences of a finding of responsibility for sexual misconduct, the preponderance standard does not adequately protect accused students' rights.

270.    Even though the 2011 Dear Colleague Letter purports to be a "guidance" document and did not go through rulemaking procedures, OCR framed many of its directives, including the directive to use the preponderance of the evidence standard, as mandatory.

271.    Moreover, the 2011 Dear Colleague Letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." *Id.* at 16.

272.    The overriding purpose of the 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the *Brandeis* court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished." *Id.*

273.    The 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual misconduct proceedings as OCR wanted. *See How Sexual Assaults Came to Command New Attention*, NPR (Aug. 13, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.

274.    After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual misconduct, to adopt procedures that

do not safeguard the rights of the accused, and to train officials to start with the presumption that an accused student is responsible, all with a focus on protection of women.

275.    In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."  In addition, OCR advised schools to give employees and students "trauma-informed" training and said "hearings should be conducted in a manner that does not inflict additional trauma on the complainant." Questions and Answers on Title IX and Sexual Violence, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

276.    The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence." *Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault*, at 2, https://www.justice.gov/ovw/page/file/905942/download.

277.    The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding. *Id*. at 2, 17.

278.    Among other things, the Task Force supported the use of a single investigator model, which generally involves one school official serving as investigator, prosecutor, and decisionmaker and severely limits the respondent's ability to challenge the complainant's account.  *Id*. at 3, 14.

279.    The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." *Id.* at 3.

280.    The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs. *Id.*

281.    Ultimately, the Department of Justice funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." *End Violence Against Women International, Effective Report Writing: Using the Language of Non-Consensual Sex*, at 5, https://www.evawintl.org/library/DocumentLibraryHandler.ashx?id=43; *see also Campus Action Kit, Start by Believing*, https://www.startbybelieving.org/wp-content/uploads/2019/08/Campus-Action-Kit.pdf.

282.    Among other things, "Start by Believing" training directs investigators to:

a.    "recreate the entire reality of the sexual assault from the perspective of the victim";

b.    focus on evidence and statements that "corroborate the victim's account";

c.    include details not just about what happened, but about "what the victim was thinking and feeling," in order to create a "word picture" that "better support[s] prosecution";

    d.   "replace neutral words such as 'said,' 'told,' or 'asked'" with more "descriptive" words – e.g., say the "victim" "begged" or "pleaded," and the "suspect" was "ordering," "insisting," or "demanding";

    e.   "describ[e] all of the elements that contributed to the victim's experience of force, threat, or fear";

    f.   "<u>always use the language of non-consensual sex</u>"; i.e., instead of "terms that convey positive, mutual interactions such as 'sexual intercourse' [or] 'oral sex,'" "it is sometimes appropriate to use terminology from the penal code, such as 'rape' or 'sexual assault,'" or, alternatively "simply describe the parts of the body and the things the victim was forced to do with those parts of the body";

    g.   "highlight implausible, absurd, and/or changing explanations provided by the suspect regarding what happened";

    h.   "try to anticipate potential defense strategies and include the evidence and information necessary to counter these strategies"; and

    i.   "ensure that . . . reports include all of the evidence required to prove the elements of the offense and refute the likely defense, which in most sexual assault cases is going to be consent."

*Effective Report Writing: Using the Language of Non-Consensual Sex*, at 5, 7, 8, 10, 11, 12, 14, 23, 30 (emphasis original).

    283.   In sum, "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can greatly increase the likelihood that charges will be filed in the case and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim

than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'" *Effective Report Writing: Using the Language of Non-Consensual Sex*, at 37.

284.    In February 2014, Catherine E. Lhamon, then the Assistant Secretary of Education and head of OCR, told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth less than the people who assault them"; that school officials and she as "chief enforcer" needed to "radically change that message"; and that "if you don't want to do it together, I will do it to you." *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education (Feb. 11, 2014), https://www.chronicle.com/article/Colleges-Are-Reminded-of/144703.

285.    According to the Chronicle of Higher Education, college officials understood they had been given "crisp marching orders from Washington" to follow OCR's directives. *Id.*

286.    On May 1, 2014, as part of its aggressive enforcement policies following the 2011 Dear Colleague Letter, OCR published a list of 55 higher education institutions nationwide that were then under investigation for possible Title IX violations. *U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations* (May 1, 2014), https://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-ix-sexual-violence-investigations.

287.    According to the Chronicle of Higher Education, that number eventually grew to over 500. *Title IX, Tracking Sexual Assault Allegations,* Chronicle of Higher Education, https://projects.chronicle.com/titleix/.

288.    The sharp increase in the number of investigations – the overwhelming majority of which have involved alleged violations of the rights of complaining students, almost always female – was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result.

**B.    In response to government and public pressure, colleges and universities across the nation have adopted Title IX policies and procedures that are "victim"-centered and fundamentally unfair to accused students.**

289.    The threats and pressure from OCR have forced colleges and universities to change their policies, since virtually all colleges and universities in the country receive federal funding.

290.    In response to the federal government's directives and enforcement activities, schools across the nation have adopted special policies for disciplinary proceedings involving alleged sexual misconduct. The policies are administered by designated officials and include investigatory and decision-making processes, evidentiary standards, and appeal processes based on OCR's actual and perceived requirements. In many instances, the policies and processes offer accused students significantly less protections than students receive in other campus disciplinary matters, including matters involving allegations of serious non-sexual misconduct.

291.    In their policies for adjudicating Title IX complaints, many schools have gone even further than OCR's specific directives in adopting procedures favoring alleged victims (the great majority of whom are female) and essentially eliminating fair process protections for respondents (the great majority of whom are male).

292.    Following the model of the federally-funded "Start by Believing" campaign, schools routinely train their officials to apply trauma-informed and "#BelieveWomen" approaches in ways that lead them to presume that an alleged assault occurred, that a

complainant's account of an incident must be true, and that a complainant's subjective impressions determine whether conduct is sexual harassment or assault. Students are suspended or expelled without meaningful notice or opportunity to be heard and are left with records that permanently brand them as sexual offenders, devastate them personally, and severely impact their educational and career opportunities.

293.    The same kinds of training and guidance go to other members of the college community, and in this age of social media and the internet, the mere mention of a sexual misconduct accusation can have the same negative and ongoing effects as a finding of responsibility, even if the accused is exonerated.

294.    "Because the changes to the process were impelled in large part by the federal government, the issues presented [in any particular case] are not entirely unique, and not confined to a single campus." *Brandeis*, 177 F. Supp. 3d at 572.

295.    Numerous groups and organizations have spoken out against the legal and financial pressure exerted by OCR to force colleges and universities to find students accused of sexual misconduct (who are overwhelmingly male) responsible, in spite of the evidence or the lack of evidence.  (*See, e.g.*, Foundation for Individual Freedom in Higher Education (FIRE), Stop Abusive and Violent Environments (SAVE), Families Advocating for Campus Equality (FACE), and prominent Harvard and University of Pennsylvania Law School faculty members asserting that OCR's new rules violate the due process rights of the accused.)

296.    In the words of a judge considering college disciplinary procedures that "appear[] to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process:" "it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past. Whether someone is a 'victim' is a

conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision. Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion." *Brandeis*, 177 F. Supp. 3d at 573.

297.    Other federal and state courts, as well as some state legislators, have similarly expressed concerns that efforts to redress longstanding social problems are resulting in unfair processes and results in individual Title IX proceedings.

**C.    Starting in 2017, the Department of Education has modified its approach to Title IX enforcement, focusing on fairness to all parties.**

298.    In guidance documents issued on September 22, 2017, the Department of Education expressed concern that many schools have established procedures for resolving allegations that "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'" Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, provided guidance on procedural protections necessary for a fair, reliable process. 2017 Q&A, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

299.    On November 29, 2018, the Department published new proposed regulations for public review and comment. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*,

https://www.federalregister.gov/documents/2018/11/29/2018-25314/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal.

300. The proposed regulations represented the Department's effort to align Title IX regulatory requirements with basic principles of justice and court rulings requiring that people accused of serious misconduct receive notice, a fair hearing before unbiased decision makers, and a presumption of innocence. *Id.*

301. The proposed regulations set forth specific procedural protections including:

a. Provisions requiring schools to provide adequate notice of allegations and their applicable procedures, conduct full and fair investigations, collect and objectively evaluate both exculpatory and inculpatory evidence, create investigative reports that fairly summarize relevant evidence, provide fair hearings in front of unbiased decisionmakers (who cannot be the same people as the investigator(s)), and give respondents a presumption of non-responsibility.

b. Provisions requiring schools to allow both parties to review all the evidence related to the allegations (not just evidence the school considers relevant or intends to rely on), so that the parties can meaningfully respond to the evidence before the investigation concludes.

c. Provisions requiring schools to train officials to conduct impartial proceedings, not to rely on sex stereotypes, and not to base credibility decisions on a party's status as complainant or respondent.

d. Provisions requiring colleges and universities to provide a live hearing and allow advisors to the parties to cross-examine the other party and witnesses.

302.    The proposed regulations confirmed that "[a school's] treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX" and that "[a school's] treatment of the respondent may also constitute discrimination on the basis of sex under title IX." Proposed 34 C.F.R. § 106.45.

303.    On May 7, 2020, the Department of Education announced the final Title IX regulations. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* (to be published in the Federal Register; unofficial text available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf).

304.    Under the final regulations: "A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." 34 C.F.R. § 106.44(a), as amended.

305.    Section 106.45(b) sets forth the specific requirements for a formal grievance process.

306.    The required procedural protections include provisions the Department proposed in 2018, as summarized above in paragraph 301.

307.    The Department repeatedly emphasized that the protections it has mandated are rooted in longstanding principles of due process and fundamental fairness and apply to both private and public institutions. "[A]s the Department has recognized in guidance for nearly 20 years, Title IX rights must be interpreted consistent with due process guarantees." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, Supplementary Information, at 276.

308.     Section 106.45(a) confirms that a school's "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."

309.     As the Department explained: "In every case in which Title IX sexual harassment is alleged, the facts must be resolved accurately to further the non-discrimination mandate of Title IX, including providing remedies to victims and ensuring that no party is treated differently based on sex. . . . The [regulatory] grievance process aims to provide both parties with equal rights and opportunities to participate in the process, and to promote impartiality without favor to complainants or respondents, both because treating a complainant or respondent differently based on sex would violate Title IX, and because a process lacking principles of due process risks bias that in the context of sexual harassment allegations is likely to involve bias based on stereotypes and generalizations on the basis of sex." Supplementary Information, at 220, 277.

310.     The Department specifically noted that models that combine the investigative and adjudicative roles in the Title IX process (as Kenyon's model does) raise "an unnecessary risk of bias that may unjustly impact one or both parties in a given Title IX proceeding." Supplementary Information, at 1249.

**D.     Pro-"victim" bias violates Title IX.**

311.     Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily result in harsher treatment of men.

312.     Indeed, as noted above, efforts to provide more protections to reported victims of sexual misconduct have consistently focused on protection of women.

313.     As the new Title IX regulations confirm, any approach under which accused people are presumed guilty or deprived of the ability to defend themselves, or individual cases are resolved without full and fair consideration of the facts of each case, is contrary to this nation's fundamental principles and contrary to Title IX and the Clery Act's requirements of a "prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa); *see also* 34 C.F.R. 106.8(b) and 45 C.F.R. § 86.8(b) (quoted above).

314.     In the words of Justice Ruth Bader Ginsburg, fair process for the accused "must not be ignored and it goes beyond sexual harassment. The person who is accused has a right to defend herself or himself, and we certainly should not lose sight of that. Recognizing that these are complaints that should be heard. There's been criticism of some college codes of conduct for not giving the accused person a fair opportunity to be heard, and that's one of the basic tenets of our system, as you know, everyone deserves a fair hearing." Asked how to "balance the values of due process against the need for increased gender equality," Justice Ginsburg replied: "It's not one or the other. It's both. We have a system of justice where people who are accused get due process, so it's just applying to this field what we have applied generally." Jeffrey Rosen, *Ruth Bader Ginsburg Opens Up About #MeToo, Voting Rights, and Millennials*, The Atlantic (Feb. 15, 2018), https://www.theatlantic.com/politics/archive/2018/02/ruth-bader-ginsburg-opens-up-about-metoo-voting-rights-and-millenials/553409/.

315.     That measures to protect reported victims are generally equated with protection of women, and measures to ensure a fair process for respondents are generally equated with protection of men, has been starkly confirmed by responses to the Department of Education's 2017 guidance and its proposal in 2018 to amend Title IX regulations to ensure a fair process for both complainants and respondents.

316. Over 100,000 comments have been filed to the proposed regulations, with a common theme being allegations that the Department's efforts to restore fair processes in campus disciplinary proceedings were motivated by bias against women and disproportionately burden women.

317. To avoid gender discrimination, campus disciplinary proceedings should be fundamentally fair to all participants: complainants and respondents, women and men.

**E.      Both on their face and as applied, Kenyon's policies and procedures violate Title IX.**

318. Both on their face and as applied in this case, Kenyon's policies and procedures for handling allegations of sexual misconduct violated Title IX. Kenyon reached an erroneous outcome, selectively enforced its disciplinary procedures, applied archaic assumptions (among other things, criticizing John for violating Jane's privacy when he produced intimate information relevant to her charges and completely disregarding evidence of Jane's sexual misconduct, including evidence that on the night of September 13 Jane was putting sexual pressure on John and he was trying to resist it), and acted with deliberate indifference both to Jane's misconduct against John and to its officials' intentional violation of John's rights, all based on John's gender. Among other things, as set forth above, Kenyon:

   a. Instigated unwarranted charges and accusations against John, with a goal of having him criminally charged and expelled.

   b. Failed to comply with the legal requirement to provide John with a live hearing with the chance to question parties and witnesses in real time.

   c. Ignored and misapplied its own Policy and procedures.

   d. Reached a result-driven determination rather than reaching a decision based on a preponderance of all relevant evidence.

69

e.  Made credibility determinations against John and in favor of Jane that were not rationally based on the evidence.

f.  Relied on snippets of alleged witness testimony, refused to provide John with complete records of their interviews, and failed to give him a meaningful opportunity to challenge the evidence against him.

g.  Failed to question Jane's credibility in view of the Investigators' specific rejection of her foundational narrative of abuse and her many demonstrably false and inconsistent statements.

h.  Selected evidence to support Jane's narrative while ignoring evidence of her inconsistencies and false statements.

i.  Failed to correctly apply the Policy's definitions of consent and incapacitation.

j.  Failed to consider the history and patterns of the parties' relationship, which are relevant under the Policy.

k.  Failed to probe the inconsistency between Jane's acknowledged and persistent desire to have sex on September 13 and the conclusion that she could not have consented to sex that same night.

l.  Failed to address the evidence that definitively established Jane was not incapacitated on the night of September 13 and John had no reason to think she was, and based key findings on speculation.

m.  Made improper and speculative inferences from John's silence, and used a manufactured inconsistency to find him incredible across the board.

n.  Treated the parties differently based on their gender, in violation of Kenyon's own definition of discrimination as including "a behavior or policy [which] has

70

the purpose or effect of restricting or denying an individual's or group's access to opportunities, programs, or resources in relation to sex, gender, gender identity, gender expression, or sexual orientation . . ." and the examples of improper differential treatment included in the Policy.

o. Selectively enforced its Policy by treating the parties differently when they reported alleged Policy violations, taking Jane's reports seriously and giving her the rights of a complainant while disregarding and failing to pursue John's reports of Policy violations by Jane.

p. Failing to train its officials to handle sexual assault allegations fairly and impartially.

319. Kenyon's materials for training its officials at the time of John Doe's disciplinary proceedings are not public and are within its exclusive possession and control. Based on public statements regarding Kenyon's training and approach to sexual misconduct allegations, as well as on the way John's case was handled, John believes and therefore avers that Kenyon officials were specifically trained to believe female complainants, shape the evidence to support female complainants' claims, and discredit male respondents.

320. On information and belief, Kenyon's deficient policies and procedures for handling allegations of sexual misconduct were deliberately designed to subject male students as a group to less favorable treatment than female students, because Kenyon knew that most sexual misconduct complaints were against male respondents, and its policies and procedures on their face and as implemented by Kenyon intentionally accorded unequal treatment to respondents.

321. As interpreted and applied by the Kenyon officials who developed Kenyon's Policy and procedures and handled John's case, Kenyon's policies and procedures deliberately

disfavor male accused students by eliminating the most fundamental procedural safeguards for the accused, including but not limited to access to relevant evidence, an effective opportunity to present a defense, an unbiased hearing, an opportunity to question the accuser and other witnesses before impartial decisionmakers, and a decision based on evidence presented at the hearing.

322.    Kenyon's discriminatory purpose is particularly evidenced by the rights it gives to students accused of other kinds of serious misconduct, including physical assault, and did not give to John in this case. *See* paragraphs 40, 105.

323.    Kenyon adopted, interpreted, and applied its Title IX policies and procedures in response to pressure from the federal government, the public, and members of the Kenyon community to take campus sexual misconduct more seriously, provide more protection to purported victims, and crack down on purported offenders.

324.    At the time the 2011 Dear Colleague Letter was issued, Kenyon handled sexual misconduct claims under the same student conduct process it applied to other kinds of claims, as described in the Kenyon College Student Handbook.

325.    The 2011-2012 Handbook, for example, gave students accused of sexual misconduct the same rights as those accused of non-sexual misconduct, including the rights to an "unbiased hearing . . . based on evidence presented at the hearing"; to remain silent and not to self-incriminate; "to review all relevant written documents prior to the hearing"; and to question all evidence, witnesses, and the other party. Kenyon Student Handbook 2011-2012, https://web.archive.org/web/20120505170040/https://documents.kenyon.edu/studentlife/studenth andbook.pdf (as captured May 5, 2012).

326. For 2013-2014 and 2014-2015, sexual misconduct claims were still addressed in the Student Handbook and still handled under the student conduct process, with rights for respondents as summarized in the previous paragraph. The Handbook for those years preserved the parties' rights to question each other, even in sexual misconduct proceedings, but now provided that "to the extent possible" the parties would prepare questions to be read aloud by their advisors and then verbally answered by the other party, and would be permitted to ask and receive verbal answers to follow up questions in the same manner. "The questioning will continue in this manner until the Respondent is satisfied that all questions have been answered." "In cases not involving sexual misconduct, the respondent(s) and complainant(s) are permitted to question each other verbally." Kenyon Student Handbook 2013-2014,

https://web.archive.org/web/20130820001745/http://documents.kenyon.edu/studentlife/studentha ndbook.pdf (as captured August 20, 2013); Kenyon Student Handbook 2014-2015,

https://web.archive.org/web/20150416184435/http://documents.kenyon.edu/studentlife/studentha ndbook.pdf (as captured April 16, 2015).

327. For 2015-2016, and again for 2016-2017, Kenyon adopted a separate policy and procedures for sexual misconduct proceedings, which it called the "Title IX and Violence Against Women Act (VAWA) Policy." The title reflects the reality: the push to strengthen protections for alleged victims of sexual assault was rooted in a goal of protecting women.

328. Under the Title IX/VAWA Policy, Kenyon switched from a hearing board model to an investigative model for sexual misconduct complaints and eliminated key protections for accused students, including the right to an unbiased hearing and the right to question their accusers in real time before the decisionmakers.

329.    Kenyon officials explained that the goal of the switch is to make the process "'less stressful and onerous, and better at taking into account the traumatic nature of the complaints.'" https://bulletin.kenyon.edu/feature/unpacking-title-ix/.

330.    In addition to the pressure that has been applied to colleges and universities generally since the 2011 Dear Colleague Letter, Kenyon has been subjected to specific pressure and criticism regarding its handling of sexual assault, and, in particular, pressed to do more to protect female "survivors" of alleged sexual assault and punish male "perpetrators."

331.    On April 25, 2016, Kenyon alumnus Michael Hayes posted an open letter titled "To Kenyon College, for Failing My Little Sister." Hayes stated that a male student had sexually assaulted his sister in her dorm room while she was incapacitated. "Despite her documented injuries, a bed stained with her own blood, her sexual orientation and the combination of that much alcohol and prescription medication in her body, the college concluded—both initially and on appeal—that there was insufficient evidence to conclude that it was more likely than not that the college's policy on sexual assault had been broken at all," he wrote. "Kenyon has betrayed my trust—a trust with the strength of 23 years. Kenyon failed my little sister in a way that I, with her permission, refuse to be silent about." https://mjakobhayes.wordpress.com/2016/04/25/to-kenyon-college-for-failing-my-little-sister/.

332.    The next day, Kenyon's president, Sean Decatur, sent a letter to the Kenyon community, saying both that sexual assault is unacceptable and that disciplinary proceedings must be fair.

> Over the past 24 hours, the Kenyon community has been made sensitive to issues regarding sexual misconduct. . . . I must speak out clearly on the larger issue of sexual assault.  Some may react with skepticism when a college president mentions "zero tolerance" for sexual assault and "fairness" regarding the procedures to address policy violations. But I do not express those sentiments lightly. I speak for all of us at Kenyon when I say that sexual assault is absolutely unacceptable, here or anywhere. Each Kenyon

student has the right to pursue their education, growth and development without obstacles created by sexual assault, and each student is guaranteed a fair and equitable process for a resolution.

https://blogs.kenyon.edu/campus-report/post/letter-from-president-decatur-to-campus-community/.

333.    A Kenyon campus paper then published an article saying "it's not enough to hide behind rhetoric. The college needs to prove that students who were sexually assaulted get the care they deserve. . . . [I]f the president of the college will not take responsibility, who will? There is clear evidence, over and over again, that cases of sexual assault on this campus do not result in fair outcomes for those attacked. A SMA [Sexual Misconduct Advisor] I spoke to commented 'I've never seen a just outcome for a survivor handed down by this administration. Not once.'" *Who is Left to Take Responsibility?* (Apr. 26, 2016).

https://thekenyonthrill.com/2016/04/26/who-is-left-to-take-responsibility/.

334.    Hayes' letter ignited a firestorm at Kenyon and far beyond. National and international media spread the story. Students staged sit-ins and protests. Kenyon alumni formed a Facebook group and then launched a blog to share their own accounts of sexual violence at Kenyon. Commenters said Kenyon had a pattern of not believing victims and sweeping assault under the rug, said "Kenyon college is a place where you can get away with rape," and suggested filing OCR complaints or a class action against the College. Alumni threatened to withhold donations until Kenyon changed its policies. *See, e.g*.,

https://www.mic.com/articles/142906/amid-campus-uproar-kenyon-college-alumni-launch-blog-for-survivors-of-sexual-assault; letter to Kenyon president signed by 789 alumni (Kenyon "must support and fight for justice for victims of sexual assault"),

https://medium.com/alumni4title9/our-letter-to-kenyon-colleges-president-10583f606cba.

335.     Many Kenyon students and alumni expressly tied their concerns to gender, referring to the need to protect women and change the "rape culture at these elite, originally all-male institutions." *See, e.g.*, comment by alumnae, https://medium.com/@alumni4title9/the-work-of-change-cb38bd0ebd?source=---------3------------------.[4]

336.     As reported in a Kenyon campus paper, on April 28, 2016, Kenyon officials including Samantha Hughes, the Title IX Coordinator who oversaw John's proceeding, conducted an open forum for discussion of Title IX. In a discussion of the connection between sexual misconduct and alcohol, a Kenyon official said she did not understand "Kenyon's party culture and why individuals' risky drinking was the administration's problem" – a statement she later reportedly backed away from. Students claimed a "rape culture" on Kenyon's campus and said alcohol was not the problem: "*Alcohol does not cause sexual assault. This cannot be underscored enough. It interacts with it. It is a systemic problem. It's a misogyny problem. It's a problem of institutionalized sexism that is perpetuated by the presence of sanctified all-male spaces such as fraternities and athletic teams." In Case You Missed It: What You Need to Know About the Title IX Forum* (April 29, 2016), https://thekenyonthrill.com/2016/04/29/in-case-you-missed-it-what-you-need-to-know-about-the-title-ix-forum/#comments (emphasis original).

337.     The Kenyon paper followed up on May 2, 2016, by publishing an opinion piece purporting to "examine the role of alcohol on college campuses, Kenyon's party policy, and subcultures of misogyny." *A Call for Systemic Change: Prevention Programming, Alcohol, and College Culture* (May 2, 2016), https://thekenyonthrill.com/2016/05/02/a-call-for-systemic-change-prevention-programming-alcohol-and-college-culture/.

---

[4]     Kenyon was an all-male college until it began admitting women in 1969.

338.     Among other things, the author claimed that "[a]ttending college puts women at an increased risk for completed or attempted sexual assault"; that the danger to women is exacerbated by Kenyon's heavy drinking and hookup culture; that sexual assault is not caused by alcohol but is "a cultural problem, a systemic problem, a misogyny problem, that *interacts* with alcohol"; that it is "'overwhelmingly men who take advantage and rape' and 'men who stand by and watch their male friends ply women with drinks, block women from leaving rooms, and sometimes gang-rape women too drunk to walk home'"; that "sanctified all-male spaces" (fraternities and sports teams) "contribute to sexual misconduct and to misogyny"; and that "[p]eople in power have a vested interest in maintaining the status quo, and the status quo everywhere is chock full of sexism, misogyny, and normalized violence against women." *Id.*

339.     A national publication cited Michael Hayes' letter to Kenyon as a part of a trend of "internet shaming" colleges into cracking down on sexual assault. Hayes was reported in the article as wanting to "send a message to Kenyon that 'you can't let this go. This is momentum that's going to build whether you try to appease the student body...or not.'" *Internet Shaming Could Change How Colleges Handle Sexual Assault* (May 24, 2016),
https://www.newsweek.com/michael-hayes-kenyon-letter-sexual-assault-461704.

340.     Kenyon took a number of steps in reaction to the national and Kenyon-specific pressure.

341.     Hughes, the Title IX Coordinator, said she was "trying to find ways to engage men in the sexual misconduct conversation through the training of student athletes and groups that throw parties on campus. 'There's a lot of criticism that [colleges are] telling women how not to get raped but not telling men not to rape,' she said. 'We're working to change that perception.'" https://bulletin.kenyon.edu/feature/unpacking-title-ix/.

342.     Addressing the claims that fraternities contribute to sexual assaults on campus, President Decatur agreed that "the campus needs to discuss behavior associated with 'toxic masculinity that can exist in certain climates,' and noted that 'many of the same toxic elements that lead to sexual misconduct' are found on campuses without Greek life. 'Focusing on "Do we eliminate Greek organizations or not" is something of a red herring,' he said. 'It doesn't get at the root cause.'" https://bulletin.kenyon.edu/feature/unpacking-title-ix/.

343.     On May 9, 2016, President Decatur announced the creation of a steering committee to oversee an external review of Kenyon's Title IX and Violence Against Women Act (VAWA) Policy. https://www.kenyon.edu/directories/offices-services/ocr/title-ix-vawa/title-ix-news-updates/title-ix-review/title-ix-review-steering-committee/.

344.     Kenyon hired Rebecca Leitman Veidlinger, a lawyer and Title IX consultant, to conduct the review.

345.     On September 12, 2016, Kenyon learned that the U.S. Department of Education's Office for Civil Rights (OCR) had begun an investigation of the College's implementation of Title IX policy. On information and belief, that investigation is still open.

346.     Veidlinger's final Report of External Review was dated November 17, 2016. https://www.kenyon.edu/files/resources/veidlinger-report_alumni-council.pdf.

347.     The Report provided background on Kenyon's policies and procedures. Among other things it:

   a.   Confirmed Kenyon's policies and procedures had changed significantly since the 2011 Dear Colleague Letter, "[c]onsistent with what is occurring at other colleges." (*Id.* at 1.)

b.  Confirmed Kenyon's policies and procedures were shaped by federal statutes, implementing regulations, OCR guidance documents, policy and programming guidance from the White House (including the White House Task Force to Protect Students from Sexual Assault's "Not Alone" report and accompanying resource materials), and recent resolution agreements between OCR and individual institutions. (*Id.* at 3-4.)

c.  Stated that Kenyon's Title IX officials are trained in "trauma-informed practice and the neurobiology of trauma." (*Id.* at 8-9.)

348.  The Report stated that students "expressed mistrust with respect to how the College administration handles the issue of sexual misconduct. Students complained of a lack of transparency regarding the investigative process and expressed a belief that perpetrators of sexual misconduct are not held accountable. . . ." (*Id.* at 5-6.)

349.  Reviewing the question of why a large percentage of complainants choose not to initiate a formal investigation, the Report cited student statements "that the investigative process is too hard on complainants, that most accused students are found not responsible, and that those found responsible do not face any serious consequences for their actions. It is important to note the majority of the students who held these views did not have their own direct experiences with the Title IX system. Rather, a number of them developed their opinions based on what they heard from others and based on information made public in the spring of 2016, regarding one sexual misconduct investigation." (*Id.* at 19.)

350.  The Report noted, but dismissed, a number of concerns expressed by members of the Kenyon community about the fairness of Kenyon's process to accused students. For example:

a.  With respect to concerns that the preponderance of the evidence standard is too low, Veidlinger said "the mandate from OCR is clear: institutions are required to use the preponderance of evidence standard." (*Id.* at 11-12.)

b.  Similarly, Veidlinger said concerns about Kenyon's practice not to allow direct questioning "ultimately reflects disagreement with the College's compliance obligations," and that "Kenyon's Policy reflects what is currently understood as part of the current best practices to effect Title IX compliance." (*Id.* at 12-13.)

c.  With respect to concerns that "respondents lack a meaningful opportunity to review the evidence, question the witnesses, and respond to the investigators' initial investigation reports (which are described as 'summaries' in the Policy)," Veidlinger said "most but not all the concerns regarding fairness to respondents stem from a lack of familiarity with the process and a possible lack of knowledge about what is meant by the relevant provisions in the Policy." (*Id.* at 12.) In particular, Veidlinger said, "the word 'summary' is a misnomer, as the investigators meticulously create investigative narratives out of each person's statements." (*Id.* at 32.)

d.  With respect to concerns about inadequate support services for respondents, Veidlinger said a majority of Kenyon's Sexual Misconduct Advisors (SMAs) "candidly told me that they would feel uncomfortable advising a respondent due to their beliefs about campus sexual assault and their feelings of alignment with victims of sexual assault." (*Id.* at 24.)

351.  The Report also noted criticisms by students that investigators did not properly apply concepts of incapacitation, consent, and preponderance of the evidence; that investigative

outcomes reflect alleged improper influence by coaches on behalf of student athletes; and that witnesses were misquoted and information in investigation reports was incorrect. Veidlinger dismissed those concerns without addressing most of them specifically, though she did note that investigators did not always explicitly set forth their analysis in incapacitation cases.  "To illustrate, the Policy provides a set of factors to consider when evaluating whether a person is incapacitated, which are summarized as inquiring whether they can appreciate the 'who, what, where, when, why or how of a sexual encounter.' While it was apparent to my eyes that the investigators had asked the questions of 'who, what, etc.,' their written analysis did not always spell out that each question had been asked and answered with reference to specific pieces of evidence in a manner that ultimately supported their findings." (*Id.* at 33.)

352.    The Report also confirmed that the Kenyon community's concern with protecting victims focused on protection of women.

a. Eleven of the investigations in 2015-2016 involved a female complainant and a male respondent; one involved a male complainant and a female respondent; and four involved same-sex complainants and respondents. (*Id.* at 42.)

b. Some students and parents "expressed concerns that if both parties in a sexual encounter are intoxicated, male students may be held to an unfair standard and may be vulnerable to false claims of sexual misconduct. Others expressed fear and anger that female students who consume alcohol are too often preyed upon and then disbelieved." (*Id.* at 41.)

c. "Students outside athletics generally expressed the belief that male athletes were more likely to commit sexual assault than non-athletes. I also heard – with much less frequency – that male athletes were wrongfully targeted by sexual

misconduct allegations and that whole teams are unfairly 'lumped together' if one

member allegedly engages in sexual misconduct." (*Id.* at 43.)

353.    The co-chairs of Kenyon's Title IX Steering Committee submitted an executive

summary of the Report of External Review, also dated November 17, 2016. According to them,

the reviewer found that Kenyon's Title IX Policy "was consistent with current law and largely

incorporates current best practices"; that "[i]nformation about the Policy and how to report

concerns of sexual misconduct was clear and widely known"; that "[i]nvestigations, conducted

through a two-investigator model, were thorough and, except for the length of investigations,

complied with the Policy guidelines"; and that Kenyon's Title IX Office "functions effectively

and has the independence, authority and support required to administer the Policy and conduct

appropriate investigations." The summary continued: "While noting the strengths of the

College's Policy and related practices, Veidlinger offered several suggestions for enhancements

and modifications to the College's Title IX/VAWA systems."

https://www.kenyon.edu/directories/offices-services/ocr/title-ix-vawa/title-ix-news-updates/title-ix-review/.

354.    The completion and publication of the Report of External Review did not assuage

the Kenyon community's concerns about Kenyon's handling of sexual assault claims.

355.    An article in a College paper reported that "[s]ome individuals were unsatisfied

by the observations and recommendations in the report. 'It still left a lot of issues unaddressed,' a

female student and survivor of sexual assault, who spoke to the Collegian on the condition of

anonymity, said. 'Me and many others talked [with Veidlinger] about a feeling of a lack of safety

on campus and a lack of clear interim measures and sanctions after finding responsibility. As far

as I can tell, those concerns were largely ignored in the report.'" The student also said the Report

did not adequately address lack of consistency in interim measures and punishments for respondents. *Title IX audit results 'unsurprising'* (Dec. 8, 2016),

https://kenyoncollegian.com/news/2016/12/title-ix-audit-results-unsurprising/.

356.    Michael Hayes responded to the Report and Kenyon's Executive Summary on December 21, 2016, taking issue with Kenyon's selective presentation of the Report's findings and deflection of responsibility for its own failings. Hayes, Michael, *To Kenyon College, in Response to Its Report of External Review* (Dec. 21, 2016),

https://medium.com/@alumni4title9/to-kenyon-college-in-response-to-its-report-of-external-review-72a859e88df3.

357.    Hayes pointed out findings in the Report that Kenyon ignored in its executive summary, and that showed the Policy was not clear and widely known (e.g.,"'[m]any students expressed a significant lack of knowledge not only about the College's sexual misconduct investigative processes, but also about the important issues of consent and intoxication/ incapacitation'" (*id.*, quoting Report at 44)); that investigations were not thorough and were not well or consistently documented; that Kenyon's Title IX office did not function effectively and did not even have uniform office, record-keeping and file management procedures; and that investigators did not adequately present their reasoning for claims involving incapacitation. *Id.*

358.    Hayes took particular issue with statements in the Report that said Kenyon community members who criticized Kenyon's processes knew only what they heard in spring 2016 about "'one sexual misconduct investigation'" and "'generalized the criticisms expressed publicly to the broader investigative system.'" *Id.*

359.    In Hayes' words: "It is a contradiction of the Report's overall findings to suggest that the Kenyon community had no other information about Kenyon's investigative processes,

and it is condescending to suggest that 'the majority of the negative impressions' came from generalizations about my sister's case. This massive community push is rooted in decades of personal experiences with a system that has failed survivors of sexual assault at Kenyon College." *Id.*

360.    In 2017, Kenyon served as a testing ground for a program a Kenyon alumnus developed, using a play to generate discussion about consent and sexual assault on college campuses.

361.    The play was presented on Kenyon's campus as part of an event hosted by Kenyon's Office of the President and Office for Civil Rights.

362.    Title IX Coordinator Samantha Hughes was interviewed before the event, and stated: "'It is my hope that audience members will leave understanding that listening, supporting and believing a person is more important than trying to assign a label on an incident that happened to someone else." *Powerful Theater* (Feb. 2, 2017), https://www.kenyon.edu/middle-path/story/powerful-theater/.

363.    The event included a panel discussion covering "relationship dynamics . . . , the way that perceptions of power and influence impact the memories of trauma, and how outsiders can help a sexual assault victim begin to feel empowered again." According to one participant: "'This play doesn't just deal with sexual consent . . . It deals with white male privilege, it deals with gender disparity where women are forced to let others be in control.'" *Alumni return for reading of TAPE, discussion about assault* (Mar. 2, 2017), https://kenyoncollegian.com/arts/2017/03/alumni-return-for-reading-of-tape-discussion-about-assault/.

364.    In an article dated April 13, 2017, Kenyon officials reported a 12.5% decrease in applications, and stated that the drop could be attributable in part to the "national news" generated by Hayes' letter and its aftermath. "'You don't know to what extent something like that too could keep people away,'" an official stated. *Political divide impacts Class of 2021 admissions*, https://kenyoncollegian.com/news/2017/04/political-divide-impacts-class-of-2021-admissions/.

365.    After the Report of External Review was issued, Kenyon revised its Title IX Policy for 2017-2018. The new Policy was called the "Title IX and Intimate Partner Violence Policy," following up on Viedlinger's suggestion that the Policy be renamed "to avoid any misconceptions as to whether a policy with the name 'Violence Against Women Act' in its title applies to other gender identities as well." (Report at 17.) For 2018-2019 and 2019-2020, however, Kenyon put "VAWA" back in the title of the Policy.

366.    Kenyon has touted the fact that reports made to the College's Office for Civil Rights during the 2016-17 academic year increased by 35% from the 2015-16 year. *Campus Report* (July 25, 2017), https://blogs.kenyon.edu/campus-report/post/office-for-civil-rights-community-update-summer-2017/.

367.    In stark contrast to its eagerness to follow the 2011 Dear Colleague Letter and other federal pressure between 2011 and 2017, Kenyon refused to change its policies in response to the U.S. Department of Education's ("DOE's") efforts to restore basic fairness to the process.

368.    In October 2017, after the DOE withdrew the 2011 Dear Colleague Letter and other guidance and issued new guidance, Kenyon announced that its staff and counsel had reviewed the new guidance "to ensure the College's continued compliance with federal expectations," and claimed that "the College's Title IX & Intimate Partner Violence policy,

published in July 2017, remains in compliance with both the previous as well as the newly issued federal guidance. For our students and employees, this means that Kenyon will continue to follow its established policies as it continues to promote a campus environment free from sexual harassment and all forms of sexual intimidation and exploitation." *Campus Report* (Oct. 3, 2017), https://blogs.kenyon.edu/campus-report/post/response-to-the-department-of-educations-new-guidance-on-campus-sexual-misconduct/.

369.    Kenyon's Policy did ***not***, however, comply with the 2017 guidance, including but not limited to the DOE's directives that schools conduct an adequate, reliable, and impartial investigation of complaints, that the school – not the parties – has the burden "to gather sufficient evidence to reach a fair, impartial determination," and that schools avoid "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations." 2017 Q&A, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

370.    In the same Campus Report referenced in paragraph 368, Kenyon stated that it was committed to eliminate sex and gender-based misconduct, and would "work tirelessly to treat all parties involved with fairness and sensitivity while fulfilling the College's obligations as outlined in the Title IX & Intimate Partner Violence Policy." https://blogs.kenyon.edu/campus-report/post/response-to-the-department-of-educations-new-guidance-on-campus-sexual-misconduct/.

371.    This too was false, as John's experience demonstrates.

372.    In 2018, after a training session to educate faculty on their responsibilities under Kenyon's policies, one professor expressed concern about the Title IX policy's abandonment of rights for the accused. "'I think the recent deal to abandon the "innocent until proven guilty standard" uniquely for this sort of offense when… all other crimes you are innocent until proven

guilty,' he said. 'Why is this especially heinous? I think this standard is unconstitutional.'" *Kevin Peterson to serve as new Title IX Deputy Coordinator* (May 3, 2018),

https://kenyoncollegian.com/news/2018/05/kevin-peterson-to-serve-as-new-title-ix-deputy-coordinator/ (ellipses in article).

373.    Kenyon reports that it has been preparing for the issuance of the new federal regulations since they were first proposed in November 2018, including reviewing anticipated policy changes with student, staff, faculty, and alumni groups. https://blogs.kenyon.edu/campus-report/post/department-of-education-issues-new-title-ix-regulations/.

374.    However, Kenyon doubled down on its plan to "follow its established policy" until new regulations were finalized. *Federal Title IX changes could impact Kenyon community* (Jan. 30, 2020), https://kenyoncollegian.com/news/2020/01/federal-title-ix-changes-could-impact-kenyon-community/.

375.    Kenyon's President expressed concern about "how the community will react to a policy shift," and whether Kenyon can "keep to the values that we've tried to embrace." He noted "that the changes might be short-lived—colleges have pushed back strongly against the resolution, and even if the Board of Education passes it (a scenario Decatur thinks is likely), several groups have threatened legal action. 'If things are put on hold, and the [presidential] administration changes in November, there's a reasonable chance that all of this just gets erased,' Decatur said." *Id.*

376.    On March 24, 2020, a group of associations including the American Association of Colleges and Universities, of which Kenyon is a member, asked the Department of Education to delay adopting the new regulations, claiming that implementation will be "enormously complex and burdensome" and that schools should not be asked "to divert precious resources

away from more critical efforts in order to implement regulations unrelated to" the COVID-19 crisis. https://universityeeoblog.files.wordpress.com/2020/03/ghhhh.pdf. As revealed in other public statements, however, the associations' members are continuing to conduct their Title IX disciplinary proceedings.

377.    Kenyon's discriminatory and one-sided process deprived John, as a male student, of educational opportunities at Kenyon on the basis of sex.

378.    On information and belief, John's case is part of a pattern and practice of Title IX violations and discrimination against male students accused of sexual misconduct.

379.    In May of 2018, for example, a male Kenyon student sued Kenyon based on its investigation of female students' reports of alleged sexual misconduct by him – even though one's accusations were demonstrably false and the other expressly said she did not want an investigation – and disregard of his reports of policy violations by a female student. *Doe v. Kenyon College*, No. 2:18-cv-00482 (S.D. Ohio).

380.    Information concerning sexual misconduct complaints at Kenyon and the outcome of disciplinary proceedings involving male students as compared to female students is in Kenyon's exclusive possession and control.  On information and belief, statistics within Kenyon's exclusive possession and control will show a pattern of intentional discriminatory conduct, erroneous outcomes, archaic assumptions, and selective enforcement based on gender.

381.    On information and belief, statistics within Kenyon's exclusive possession and control will show that students accused of sexual misconduct are overwhelmingly male, and that male students accused of sexual misconduct are overwhelmingly found responsible.

382.    On information and belief, statistics within Kenyon's exclusive possession and control will show that female students accused of serious sexual or non-sexual misconduct are treated more favorably than male students in general, and John in particular.

383.    As a direct, proximate, and foreseeable consequence of Kenyon's violations of Title IX, John sustained significant damages, including, without limitation, damages for emotional distress, physical distress, damage to reputation, loss of educational and athletic opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

384.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II - RETALIATION IN VIOLATION OF TITLE IX
## OF THE EDUCATION AMENDMENTS OF 1972

385.    John repeats and realleges each and every allegation set forth above as if fully set forth herein.

386.    During the investigation, and with the encouragement of the Title IX Coordinator, John provided personal and intimate information regarding his relationship with Jane. The evidence directly contradicted Jane's fundamental claim that the relationship was abusive and unhappy and supported John's reports that Jane herself had violated Kenyon's Policy.

387.    John's complaints regarding Jane's conduct, his defense against her complaints, and his production of evidence in support of his complaints and his defense were protected activities under Title IX.

388.    As set forth in detail above, Kenyon was aware of John's protected activities.

389. The Investigators retaliated against John by refusing to consider the evidence he submitted, falsely saying it was not relevant and suggesting he violated Jane's privacy by submitting it: "The majority of the information provided depicts Complainant in vulnerable and compromising situations, that was likely meant to be kept inside the relationship and not released to third parties."

390. The Investigators should have considered the evidence rather than criticizing and retaliating against John for defending himself and reporting Policy violations by Jane.

391. As a direct, proximate, and foreseeable consequence of Kenyon's retaliation in violation of Title IX, John sustained significant damages, including, without limitation, damages for emotional distress, physical distress, damage to reputation, loss of educational and athletic opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

392. As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III - BREACH OF CONTRACT

393. John repeats and realleges each and every allegation set forth above as if fully set forth herein.

394. At all times relevant hereto, a contractual relationship existed between John and Kenyon.

395. The promises in Kenyon's Student Handbook and Policy are legally binding obligations.

396.     Kenyon is required to act in accordance with its written policies and procedures in investigating and adjudicating reports of alleged violations of student conduct standards.

397.     Based on the facts and circumstances set forth in this Complaint, Kenyon materially breached its express and/or implied agreement(s) with John by failing to comply with its obligations, standards, policies, and procedures in the course of the disciplinary proceedings against John, and by subjecting him to a fundamentally unfair process.

398.     In its Policy and its Student Handbook, Kenyon promises, among other things, that it will conduct disciplinary proceedings with "fundamental fairness" and will comply with Title IX, related statutes, and other state and federal law; will not discriminate based on sex or gender (stating that discrimination occurs when "a behavior or policy has the purpose or effect of restricting or denying an individual's or group's access to opportunities, programs, or resources in relation to sex, gender, gender identity, gender expression, or sexual orientation . . ."); will assign trained and impartial investigators; will conduct an "adequate, reliable, thorough, and impartial investigation"; will produce an investigative Report that "summarizes the relevant information gathered and synthesizes the areas of agreement and disagreement between the parties and any supporting information or accounts," based on a review of "all facts gathered to determine whether the information is relevant given the allegation"; will assess cases in accordance with the terms and definitions set forth in the Policy; and will make findings of responsibility only if supported by a preponderance of "all relevant and admissible information." *See, e.g.*, Section IV.C above, including paragraphs 97-99, listing specific applicable provisions.

399.     Kenyon materially breached the obligations set forth in Section IV.C above, including paragraphs 97-99, when, among other things, it:

a.   Instigated unwarranted charges and accusations against John, with a goal of having him criminally charged and expelled.

b.   Failed to comply with the legal requirement to provide John with a live hearing with the chance to question parties and witnesses in real time.

c.   Reached a result-driven determination rather than reaching a decision based on a preponderance of all relevant evidence.

d.   Made credibility determinations against John and in favor of Jane that were not rationally based on the evidence.

e.   Relied on snippets of alleged witness testimony, refused to provide John with complete records of their interviews, and failed to give him a meaningful opportunity to challenge the evidence against him.

f.   Failed to question Jane's credibility in view of the Investigators' specific rejection of her foundational narrative of abuse and her many demonstrably false and inconsistent statements.

g.   Selected evidence to support Jane's narrative while ignoring evidence of her inconsistencies and false statements.

h.   Failed to correctly apply the Policy's definitions of consent and incapacitation.

i.   Failed to consider the history and patterns of the parties' relationship, which are relevant under the Policy.

j.   Failed to probe the inconsistency between Jane's acknowledged and persistent desire to have sex on September 13 and the conclusion that she could not have consented to sex that same night.

k.  Failed to address the evidence that definitively established Jane was not incapacitated on the night of September 13 and John had no reason to think she was, and based key findings on speculation.

l.  Made improper and speculative inferences from John's silence, and used a manufactured inconsistency to find him incredible across the board.

m.  Treated the parties differently based on their gender, in violation of Kenyon's own definition of discrimination and the examples of improper differential treatment included in the Policy.

400.  Kenyon materially breached the provisions in its Student Handbook that respondents are not presumed responsible and have the right to remain silent, and that silence will not be construed against the respondent.

401.  Kenyon materially breached the Policy when it disregarded John's reports of Policy violations by Jane, failed to give him the support, assistance, and procedural protections it promised to extend to any individual reporting prohibited conduct, and failed to investigate and adjudicate his reports.

402.  Kenyon materially breached the Policy when its Investigators retaliated against John for exercising his right to report prohibited conduct by Jane and defend himself against Jane's baseless claims.

403.  Kenyon materially breached the Policy when its Appeals Officer failed to correct the material procedural errors and clearly erroneous outcome on appeal.

404.  John fully complied with his contractual obligations to Kenyon.

405.  As a direct, proximate, and foreseeable consequence of Kenyon's breach of its express and/or implied contractual obligations, John sustained significant damages, including,

without limitation, damages for emotional distress, physical distress, damage to reputation, loss of educational and athletic opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

406.     As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV - PROMISSORY ESTOPPEL

407.     John repeats and alleges each and every allegation set forth above as if fully set forth herein.

408.     As described in this Complaint, Kenyon promised that all Title IX proceedings would be conducted in compliance with its Sexual Misconduct and Harassment Policy and "in compliance with the requirements of Title IX, the Clery Act, as amended by the Violence Against Women Act, the Family Educational Rights and Privacy Act (FERPA), and state and federal law." (Policy, Section I.)

409.     Kenyon promised in its Student Handbook and Policy that respondents can make decisions about their participation and whether to remain silent without having silence construed against them.

410.     Kenyon promised in its Student Handbook and Policy that respondents will have the right to provide evidence.

411.     Kenyon's Title IX Coordinator represented to John that he could participate in the proceeding by submitting written statements and evidence rather than attending an in-person interview, and that he should produce evidence relevant to the proceeding.

94

412.     John detrimentally relied on these promises, including but not limited to making key decisions as to how to defend himself and participate in the proceedings and deciding to submit full documentary evidence regarding the parties' relationship.

413.     John was damaged when Kenyon made adverse findings based on decisions he made in reliance on these promises.

414.     John's detrimental reliance and the damages he incurred as a result were foreseeable to Kenyon.

415.     As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, John Doe respectfully requests that this Honorable Court:

(a)     Order Kenyon College to reverse and expunge its findings of responsibility and sanction of expulsion from John's education record;

(b)     Order Kenyon College to provide a Dean's Certification that shall be made available to third parties (such as educational institutions and prospective employers) certifying that it has reversed and expunged the findings and sanction;

(c)     Award John compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damages for emotional distress, physical distress, damage to reputation, loss of educational and athletic opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages;

(d)     Award prejudgment interest;

(e)     Award attorneys' fees and costs pursuant to statutory or common law doctrines providing for such award; and

(f)     Grant such other and further relief that the Court deems just and proper.

Dated: September 22, 2020                    Respectfully submitted,

                                             JOHN DOE


                                             By: /s/ Rex H. Elliott_____

Rex H. Elliott
C. Benjamin Cooper
COOPER ELLIOTT
2175 Riverside Drive
Columbus, Ohio 43221
Phone: (614) 481-6000
Email: rexe@cooperelliott.com
        benc@cooperelliott.com

Patricia M. Hamill
(Admission *Pro Hac Vice* Pending)
Lorie Dakessian
(Admission *Pro Hac Vice* Pending)
CONRAD O'BRIEN PC
Centre Square, West Tower
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Phone: (215) 864-9600
Email: phamill@conradobrien.com
        ldakessian@conradobrien.com