**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

JOHN DOE,                                      :
                                               :      CASE NO. 2:20-cv-04972
      Plaintiff,                          :
                                               :      JUDGE MICHAEL H. WATSON
    v.                                       :
                                               :      MAGISTRATE JUDGE CHELSEY M. VASCURA
KENYON COLLEGE,                                :
                                               :
      Defendant.                          :

---

**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

---

      Pursuant to Civ. R. 12(c), Defendant Kenyon College, by and through counsel, files this Motion for Judgment on the Pleadings.  Specifically, and as detailed in the attached Memorandum in Support, Plaintiff John Doe has failed to state a claim for relief under federal or state law.  A Memorandum in Support is attached.

                           Respectfully submitted,

                           /s/ *Joshua D. Nolan*
                           JOSHUA D. NOLAN* (0084592)
                             *Trial Attorney*
                           Bricker & Eckler LLP
                           1001 Lakeside Avenue E.
                           Cleveland, Ohio 44114
                           (216) 523-5405
                           (216) 523-7071 (facsimile)
                           jnolan@bricker.com

                           ERIN E. BUTCHER (0087278)
                           LINDSEY A. ROBERTS (0096979)
                           Bricker & Eckler LLP
                           100 S. Third Street
                           Columbus, Ohio 43215
                           (614) 227-2303
                           (614) 227-7714
                           (614) 227-2390 (facsimile)
                           ebutcher@bricker.com
                           lroberts@bricker.com

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................v

SUMMARY OF THE ARGUMENT ............................................................................... viii

MEMORANDUM IN SUPPORT.......................................................................................1

I.      INTRODUCTION ...................................................................................................1

II.     RELEVANT FACTS ...............................................................................................1

        A.     Jane's successful claims against John under Kenyon's Title IX Policy at Kenyon raised in September 2019. ...........................................................2

              1.     The January 18, 2019 incident. ....................................................3

              2.     The February 2, 2019 incident. ....................................................4

              3.     The September 13-14, 2019 incident. ..........................................4

                     a.     John and Jane at his apartment from approximately 12:15-12:45 a.m.................................................................5

                     b.     John and Jane leave John's apartment at approximately 12:45 a.m.............................................................5

                     c.     John and Jane leave the apartment and get into an argument that attracts bystanders, a Community Advisor, Campus Security, and the Sherriff's Office. ....................................................6

                     d.     Observations of Jane's incapacitation by witnesses and John the night of September 13-14, 2019. .......................................9

        B.     John's allegations regarding Kenyon's Title IX Process and commencement of this lawsuit.................................................................11

               1.     Alleged false statements by Jane. ..............................................13

               2.     Alleged failure by Kenyon to take his claims against Jane seriously. ...................................................................................14

        C.     Pertinent Sections of Kenyon's Student Handbook and Title IX Policy. .............14

i

1.    Kenyon's 2019-2020 Student Handbook, which John attached as Exhibit A to his Second Amended Complaint............................................14

2.    Kenyon's Sexual Misconduct and Harassment Policy: Title IX, VAWA, Title VII 2019-2020, attached as Exhibit B to John Doe's Second Amended Complaint. ...................................................16

3.    Relevant and sex and gender-neutral definitions from Kenyon's Title IX Policy........................................................17

    a.    Non-consensual sexual intercourse.................................17

    b.    Non-consensual sexual contact ....................................18

    c.    Consent ................................................................18

    d.    Incapacitation ........................................................20

    e.    Physical Harm and Intimidation ...................................21

    f.    Intimate Partner Violence ..........................................21

4.    Relevant and sex- and general- neutral Title IX process Kenyon's Title IX Policy.........................................................22

    a.    Intake of the report through selection of formal resolution ...........22

    b.    The Investigation ....................................................23

    c.    Review of Investigation and Initial Investigative Report ..............24

    d.    Determination of Responsibility, the Adjudicator, and Sanctions............................................................25

    e.    Appeal ...............................................................26

III.    LAW AND ARGUMENT ...........................................................27

    A.    Standard of Review...........................................................27

    B.    John has failed to state a claim for relief under Title IX. .....................28

    1.    John has failed to state a claim under an erroneous outcome theory.........29

    a.    John fails to plead sufficient facts to cast an articulable doubt on the accuracy of the outcome of the January 18, 2019 incident...............................................................32

16595310v3

        b.      John fails to plead sufficient facts to cast an articulable doubt on the accuracy of the outcome for the February 9, 2019 incident...................................................................................33

        c.      John fails to plead sufficient facts to cast an articulable doubt on the accuracy of the outcome for the September 13-14, 2019 incident. .....................................................34

                i.      John does not plead that he did not have sexual intercourse with Jane on September 13-14, 2019. ............35

                ii.     The facts as pleaded by John support that Jane was incapacitated during sexual intercourse under Kenyon's Policy...............................................................37

                iii.    John fails to plead sufficient facts that he was not aware or should not have been aware that Jane was incapacitated. ....................................................40

    2.     John fails to state a claim under a deliberate indifference theory.............42

    3.     John fails to state a claim under a selective enforcement theory..............44

    4.     John fails to state a claim under an archaic assumption theory. ...............46

    5.     John fails to state a claim for hostile environment under Title IX............47

C.     John fails to state a claim for retaliation. ..............................................48

D.     John fails to state a claim for relief under state law..................................50

    1.     John fails to state a claim for breach of contract. .....................................50

        a.      Paragraph 399(a) – John's bald and self-contradicting allegations that Kenyon "[i]nstigated unwarranted charges and accusations against John, with a goal of having him criminally charged and expelled." .................................54

        b.      Paragraph 399(b) – John's facially incorrect allegation that Kenyon "[f]ailed to comply with the legal requirement to provide John with a live hearing with the chance to question parties and witnesses in real time." ................................55

        c.      John's "bevy of purported" contractual violations in the process at Paragraphs 399(c) through (g) and 400 that do not show the process was not fundamentally fair. .........................56

d.    Paragraph 399(h) and (k) – John's internally inconsistent and contradictory allegations that Kenyon "[f]ailed to correctly apply the Policy's definitions of consent and incapacitation" and that Kenyon "[f]ailed to address the evidence that definitively established Jane was not incapacitated on the night of September 13 and [Plaintiff] had no reason to this she was, and based key findings on speculation."..................................................................60

e.    Paragraphs 399 (i) and (j) – John's self-contradictory allegations regarding Kenyon failing to consider the history and patterns of the parties' relationships and that Kenyon "[f]ailed to probe the inconsistency between Jane's acknowledged and persistent desire to have sex on September 13 and the conclusion that she could not have consented to sex that same night."..................................63

f.    Paragraphs 399(l) and 400 – John's allegation that Kenyon "[m]ade improper and speculative inferences from John's silence, and used a manufactured inconsistency to find him incredible across the board."..........................................64

g.    Paragraph 399(m), 401, and 402 – John baldly alleges differential treatment....................................................66

h.    Paragraph 402 - John baldly alleges retaliation. ............67

i.    Paragraph 403 - Appeals Officer failed to correct procedural errors and erroneous outcome in the process.............68

2.    John has failed to state a claim for promissory estoppel. .........69

IV.    CONCLUSION..............................................................70

CERTIFICATE OF SERVICE .................................................71

# TABLE OF AUTHORITIES

Page

## CASES

*Barany–Snyder v. Weiner*, 539 F.3d 327 (6th Cir. 2008) ........................................ 17, 28

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) .................................................. 27

*Bonner Farms, Ltd. v. Power Gas Mktg. & Transmission*, No. 5:04-2188, 2007 WL
     2463247 (N.D. Ohio Aug. 28, 2007) ................................................................. 69

*Bose v. Bea*, 947 F.3d 983 (6th Cir. 2020), *cert. denied*, No. 20-216, 2021 WL 78095
     (U.S. Jan. 11, 2021) ........................................................................................ 48

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ........................................... 43

*Doe v. Amherst Coll.*, 3:15-cv-30097, Doc. 38 (D. Mass. Oct. 5, 2015) ...................... 51

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ............................................................ passim

*Doe v. Case W. Res. Univ.*, No. 1:17 CV 414, 2017 WL 3840418 (N.D. Ohio Sept. 1,
     2017) (Nugent, J.) ........................................................................................... 69

*Doe v. Case Western Reserve Univ.*, 809 F. App'x. 276 (6th Cir. 2020) .................... 56

*Doe v. Claiborne Cty.*, 103 F.3d 495 (6th Cir. 1996) .................................................. 47

*Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016) .................................... 30, 44, 47, 51

*Doe v. Kenyon College*, No. 2:18-cv-00482 (S.D. Ohio) ............................................ 45

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ........................................... 28, 43, 47

*Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020) ................................................ 30

*Doe v. Ohio State Univ.*, 239 F.Supp.3d 1048 (S.D. Ohio 2017) (Smith, J.) ............... 30

*Doe v. Ohio State University*, 323 F.Supp.3d 962 (S.D. Ohio 2018) (Smith, J.) ......... 43

*Doe v. Univ. of Cincinnati*, 173 F.Supp. 3d 586 (S.D. Ohio 2016) (Beckwith, J.)...... 47

*Doe v. University of Dayton*, 766 Fed.Appx.275 (6th Cir. 2019) .............................. 28, 44, 47, 50

*Evans v. Jay Instrument and Specialty Co.,* 889 F.Supp. 302 (S.D. Ohio 1995).................. 28, 31

*Gascho v. Glob. Fitness Holdings, LLC*, 918 F. Supp. 2d 708 (S.D. Ohio 2013) ........................ 28

*Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315 (6th Cir. 2017)........................ 48, 49

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)........................................................... 47

*Housing Auth. Risk Retention Grp., Inc. v. Chicago Housing Auth.*, 378 F.3d 596
(7th Cir. 2004).......................................................................................... 28

*JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577 (6th Cir. 2007)........................................ 27

*Little v. UNUMProvident Corp.*, 196 F. Supp. 2d 659 (S.D. Ohio 2002) .................................... 28

*Mallory v. Ohio University*, 76 F. App'x 634 (6th Cir. 2003)......................................... 29, 43, 47

*Marshall v. Ohio University*, No. 2:15-cv-775, 2015 WL 7254213
(S.D. Ohio Nov. 17, 2015) (Smith, J) ......................................................... 30, 31

*McDade v. Cleveland State Univ.,* No. 14AP-275, 2014 WL 4557015
(Ohio App. Sept. 16, 2014)................................................................................. 50

*McGath v. Hamilton Local Sch. Dist.*, 848 F. Supp. 2d 831 (S.D. Ohio 2012)............... 17, 27, 28

*O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578 (6th Cir. 2007)......................................... 69

*Ray v. Wilmington Coll.,* 667 N.E.2d 39 (Ohio App. 1995) ....................................... 50

*Sahm v. Miami Univ.*, No. 1:14-cv-698, 2015 WL 93631 (S.D. Ohio Jan. 7, 2015)
(Dlott, J.) ........................................................................................ 29, 30

*Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043
(S.D. Ohio Mar. 3, 2018) (Smith, J.) ....................................................... 50, 52, 69

*Sterrett v. Cowa*n, 85 F.Supp.3d 916 (E.D. Mich. 2015)........................................... 47

*Stewart v. Everywhere Global, Inc.*, 68 F.Supp.3d 759 (S.D. Ohio 2014) (Graham, J.).............. 69

Traverse Bay Area Intermediate Sch. Dist. v. Michigan Dep't of Educ.,
615 F.3d 622 (6th Cir. 2010) ....................................................................... 27

*Valente v. Univ. of Dayton,* 438 Fed.Appx. 381 (6th Cir. 2011) ................................. 50

*Walker v. J.P Morgan Chase Bank, N.A.*, No. 3:13-CV-356, 2015 WL 1637618
(S.D. Ohio, Apr. 13, 2015) (Rose, J.) ....................................................... 28, 31

*Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281 (6th Cir. 2010) ............... 27

*Wells v. Xavier Univ.*, 7 F.Supp.3d 746 (S.D. Ohio 2014) (Spiegel, J.)....................... 29

*Wiler v. Kent State Univ.*, No. 5:20-cv-490, 2021 WL 809350, (N.D. Ohio Mar. 3, 2021)......... 49

*Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) ............................................................. 29, 30

**REGULATIONS**

Fed.R.Civ.P. 12(b)(6)................................................................................................... 27

Fed.R.Civ.P. 12(c) ...................................................................................................... 28

Fed.R.Civ.P. 7(a) ........................................................................................................ 28

**OTHER AUTHORITIES**

Kenyon 2019-2020 Student Handbook, Section W. Sexual and Gender-Based
    Discrimination.................................................................................................. 15, 53

Kenyon's 2019-2020 Student Handbook........................................................... 1, 14, 16

Kenyon's Title IX and Sexual Misconduct Policy for 2019-2020 ...................... passim

Kenyon's Title IX Policy, Section VI.D........................................................... 17, 18

Kenyon's Title IX Policy, Section VI.E ................................................................. 18

Kenyon's Title IX Policy, Section VII.A................................................................ 18

Kenyon's Title IX Policy, Section VII.A................................................................ 20

Kenyon's Title IX Policy, Section VII.D........................................................... 20, 21

Kenyon's Title IX Policy, Section VII.H................................................................ 21

Kenyon's Title IX Policy, Section VII.J........................................................... 21, 22

Kenyon's 2019-202 Student Handbook, Section B. Non-Sexual Assault.................. 15

Kenyon's Title IX Policy, Section X.F.3 ................................................................ 25

Kenyon's Title IX Policy, Section X.F.4 ........................................................... 25, 59

Kenyon's Title IX Policy, Section X.F.5 ................................................................ 26

Kenyon's Title IX Policy, Section XI" .................................................................. 22

Kenyon's Title IX Policy, Section XI.B................................................................. 23

Kenyon's Title IX Policy, Section XI.F. ................................................................ 23

## SUMMARY OF THE ARGUMENT

This case is about John Doe's distaste for the consequences of his actions against his then-girlfriend, Jane Roe, in violation of Kenyon College's Title IX Policy while both were students at Kenyon College ("Kenyon"). Kenyon found John responsible by a preponderance of the evidence for violating Kenyon's Title IX Policy for three separate instances: nonconsensual sexual intercourse and contact against Jane on September 13-14, 2019, and two separate incidents of physical harm/intimidation and intimate partner violence against Jane from January 18, 2019 and February 9, 2019. The investigation into John's actions included statements and evidence from John, Jane, and many witnesses. As a result of these findings against John, Kenyon sanctioned John with dismissal. John appealed internally pursuant to Kenyon's Title IX process and Kenyon's Appeals Officer upheld the determination and sanction. John sued Kenyon for violations of Title IX and state contract law.

As pleaded by John, he fails to state a claim for which this Court may grant him relief. John alleges violation by Kenyon of Title IX generally (Count I) and retaliation under Title IX (Count II). His allegations fail under any of the theories available under Title IX in the Sixth Circuit: (1) erroneous outcome; (2) selective enforcement; (3) deliberate indifference, and (4) archaic assumption. *Doe v. University of Dayton*, 766 Fed.Appx.275, 281 (6th Cir. 2019) (citing *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018)). To the extent John intended to raise a challenge under hostile environment, John's allegations also fail under a hostile environment theory under Title IX. (*Id.*) Finally, John's Title IX retaliation claim also fails to state a claim for relief.

First, John fails under an erroneous outcome theory because he fails to plead sufficient facts that he is "innocent" of the underlying conduct to cast doubt on Kenyon's determination.

*Doe v. Ohio State Univ.*, 239 F.Supp.3d 1048, 1069-70 (S.D. Ohio 2017) (Smith, J.) (citing *Sahm v. Miami Univ.*, 110 F. Supp.3d 774, 777-78 (S.D. Ohio 2015) (Dlott, J.)).

Second, John fails to state a claim under deliberate indifference theory because John has not alleged any sexual harassment he experienced that was so severe, pervasive, and objectively offensive that ineffectively barred his access to educational opportunities or benefits.  *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018).

Third, John fails under a selective enforcement theory because he pleads only insufficient bald statements without identifying a single female comparator accused of the same violations whom Kenyon treated differently from John.  *Doe v. Univ. of Dayton*, 766 Fed. Appx. 275, 284 (6th Cir. 2019).

Fourth, John fails under an archaic assumption theory because he has not alleged that he was denied an equal opportunity to participate in an athletic program because of historical assumptions about gender-related physical capabilities.  *Doe v. Baum*, 903 F.3d 575, 578-88 (6th Cir. 2018).

Fifth, to the extent John intended to raise a hostile environment claim under Title IX, he fails to allege that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's educational environment." *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018).

Finally, John's Title IX retaliation claim fails because he has not alleged any causal connection between any protected activity and an adverse action.  *Bose v. Bea*, 947 F.3d 983, 988–89 (6th Cir. 2020), *cert. denied*, No. 20-216, 2021 WL 78095 (U.S. Jan. 11, 2021) (citing *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017)).

16595310v3

John's remaining claims are state law claims for breach of contract and, alternatively, promissory estoppel.  John's breach of contract claims fail to state a claim for relief because as pleaded, he has not identified a breach by Kenyon under Ohio law. " *Pierre v. Univ. of Dayton*, No. 3:15-cv-362, 2017 WL 1134510, at *5 (S.D. Ohio Mar. 27, 2017) (Rose, J.) (citing *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006)).  Regarding Title IX disciplinary procedures for private colleges, "[t]he proper focus in analyzing whether a private university provided fundamental fairness is whether the University adhered to its misconduct procedure." *Id.* at *6.  When construing contractual obligations for private colleges under Title IX, school-disciplinary committees are entitled to a presumption of impartiality, absent an allegation of actual bias. *Schuamleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043, at *11 (S.D. Ohio Mar. 3, 2018) (Smith, J.).  Construing Kenyon's Title IX Policy and Student Handbook, other than disagreeing with the results of the application and outcome to him, John does not identify any specific concrete ways in which Kenyon College did not follow its procedures and he fails to state a claim for breach of contract.

Finally, John's alternative theory promissory estoppel similarly fails.  John alleges that he relied on the promise that Kenyon's Title IX Policy and process would be conducted "in compliance with the requirements of Title IX, the Clery Act, as amended by the Violence Against Women Act, the Family Educational Rights and Privacy Act (FERPA), and state and federal law." (Doc. 27, at ¶ 408.)  However, John alleges that Kenyon's Title IX Policy did not comply with the Clery Act, VAWA, FERPA, or state law because it did not provide him with a live cross-examination theory under *Doe v. Baum*, and that he baldly does not think was fundamentally fair. However, he fails to state a claim because *Doe v. Baum*, 903 F.3d 575, 582-85 (6th Cir. 2018), does not require private schools to provide live cross-examination hearings and he has not pled

facts sufficient to allege that Kenyon did not follow its own process or that that process was not fundamentally fair.

For these reasons, articulated in more detail in Kenyon's Memorandum in Support, Kenyon respectfully requests that this Court dismiss John's Second Amended Complaint for failure to state a claim for which this Court may grant relief.

16595310v3

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

John Doe's Second Amended Complaint is replete with bald, self-serving, and misdirected conclusions that are undone by John's other more specific factual allegations such that he has failed to state a claim for relief.  Attempts to sex-shame the underlying Jane Roe (*see, e.g.,* Doc. 27, at ¶¶ 11, 116, 123(a)(ii), 148(b) (repeatedly and unnecessarily referencing Jane's use of sex toys in other consensual sexual encounters)) and the typical criticisms by plaintiffs on colleges in the aftermath of the U.S. Dept. of Education's 2011 Dear Colleague Letter are not enough to distract from the underlying problem for John: he fails to plead facts sufficient to cast doubt on the accuracy of the underlying Title IX process, or otherwise state a claim under Title IX or state law. John just doesn't like the words used to describe his actions or that Kenyon found him responsible for that conduct.  Specifically, John does not sufficiently plead that he did not violate Title IX for findings of physical harm and intimidation, intimate partner violence, and non-consensual sexual intercourse and contact against Jane.  As argued below, Defendant Kenyon College ("Kenyon") respectfully asks this Court to enter judgment in its favor.

### II.    RELEVANT FACTS

The following facts are from John Doe's Second Amended Complaint and are assumed true for purposes of this motion only.  The relevant facts in this section include:  (A.) Jane's successful claims against John under Kenyon's Title IX Policy at Kenyon raised in September 2019; (B.) John's allegations about Kenyon's Title IX process and commencement of this lawsuit; and (C.) pertinent Sections of Kenyon's Student Handbook and Title IX Policy.

### A. Jane's successful claims against John under Kenyon's Title IX Policy at Kenyon raised in September 2019.

John alleges that he and Jane were "in an exclusive dating relationship...for 19 months, since February of 2018." (Doc. 27, at ¶ 3.) John alleges that, on September 16, 2019, Jane reported violations of Kenyon's Policy to the Title IX Coordinator. (*Id.* at ¶ 124.) John alleges that, on September 20, 2019, Jane "submitted a written complaint to Kenyon's Title IX Office" in which she "recast her entire relationship with John as a 'pattern of abusive behavior, physical, emotional, verbal, and now sexual.'" (*Id.* at ¶¶ 31-32.)

Specifically, John alleges that, following an investigation, Kenyon investigators ("Investigators") found him responsible for three violations of Kenyon's Title IX Policy, which were later upheld on appeal at Kenyon:

- a January 18, 2019 incident "where Jane claimed John had been drunk and pushed her down a hill";

- a February 2, 2019 incident "stemming from an argument between John and Jane, where Jane claimed John had hit her"; and

- "nonconsensual sexual intercourse and contact on the night of September 13, 2019."

(*Id.* at ¶ 50.)

Sprinkled throughout his 415-paragraph Second Amended Complaint (not including sub paragraphs, of which there are many) John asserts that he "was falsely accused of violating Kenyon's Sexual Misconduct and Harassment Policy" (*id.* at ¶ 1), that he "has consistently denied, and continues to deny, any sexual or physical misconduct toward Jane" (*id.* at ¶ 42), that he provided a written statement to Investigators "denying Jane's allegations of abuse and rape" (*id.* at ¶ 146), that he provided a written statement to Investigators that "[s]tated that he had never physically abused Jane or engaged in sexual conduct or contact without her consent" (*id.* at ¶ 148(a)), and "that he never sexually assaulted Jane" (*id.* at ¶ 163).

However, John has done himself a disfavor in his attempt to apparently plead alternative facts to alternative theories. Specifically, while John attempts to label events in a way that is tidy for him, these conclusory labels are not only unsupported by this many other allegations, these conclusions are nullified by them.

### 1.     The January 18, 2019 incident.

John alleges that Jane reported in her complaint to Kenyon, that, on January 18, 2019, "John 'grabbed [her] and threw [her] down the hill.'" (Doc. 27, at ¶ 218.) John alleges that Jane sent a text to one of her friends about the incident saying, "He like threw me down a hill idk what's up it's wack man." (*Id.* at ¶ 223.) John alleges that Jane sent a text to the same friend about the incident, saying "he [John] would not let her [Jane] leave his room after the incident." (*Id.*) John alleges that Jane sent another text in the exchange that states, "I know he was blacked out but it still hurt…I mean I know he was super trashed and he doesn't mean it." (*Id.*)

John alleges that there is no evidence that Jane expressed this concern to John. (*Id.* at ¶ 224.) John alleges that another witness stated that Jane later "diminished the event, almost like it didn't happen." (*Id.* at ¶ 225.)

John alleges that "he was drunk that night, and fell several times. Jane fell when she was trying to help him get out of a bush, and at one point he accidentally fell into Jane and she fell with him. John did not intentionally grab or push her." (*Id.* at ¶ 219.)

As discussed below, regardless of the terms he wants to use to describe his actions, or his lack of responsibility for his actions, his specific factual pleadings evidence that he nevertheless committed violations of the Title IX Policy for physical harm or intimidation and intimate partner violence. At the very least, even construing the events of January 18, 2019, in favor of John as pleaded in his Second Amended Complaint, he has not shown that the finding of a violation was in error.

### 2.     The February 2, 2019 incident.

John alleges that "Jane claimed that John 'struck [her] around her head and neck with his right arm.'"  (Doc. 27, at ¶ 231.)  John alleges that "[t]he evidence showed that John and Jane got into an angry argument and were yelling at each other."  (*Id.* at ¶ 232.)  John alleges that he "acknowledged that he damaged some items in his room" during this argument.  (*Id.* at ¶ 233.) John alleges that he "told the Investigators he did not direct any aggression toward Jane.  (*Id.*) John alleges that Jane texted a friend once stating, "he never hit me though he tried once."  (*Id.* at ¶ 234.)

Again, and as discussed below, regardless of the terms he wants to use to describe his actions or his lack of responsibility for his actions—as he pleads his actions, he has violated the Title IX Policy violation for physical harm or intimidation and intimate partner violence.  At the very least, as John describes his actions on February 9, 2019, he has not shown the finding of a violation was in error.

### 3.     The September 13-14, 2019 incident.

John's Amended Complaint focuses heavily on the September 13-14, 2019 incident.  As with his descriptions of the other two dating violence incidents, John's allegations do not cast a doubt on the accuracy of Kenyon's Title IX outcome regarding the night of September 13-14, 2019.

John alleges that he and Jane were sexually active during their relationship, including earlier on the day of September 13, 2019.  (*E.g.*, Doc. 27, at ¶ 9.)  John alleges that Jane wanted to have sex again later that day.  (*Id.*)  Specifically, John alleges that Jane stated they "talked about trying to have sex again sometime later that day, but nothing worked out."  (*Id.* at ¶ 123(a)(i).)

John alleges that "[l]ate that evening [September 13, 2019], John and Jane went to a party at a friend's apartment."  (*Id.* at ¶ 12.)  John alleges that he and Jane went to the party together at

"approximately 10-11 p.m." (*Id.* at ¶ 123(a)(iii).) John alleges that witnesses at the party saw John and Jane "making out on the dance floor and being extremely affectionate with each other." (*Id.*)

John also alleges that Jane acknowledged to Investigators, "before she and John went to John's apartment, she had wanted to have sex with him." (*Id.* at ¶ 33.)

        **a.**       **John and Jane at his apartment from approximately 12:15-12:45 a.m.**

John alleges that "[a]t about midnight, Jane and John left the party to go to John's apartment, arriving there at about 12:15 a.m. on September 14." (*Id.* at ¶ 13; *see also id.* at ¶ 123(b)(i)-(ii).) John alleges that from approximately 12:15-12:45 a.m., "[t]hey were in John's apartment. Jane later alleged a sexual encounter occurred which she did not remember." (*Id.* at ¶ 123(b)(iii).) John alleges further that "[d]espite her purported lack of memory, she claimed John had raped her, saying she could not have consented because she had been incapacitated by alcohol and did not remember having sex." (*Id.* at ¶ 34.)

John alleges that, following Jane's Title IX complaint, he "decided to exercise his right not to provide further details about the night of September 13/14" (*id.* at ¶ 43), decided not to sit for an in-person interview (*id.* at ¶ 46), and due to concern for potential criminal charges on this issue, "he exercised his right to remain silent with respect to the alleged encounter with Jane on September 13/14, 2019" (*id.* at ¶ 134).

In contrast, John alleges in the Second Amended Complaint that, according to Jane, John told her they had sex" (id. at ¶ 16) and also told her that "he had raped her." (*Id.* at ¶ 123 (b)(x).)

        **b.**       **John and Jane leave John's apartment at approximately 12:45 a.m.**

John alleges that, "[a]t about 12:45 a.m., John asked Jane to leave and go back to her own place." (Doc. 27, at ¶ 14.) John also alleges, "[Jane] acknowledged that when he asked her to go home she was angry because she wanted to stay and have sex. She reported that she had been

drinking and did not remember anything between the party and finding herself outside John's apartment feeling 'bitter' because he was making her leave." (*Id.* at ¶ 33.)

> ### c. John and Jane leave the apartment and get into an argument that attracts bystanders, a Community Advisor, Campus Security, and the Sherriff's Office.

John alleges that, after leaving his apartment at 12:45 a.m., "[t]hey argued about the fact that he wanted her to go home and she wanted to stay." (*Id.* at ¶ 17.)  He alleges further, "Jane (again according to her own statements) was angry because she wanted to stay and have sex with him." (*Id.* at ¶ 15.)  John alleges that "[a]ccording to Jane, John told her they had already had sex, but she claimed not to remember it, purportedly due to a temporary blackout from the alcohol she had consumed." (*Id.* at ¶ 16.)

John alleges that at approximately 12:55 a.m.,

> Jane and John argued about the fact that John wanted Jane to go home when she wanted to stay with him and have sex.  Several bystanders, including a female student who served as a Kenyon Community Advisor, overheard a few words from the argument and approached them.  The Community Advisor claimed John chest bumped her, though she did not claim to have been injured, and flagged down Kenyon Campus Safety officers who were passing by.  One of the Campus Safety officers physically detained John, in violation of Kenyon policy.  The officers spoke to John and Jane separately, and the sheriff's office was called.

(*Id.* at ¶ 123(b)(v).)

As John alleges, Jane told Investigators that during their argument that led to intervention by bystanders, a Community Advisor, Campus Security, and sheriff's deputy, John repeatedly screamed "I raped you!" to Jane.  (*Id.* at ¶ 182.)

John alleges that the bystanders reported that they heard John and Jane "make references to 'rape' and 'consent.'"  (*Id.* at ¶ 140.)  John alleges, "[t]he Community Advisor told the deputy

she overheard Jane and John talking about consent and heard the terms 'didn't get consent.'" (*Id.* at ¶ 123(vi).)

John alleges that the argument with Jane that attracted bystanders resulted in the female Community Advisor claiming that John "chest bumped" her, the Community Advisor flagging down Campus Security, Campus Security physically detaining John, and a sheriff's deputy arriving at the scene. (*Id.* at ¶¶ 19-21; *see also id.* at ¶ 123(b)(iv)-(v).) As John alleges, the Community Advisor said she would like to press charges against John and John was arrested. (*Id.* at ¶ 123(b)(vi).)

John alleges that, based on their interactions with John at this time and what they witnessed, Campus Safety described John as "being aggressive" (*id.* at ¶ 24), and that they "were not going to let [John] go until they figured out if he had assaulted Jane" (*id.* at ¶ 22). As allegedly reported by Jane, Campus Safety "felt they had enough evidence based on that one interaction to tell me I was in an abusive relationship." (*Id.* at ¶ 27.)

John alleges that the sheriff's deputy was dispatched at 1:07 a.m. (*Id.* at ¶ 123(b)(vi).) John alleges the sheriff's deputy's body camera recorded from 1:07 a.m. when he arrived and ran for 10 minutes. (*Id.* at ¶ 123(b)(vi).) John alleges that "Investigators failed even to acknowledge that *within half an hour* of the alleged sexual encounter, Jane had a completely lucid, coherent, logical, and calm videotaped conversation with Kenyon Campus Safety officers and a sheriff's deputy." (*Id.* at ¶ 55 (emphasis added).)

John's description of the body camera video occurring "within half an hour of the alleged sexual encounter" is contrary to his timeline. Again, John alleges that he and Jane returned to his apartment at 12:15 a.m. and left at around 12:45 a.m. Assuming the sexual encounter began as early as 12:15 a.m., a more accurate description of the time frame is that Jane was recorded in a

video sometime between 37-52 minutes after the sexual encounter, if assuming Jane appeared at 1:07 a.m., as opposed to closer to 1:17 a.m. (on the less conservative calculation, the video was in the range of 37-62 minutes later) and certainly not "within half an hour" after the alleged sexual encounter. (*See id*. at ¶ 55.)

John alleges that what Jane told the sheriff's deputy is entirely consistent with her not being aware that they had had sex: that "she was mad that John was trying to send her home, she had wanted to 'hook up' with him, and he hadn't done anything wrong." (*Id.* at ¶ 55.) John further alleges that Jane told the sheriff's deputy early in the morning of September 14, 2019, "Like, I don't think he did anything wrong to me. I was mad because *we hadn't hooked up in like a week so I was asking him like why he didn't want to hook up with me* and I think that's what they heard and he was mad at me and was trying to send me home." (*Id.* at ¶ 123(b)(vi) (emphasis added).) John alleged that he and Jane had consensual sex earlier in the day of September 13, 2019. (*Id.* at ¶ 9.) Although John alleges that Jane was "lucid" during this interaction with the sheriff's deputy, John does not acknowledge Jane's confusion in this statement given that John and Jane had had sex at least once in the last day; Jane does not appear to remember it.

Further consistent with Jane's confusion at not being aware she and John had had sex, John points to communications Jane had with witnesses. John alleges that at 1:15 a.m., "Jane texted her friend Witness A that John 'just got arrested. For raping me. Idk what's going on. He didn't tho." (*Id.* at ¶¶ 123(b)(viii), 185.) John alleges that from 1:14 a.m.-2:39 a.m., "Jane called her friend Witness C, who, according to the Report, told Investigators Jane said she wanted to stay with John and have sex, John told her he did not want her there, Jane had told John they didn't have sex, and that's when John said he raped [Jane]." (*Id.* at ¶ 123(b)(x).)

####      d.      Observations of Jane's incapacitation by witnesses and John the night of September 13-14, 2019.

John's attempt to misdirect the evidence gathered the night of September 13-14, 2019 regarding Jane's incapacitation is undone by the actual facts he pleads.

As John details in his Second Amended Complaint, many witnesses saw and interacted with John and Jane the night of September 13-14, 2019.  John alleges "[a] number of witnesses saw Jane and John that night, both before and after the alleged rape."  (*Id.* at ¶ 35.)  John alleges that the Investigators interviewed these many witnesses: "The Investigators interviewed Jane and others, including some of Jane's friends, some of John's friends, people who had observed John and Jane as they walked back to Jane's place in the early morning hours of September 14, and various Kenyon officials."  (*Id.* at ¶ 133.)

John concludes baldly: "[t]he evidence definitively established that Jane was not incapacitated the night of September 13."  (*Id.* at ¶ 192.)  In reference to the many witnesses interviewed by Investigators, he states, throughout his Second Amended Complaint, that "[n]ot one of them…thought Jane was incapacitated or exhibiting signs of incapacitation" (*id.* at ¶ 35), and "[n]one of the witnesses who saw Jane that evening thought she was incapacitated or exhibiting signs of incapacitation" (*id.* at ¶ 197).  He accuses the Investigators of determining Jane was incapacitated "[w]ith no evidence" (*id.* at ¶ 216) and was based on "sheer speculation" (*id.* at ¶ 55).

John's continued allegations underscore the misdirection of his description above.  John alleges:

> Investigators cited one witness's report that Jane's eyes were "red, glassy, and her face was puffy like she'd been crying," and witness statements that she was "very emotional" after they left John's apartment.

(*Id.* at ¶ 207.)  John's assertions that "not one" witness described Jane as incapacitated or "even noticeably intoxicated" are undone by his own allegations.  As John notes, *several* witnesses reported signs of Jane's physical and mental state that they felt worth noting to Investigators and, as discussed below, are signs of incapacitation under Kenyon's Title IX Policy.

Moreover, *John himself described Jane as "blacked out" that night*.  John alleged that at 5:00 a.m. that morning, he told Jane, "I thought you were too blacked out to take my call."  (*Id.* at ¶ 123(b)(xxii).)  John also sent Jane a text message describing her as "blacked out" the night of September 13-14, 2019 and described her that way to his friends.  (*Id.* at ¶ 149.)

John alleges that he described Jane as "blacked out" because that was the language Jane had used and it "shocked him."  He alleges that he provided a statement to Investigators stating, "I was explaining to her that if [her statement that she had blacked out] were true, then we could not be together sexually and I should not stay at her house.  I never stated that I raped anyone…Any reference to her as having blacked out in my text message to her was based solely on her statement that she had blacked out.  I saw no signs of significant intoxication and she was certainly not impaired or incapacitated."  (*Id.* at ¶ 149.)

John alleges that Jane alleged the two had a "name game" (which he does not describe) to indicate consent in relation to the night of September 13-14, 2019 and that he did not comment on the "name game" with Investigators. (*Id.* at ¶ 214(c).)  John alleges that Investigators "seized on Jane's reference to a 'name game'" that Jane referenced as a way that they determined if they could consent to sex.  (*Id.*)  John alleges that Investigators noted John's "failure to comment" on the name game raised by Jane during the investigation and notes "as if a 'name game' was the only way to determine whether someone can and does consent to sex."  (*Id.*)  As John pleads, the Investigators did not consider the name game the "only way" to determine ability to consent and

consent.  As John pleads, in addition to the statements by witnesses, Jane, and John above in their

analysis, Investigators also considered: (1) Jane alleged the couple would play a name game to

determine ability to consent after drinking, (2) Jane alleged that she did not recall playing a name

game with John that night, and that (3) John did not rebut Jane's allegations about the couple's use

of the name game to determine their ability to consent or not playing it that night. (*Id.* at ¶ 214(c).)

John's allegations regarding reliance on his expert toxicologist are also misplaced.  John

alleges that he "submitted reports by an expert toxicologist, who stated – based on information that

Jane provided, the body camera video, and the observations of witnesses – that [Jane] was not

incapacitated or even noticeably intoxicated."  (*Id.* at ¶ 150.)  John does not describe what

information he provided the toxicologist other than that the video that John described as

occurring/being recorded "less than thirty minutes" after an alleged sexual assault, and that "none

of the witnesses" described Jane as incapacitated.  John does not allege that the toxicologist met

with Jane, or received any information independent of the information curated by John for his own

benefit.  For the reasons above, John's allegations describing the night of September 13-14, 2019,

undo these self-serving descriptions of Jane's state.

In sum, John's assertions that no witnesses or evidence supported the Investigators' finding

that Jane was incapacitated is a mischaracterization, as his own allegations show.

**B.**     **John's allegations regarding Kenyon's Title IX Process and commencement of this lawsuit.**

Six days after the incident, following Jane's September 20, 2019 Title IX complaint to

Kenyon, Kenyon launched an investigation and on December 21, 2019, the Investigators issued

their Final Investigative Report.  (*Id.* at ¶ 49.)  As addressed above, the Investigators determined

in their Final Investigation Report that the record supported by a preponderance of the evidence

that John had violated Kenyon's Title IX Policy for "alleged nonconsensual sexual intercourse and

contact on the night of September 13, 2019" as well as the January 18, 2019 and February 2, 2019 incidents involving Jane. (*Id.* at ¶ 50.)

As a result of these findings, "[a] Kenyon Adjudicator issued a sanction decision on January 11, 2020, dismissing John from Kenyon and barring him from Campus." (*Id.* at ¶ 58.)

John alleges that he appealed the decision for procedural error and clearly erroneous outcome. (*Id.* at ¶ 63.) According to John, "[o]n February 17, 2020, the Appeals Officer rejected John's appeal." (*Id.* at ¶ 241.)

John alleges that he reminded the Appeals Officer's "obligation to follow the law, including the Sixth Circuit precedent requiring schools to allow respondents to question complainants and witnesses in a live hearing before impartial factfinders…" (*id.* at ¶ 61) and, on February 27, 2020, Kenyon College's Appeals Officer denied Plaintiff's appeal. (*Id.* at ¶ 60; *see also id.* at ¶ 41, citing *Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018.).) John continues, "the Appeals Officer responded that this was 'irrelevant, since the College is only obligated to follow its Policy, and the Policy does not allow for cross-examination in its process." (*Id.* at ¶ 61.)

Further, John appears to allege that he appealed that Investigator's outcome on the grounds that it was erroneous because the Investigators "started with an assumption Jane was telling the truth" and selected and viewed the evidence they gathered "with the goal of supporting that assumption." (*Id.* at ¶ 56.)

Specifically, John alleges that, during the investigation, he told Investigators that Jane lied and he gave "the Investigators evidence that Jane had sexually harassed, pressured, and coerced him, and that he had been resisting Jane's sexual pressure on the night of September 13[, 2019]." (*Id.* at ¶¶ 66-67.) John alleges that Kenyon College "did not, however, open an investigation of Jane's Policy violations or consider them in deciding the claims against John." (*Id.* at ¶ 71.)

1.    **Alleged false statements by Jane.**

John appears to allege that, because Jane made other allegations of abuse against John for which he was found not responsible under Kenyon's Title IX process, that therefore these allegations are false statements. John also appears to allege that Jane's description in text messages regarding whether she and John would have sex on September 12, 2019, to be proof of false statements.

Regarding allegations that Jane's additional abuse claims constitute false statements, John alleges, "the Investigators rejected Jane's foundational claim of ongoing and persistent abuse, stating that '[u]p until the September 13, 2019 incident, [Jane] seemed to be taking [John's alleged] negative behavior in stride, keeping her grades up, and actively and enthusiastically participating in the relationship." (*Id.* at ¶ 49.) He continues, "[t]he Investigators did not explain how they could reject Jane's foundational claims of abuse and still repeatedly say she was consistent and credible." (*Id.* at ¶ 53.) John also alleges, "John also gave the Investigators evidence that Jane had blatantly lied to the Investigators about both the overall nature of their relationship and specific incidents, and had engaged in a pattern of vindictive behavior and exaggerated reactions." (*Id.* at ¶ 67.) John explains that "he submitted personal and intimate evidence to contradict Jane's false narrative of abuse." (*Id.* at ¶ 73.) And, "[t]he Investigators failed to consider the impact of Jane's false recasting of the parties' relationship." (*Id.* at ¶¶ 160.)

Similarly, John appears to also claim that Jane's description of their relationship was false because she made a false statement in her Title IX complaint. Specifically, John alleges, "In Jane's Title IX complaint, she said that for the rest of that week she did not want sex, that John tried to hook up with her at the river on September 12, and that she declined 'over and over again.'" (*Id.* at ¶ 121.) John alleges that a text exchange between them from September 12, 2019, proves she made a false statement. Specifically, John alleges that Jane texted him to see if he wanted to have

sex several times and, after receiving no response, Jane texted John that "she actually didn't want to," to which he responded 'Haha ok baby.'  She then said, 'I kinda wanna have Sex but not enough to leave my room,' then said she did not want John to go to another girl, then said 'Idk j don't think I've ever turned down sex before.'"  (*Id.* at ¶ 122.)

### 2.  Alleged failure by Kenyon to take his claims against Jane seriously.

John alleges that, "[d]uring the investigation, John gave the Investigators evidence that Jane had sexually harassed, pressured, and coerced him, and indeed, that he had been resisting Jane's sexual pressure on the night of September 13."  (*Id.* at ¶ 66.)  John alleges, "Kenyon does not require individuals alleging potential violations of its Policy to make formal complaints, but commits to actions it will take in 'every case'."  (*Id.* at ¶ 69.)  John further alleges that, with regards to support to a person bringing a Title IX complaint, Kenyon gave Jane support "when she made complaints about John, but not John when he told Investigators of her conduct and false claims."  (*Id.* at ¶ 102(g).)  John alleges that when he "raised this point in his appeal, the Appeals Officer's response was that he could make a complaint now.  She did not address Kenyon's failure to honor its Policy obligations when he first reported Jane's misconduct."  (*Id.* at ¶ 72.)

### C.  Pertinent Sections of Kenyon's Student Handbook and Title IX Policy.

### 1.  Kenyon's 2019-2020 Student Handbook, which John attached as Exhibit A to his Second Amended Complaint.

John attaches Kenyon's 2019-2020 Student Handbook as Exhibit A to his Second Amended Complaint and cites to it several times through his Second Amended Complaint. Specifically, John appears to compare and contrast the sexual misconduct and non-sexual misconduct processes.  (*E.g.*, Doc. 27, at ¶¶ 37-40.)  Kenyon 2019-2020 Student Handbook provides "Student Regulations" that govern student life.  (Doc. 27-1, Exhibit A, PAGEID# 798.) Accordingly, the relevant provisions are included below.

14

Under "B. Non-Sexual Assault," the Student Handbook refers to Kenyon's Sexual Misconduct Policy:  Title IX, VAWA, Title VII for sexual assault and intimate partner violence and provides, in pertinent part:

> *Note: Sexual assault and intimate partner violence are discussed in the Title IX/VAWA Policy.  See Section W.*

(Doc. 27-1, PAGEID# 799 (italics original, hyperlink to Title IX Policy omitted).)

Under "W. Sexual and Gender-Based Discrimination," the Student Handbook refers to Kenyon's Sexual Misconduct Policy: Title IX, VAWA, Title VII and provides:

> The College is committed to fostering a climate free from sexual and gender-based discrimination, harassment and violence, intimate partner violence and stalking through clear and effective policies, a coordinated education and prevention program, and prompt and equitable procedures for resolution of reports of conduct prohibited under this policy.  The College encourages all members of its community to participate in the process of creating a safe, welcoming and respectful environment on campus.
>
> *More information about Kenyon's Sexual Misconduct and Harassment Policy: Title IX, VAWA, Title VII is available at kenyon.edu/title-ix.*
>
> Sexual and gender-based discrimination, harassment and violence, intimate partner violence and stalking, in any form, are serious violations of College and community standards and values, and will not be tolerated at Kenyon.  The College is committed to taking all appropriate steps to eliminate prohibited conduct, prevent its recurrence and address its effects.  Individuals found responsible under this policy may face disciplinary up to and including dismissal from the College and/or termination of employment.
>
> The College will not tolerate retaliation against an individual who makes a report or participates in any proceedings under this policy, Kenyon College policy prohibits any form of retaliation, and community members engaging in retaliation will be subject to disciplinary action, whether such acts are implicit or explicit, or committed directly or indirectly.
>
> This policy provides the Kenyon community with (1) resources and recourse for individuals who experience prohibited conduct,* (2) guidance to a complainant, a respondent or other affected

15

community members, (3) Kenyon's expectations for healthy respectful interpersonal interaction and communication, and (4) a procedural outline for addressing behaviors that are counter to Kenyon's mission and prohibited by this policy.

All College proceedings under this policy are conducted in compliance with the requirements of Title IX, the Clery Act, as amended by the Violence Against Women Act, the Family Educational Rights and Privacy Act (FERPA), and state and federal law. No information shall be released from such proceedings except as required or permitted by law and College policy.

*When used in this policy, complainant refers to the individual(s) who experiences Prohibited Conduct, regardless of whether that individual makes a report or seeks formal disciplinary action. A respondent refers to the individual(s) who has been accused of Prohibited Conduct.

(Doc. 27-1, PAGEID# 819-20 (italics original).)

The Student Handbook provides a process for violations under the student conduct process, which governs non-sexual misconduct. (Doc. 27-1, PAGEID# 827-842.) As discussed below, the grievance process for allegations of student conduct violations under the 2019-2020 Student Handbook does not apply to allegations of violations under the Sexual Misconduct and Harassment Policy: Title IX, VAWA, Title VII 2019-2020, which has its own separate grievance process.

### 2. Kenyon's Sexual Misconduct and Harassment Policy: Title IX, VAWA, Title VII 2019-2020, attached as Exhibit B to John Doe's Second Amended Complaint.

For purposes of addressing John Doe's claims against Kenyon,, John incorporated in his Second Amended Complaint partial quotations of the definitions in Kenyon's Title IX and Sexual Misconduct Policy for 2019-2020 ("Kenyon's Title IX Policy"), as well as citing to the publicly available policy, imbedding a hyperlink to the policy, including the full web address to the policy, and attaching the policy as Exhibit B to his Second Amended Complaint (Doc. 27-2).[1] John raises

---

[1] As addressed below in the "Standard of Review," when reviewing a Motion for Judgment on the Pleadings, a court may also consider "matters of public record, orders, items appearing in the

several allegations of violation of Title IX, both with the Kenyon's Title IX Policy itself and as applied to him. Accordingly, the relevant portions of Kenyon's Title IX Policy are included for relevant definitions and the grievance process for sexual misconduct allegations.

### 3. Relevant and sex and gender-neutral definitions from Kenyon's Title IX Policy.

As John alleges, Jane claims against him were found to violate Kenyon's Title IX Policy for the following three incidents: the January 18, 2019 incident of pushing Jane down a hill, the February 9, 2019 incident for attempting to hit Jane, and for her allegations that he had sex with her without consent and while she was incapacitated on the night of September 13-14, 2019. The pertinent definitions from Kenyon's Title IX Policy, "non-consensual sexual intercourse," "non-consensual sexual contact," "consent," "incapacitation," "physical harm and intimidation," and "intimate partner violence" follow.

#### a. Non-consensual sexual intercourse

Kenyon's Title IX Policy at Section VI Prohibited Conduct, defines "non-consensual sexual intercourse", as follows:

> Non-Consensual Sexual Intercourse is defined as having or attempting to have sexual intercourse with another individual without Consent (see section VII).

> Penetrative examples of sexual intercourse include but may not be limited to: vaginal or anal penetration, however slight, with a body part (e.g., penis, tongue, finger, hand) or object, or oral penetration involving mouth to genital contact or mouth to anus contact.

---

record of the case, and exhibits attached to the complaint." *McGath v. Hamilton Local Sch. Dist.*, 848 F. Supp. 2d 831, 836 (S.D. Ohio 2012) (*quoting Barany–Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008)). Here, John Doe has attached a full copy of Kenyon's Title IX Policy to his Second Amended Complaint as Exhibit B (Doc. 27-2), as well as quoted portions of it in his allegations for the definition of "incapacitation." As John indicates in his Second Amended Complaint by imbedding hyperlink and including a full website citation, Kenyon's Title IX Policy is also publicly available online.

> Non-penetrative examples of sexual intercourse may include, but may be not be limited to: exposed genitals rubbing against each other, rubbing one's exposed genitalia against parts of another individual's body, or rubbing another's exposed genitalia.
>
> A finding of responsibility for non-consensual sexual intercourse will result in suspension, dismissal or termination of employment.

(Doc. 27-2, Second Amended Complaint Exhibit B, PAGEID# (cutoff), p. 13 of 33, at Section VI.D.)

### b.    Non-consensual sexual contact

Kenyon's Title IX Policy at Section VI Prohibited Conduct, defines "non-consensual sexual contact", as follows:

> Non-Consensual Sexual Contact is defined as having sexual contact with another individual without Consent (see section VII).
>
> Sexual contact includes any intentional touching of the intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, genitals, buttocks, groin, mouth or any other part of the body that is touched in a sexual manner. Sexual contact may be over the clothes or skin-to-skin.

(*Id.* at p. 13 of 33, at Section VI.E.)

### c.    Consent

Kenyon's Title IX Policy at Section VII Related Definitions and Concepts, defines "non-consensual sexual contact", in pertinent part, as follows:

> Individuals who choose to engage in sexual activity of any type with each other must first obtain clear consent. Consent is clear, knowing, and voluntary permission. It can only be given by someone of legal age. Consent is demonstrated through mutually understandable words or actions that clearly indicate a willingness to engage freely in sexual activity. Silence cannot be assumed to indicate consent. Some additional considerations about consent include:
>
> • Each participant in a sexual encounter is expected obtain and give consent to each act of sexual activity in order for the activity to be considered consensual. Consent to one form

18

of sexual activity does not constitute consent to engage in all forms of sexual activity.

- Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. While consent can be given by words or actions, non-verbal consent is more ambiguous than explicitly stating one's wants and limitations. Relying on non-verbal communication can lead to misunderstandings. Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response. A person who does not physically resist or verbally refuse sexual activity is not necessarily giving consent.

- When consent is requested verbally, absence of any explicit verbal response or a clear nonverbal response constitutes lack of consent. A verbal "no" constitutes lack of consent, even if it sounds insincere or indecisive. Under this policy, "no" always means "no." "Yes" only means "yes" when it is voluntarily and knowingly given by an individual who has the capacity to give consent.

- If any time during the sexual activity, any confusion or ambiguity arises as to the willingness of other individuals to proceed, all parties should stop and clarify, verbally, the other's willingness to continue before proceeding with such activity.

- Any party may withdraw consent prior to the completion of the act. Withdrawal of consent should be outwardly demonstrated by words or actions that clearly indicate a desire to end sexual activity. Once withdrawal of consent has been expressed, sexual activity must cease.

- ***Individuals with a previous or current intimate relationship do not automatically give either initial or continued consent to sexual activity. Even within the context of a relationship, there must be mutually understandable communication that clearly indicates a willingness to engage in sexual activity each time.***

- Consent is not effective if it results from use of threat of physical force, intimidation, or coercion, or any other factor that would eliminate an individual's ability to exercise free will to choose whether or not to have sexual contact.

19

> ***Individuals who consent to sexual activity must be able to fully understand what they are doing. An individual who is physically incapacitated by alcohol or other drug consumption (voluntarily or involuntarily)*** or is asleep, fading in and out of consciousness, unconscious, unaware, or otherwise physically helpless i***s considered unable to give consent. See Incapacitation for further discussion.***

> […]

(*Id.* at p. 15 of 33, Section VII.A (emphasis added).)

### d.   Incapacitation

Kenyon's Title IX Policy at Section VII Related Definitions and Concepts, defines "incapacitation", as follows:

> An individual who is incapacitated lacks the ability to make informed, rational judgments and cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring. In addition, persons with certain intellectual or developmental disabilities may not have the capacity to give consent. Consent cannot be obtained by taking advantage of another individual's Incapacitation.

> Where alcohol or other drugs are involved, Incapacitation is a state beyond intoxication. The impact of alcohol and other drugs varies from person to person; however, warning signs that a person may be approaching Incapacitation may include slurred speech, vomiting, unsteady balance, strong odor of alcohol, combativeness, or emotional volatility.

> Evaluating Incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects an individual's:

> - Decision-making ability;
> - Awareness of consequences;
> - Ability to make informed judgments;
> - Capacity to appreciate the nature and the quality of the act; or
> - Level of consciousness.

16595310v3

> In other words, a person may be considered unable to give valid consent due to Incapacitation if the person cannot appreciate the who, what, where, when, why, or how of a sexual interaction.
>
> Evaluating Incapacitation also requires an assessment of whether a respondent was or should have been aware of the reporting party's Incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the respondent's position.
>
> Being intoxicated or impaired by drugs or alcohol is never an excuse for any Prohibited Conduct under this policy and does not diminish one's responsibility to obtain informed and freely given consent.

(*Id.* at p. 16 of 33, Section VII.D.)

### e.      Physical Harm and Intimidation

Kenyon's Title IX Policy at Section VII Prohibited Conduct, defines "physical harm and intimidation" as follows:

> Physical harm and/or intimidation include threatening, or causing physical harm, written or verbal abuse or other conduct that threatens or endangers the health or safety of any person; or implied threats or acts that cause an unreasonable fear of harm in another. Examples include but are not limited to: hitting, choking, or otherwise contacting another person in a physically aggressive manner. These acts may be directed at the individual and/or the individual's property and possessions. When these acts occur in the context of a romantic or sexual encounter, or intimate partner violence or when the behavior is perpetrated on the basis of sex or gender, the conduct will be resolved under this policy. A finding of responsibility will result in suspension, dismissal or termination of employment. When a student is found responsible for a violation of this policy, the recommended sanction is a minimum of one semester suspension form the College.

(*Id.* at p. 14 of 33, at Section VII.H.)

### f.      Intimate Partner Violence

Kenyon's Title IX Policy at Section VII Prohibited Conduct, defines "intimate partner violence", as follows:

> Intimate Partner Violence (including dating violence and domestic
> violence) includes any act of violence or threatened act of violence
> that occurs between individuals who are involved or have been
> involved in a sexual, dating, spousal domestic, or other intimate
> relationship.  Intimate Partner Violence may include any form of
> Prohibited Conduct under this policy. When a student is found
> responsible for a violation of this policy, the recommended sanction
> is a minimum of one semester suspension from the College.
>
> The College will evaluate the existence of an intimate relationship
> based upon the reporting party's statements and taking into
> consideration the length of the relationship, the type of relationship,
> and the frequency of interactions between the persons involved in
> the relationship.

(*Id.* at p. 14 of 33, at Section VII.J.)

### 4.    Relevant and sex- and general- neutral Title IX process Kenyon's Title IX Policy.

As Plaintiff alleges, Kenyon College conducted an investigation, adjudication, and appeal

in Plaintiff's Title IX process, which were governed by Kenyon College's Title IX Policy.   In

pertinent part, Kenyon College's Title IX Policy provides for the following process in "Section

XI. Review, Investigation and Resolution Options."

### a.    Intake of the report through selection of formal resolution

In pertinent part, Kenyon College's Title IX process provides for an initial assessment upon

receipt of the report by the Title IX Coordinator.  (Doc. 27-2, at p. 22 of 33.)

> In the course of this initial assessment, the Title IX Coordinator will
> consider the interest of the reporting party and their expressed
> preference for the manner of resolution, as well as the College's
> broader obligation to maintain a safe campus free from harassment
> and discrimination.
>
> […]
>
> The initial review will proceed to the point at which a reasonable
> assessment of the safety of the individual and of the campus
> community can be made, and the Title IX Coordinator has sufficient
> information to determine the appropriate manner of resolution.

22

> At the conclusion of the assessment, the Title IX Coordinator, will determine the appropriate manner of resolution…It is at the discretion of the Title IX Coordinator to determine which method of resolution is appropriate.
>
> […]

(*Id.* at p. 23 of 33, Section XI.B.)

"Where the Title IX Coordinator concludes that Formal Resolution is appropriate, the College will initiate an investigation." (*Id.* at p. 24 of 33, Section XI.F.)

### b. The Investigation

The Title IX Coordinator designates two trained investigators, one of whom is typically a College employee, although one or both may be an external investigator. (*Id.* at p. 25 of 33, Section X.F.1.) The Title IX Policy describes the investigative process:

> The investigators will interview the complainant and the respondent to understand the details of the reported incident. The investigators, in their discretion, will conduct other fact finding and/or discussions with any other individuals who may have information relevant to the determination. Witness must have observed the acts in question or have information relevant to the incident and cannot be participating solely to speak about an individual's character. The investigators will also gather any available physical evidence, including documentation, communications between the parties, and other electronic records as appropriate.
>
> […]
>
> The complainant and respondent will have an equal opportunity to be heard; submit written questions to ask of the other party or relevant witnesses; submit information and evidence; and identify witnesses who may have relevant information. Investigators will review submitted questions and, in their discretion, may choose which questions are necessary and appropriate to the investigation and conduct any follow-up at they deem relevant.
>
> All parties and witnesses are expected to provide truthful information. Knowingly providing false or misleading information is a violation of College policy and subject a student or employee to disciplinary action.

16595310v3

[…]

The sexual history of the complainant and respondent will never be used to prove character or reputation.  Moreover, evidence related to prior sexual history of either of the parties is generally not relevant to the determination of a policy violation and will only be considered in very limited circumstances.  For example, if the existence of consent is at issue, the sexual history between the parties may be relevant to help understand the manner and nature of communications between the parties and the context of the relationship, which may have bearing on whether consent was sought and given during the incident in question.  However, even in the context of a relationship, consent to one sexual act does not, by itself, constitute consent to another sexual act, and consent on one occasion does not, by itself constitute consent on a subsequent occasion.  In addition, under very limited circumstances, prior sexual history may be relevant to explain the presence of a physical injury or to help resolve another question raised by the report.

Any party seeking to introduce information about prior sexual history or pattern evidence should bring this information to the attention of the investigators at the earliest opportunity.  While the investigators may explore relevant areas of inquiry, the Title IX Coordinator has the discretion to make the final determination whether evidence of prior sexual history or other misconduct is relevant to the determination regarding responsibility.

[…]

(*Id.* at p. 25-26 of 33, Section X.F.1.)

### c.    Review of Investigation and Initial Investigative Report

At the conclusion of the investigation, the investigators prepare a written initial (preliminary) investigation report that the parties may review.  (Doc. 27-2, p. 26 of 33, Section X.F.2.)  In preparing for this initial investigation report, the investigators review all facts gathered to determine whether the information is relevant given the allegation and redact information that is irrelevant, more prejudicial than probative, immaterial, or of personal opinion.  (*Id.*)

After viewing this initial investigation report, the complainant and respondent may request to be re-interviewed.  (*Id.* at p. 27 of 33.)  Additionally, the complainant and respondent may, in

16595310v3

24

writing, submit any additional comments, witnesses, evidence, or suggested follow-up questions to the investigators within five business days of the opportunity to review the initial investigation report. (*Id.*) After these five business days have lapsed, the investigators conduct any additional follow-up that they deem appropriate. (*Id.*)

### d. Determination of Responsibility, the Adjudicator, and Sanctions

After completing their follow up from the initial investigation report, the investigators make a determination, by a preponderance of the evidence, whether there is sufficient information to support a finding of responsibility. (Doc. 27-2, at p. 27 of 33, Section X.F.3.) The investigators include in the final investigation report their findings and rationale for each of the findings. (*Id.*) The final investigation report is shared with the complainant and respondent by the Title IX Coordinator. (*Id.*)

If the investigators determine, by a preponderance of the evidence, that there is sufficient information to find respondent in violation of Kenyon's Title IX policy, the matter is referred to an Adjudicator to determine the appropriate sanction. (*Id.*)

The Adjudicator must be a neutral and impartial decision-maker. (*Id.* at p. 27 of 33, Section X.F.4.) The parties are informed in writing of the identification of the Adjudicator and provided the opportunity to submit a written request to the Title IX Coordinator to replace the Adjudicator, if there are reasonable articulable grounds to establish bias, conflict of interest or an inability to be fair and impartial. (*Id.*) The designated Adjudicator is only be replaced if the Title IX Coordinator determines that their bias precludes impartiality or constitutes conflict. (*Id.*)

In determining the appropriate sanctions, the Adjudicator:

- affords the complainant and the respondent the opportunity to submit a written impact/mitigation statement to the Adjudicator for consideration within three calendar days of the notice of referral to adjudication;

- considers a sanction(s) designed to eliminate the Prohibited Conduct, prevent its recurrence, and address its effects, while supporting the College's educational mission and Title IX obligations; and

- imposes any sanction deemed appropriate after a consideration of all the relevant information.

In reaching a determination on the sanction, the Adjudicator considers the following factors: (1) respondent's prior conduct history; (2) how the College has sanctioned similar incidents in the past; (3) the nature and violence of the conduct at issue; (4) the impact of the conduct on the complainant; (5) the impact of the conduct on the community, its members, or its property; (6) whether the respondent has accepted responsibility for their actions; (7) whether the evidence in conjunction with the prior conduct history, suggests that the respondent is reasonably likely to engage in the same or similar conduct in the future; (8) the need to deter similar conduct by others; and (9) any other mitigating or aggravating circumstances, including the College's values. (*Id.* at p. 28 of 33, Section X.F.5.) Students found in violation of Kenyon College's Title IX Policy may be sanctioned up to and including dismissal from Kenyon College. (*Id.*) The Adjudicator provides a written determination of outcome, sanction, and rationale to the complainant and respondent. (*Id.* at p. 30 of 33, Section X.F.7.) This outcome letter also provides each party with their appeal rights. (*Id.*)

### e.     Appeal

A complainant and respondent may each appeal the outcome, including the investigators' finding of responsibility (or no responsibility). (Doc. 27-2, at p. 30 of 33, Section X.G.) In a request for an appeal, the burden of proof lies with the party requesting the appeal. (*Id.*) A party's dissatisfaction with the outcome of the investigation is not grounds for appeal. (*Id.*) Grounds for appeal are limited to: procedural error(s) that materially affected the outcome; new information

unavailable at the original proceeding, which shall be set forth in the appeal; or the decision of the investigators and/or adjudicator was clearly erroneous based on the evidence in the record. (*Id.*)

In appeals of cases in which the respondent is a student, the Appeals Officer is the Vice President for Student Affairs, or if the Vice President cannot serve, the Provost. (*Id.*) As in the case of the Adjudicator, the Appeals Officer must be a neutral and impartial decision-maker. (*Id.*) Likewise, the parties are informed, in writing and in advance of the appellate review, the identity of the designated Appeals Officer and permitted to submit a written request to the Title IX Coordinator to request a replacement if there are reasonable articulable grounds to establish a bias, conflict of interest or an inability to be fair and impartial. (*Id.*)

## III. LAW AND ARGUMENT

### A. Standard of Review

"Courts apply the same analysis to motions for judgment on the pleadings under Rule 12(c) as they apply to motions to dismiss under Fed. R. Civ. P. 12(b)(6)." *McGath v. Hamilton Local Sch. Dist.*, 848 F. Supp. 2d 831, 836 (S.D. Ohio 2012) (citing *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 284 (6th Cir. 2010)). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007)).

In order to survive dismissal for failure to state a claim, a plaintiff in a civil action "must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate Sch. Dist. v. Michigan Dep't of Educ.,* 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "However, not all 'facts' alleged by a Party are considered. For example, bald self-serving and conclusory allegations may not be

16595310v3

considered." *Walker v. J.P Morgan Chase Bank, N.A.*, No. 3:13-CV-356, 2015 WL 1637618, at

*1 (S.D. Ohio, Apr. 13, 2015) (Rose, J.) (citing *Evans v. Jay Instrument and Specialty Co.,* 889

F.Supp. 302, 310 (S.D. Ohio 1995)).

Courts will grant a motion for judgment on the pleadings "if there is an absence of law to

support a claim of the type made, or of facts sufficient to make a valid claim, or if on the face of

the complaint there is an insurmountable bar to relief indicating that the plaintiff does not have a

claim." *Gascho v. Glob. Fitness Holdings, LLC*, 918 F. Supp. 2d 708, 717 (S.D. Ohio 2013) (citing

*Little v. UNUMProvident Corp.*, 196 F. Supp. 2d 659, 662 (S.D. Ohio 2002)).

In ruling on a motion for judgment on the pleadings, "the court considers the pleadings,

which consist of the complaint, the answer, and any written instruments attached as exhibits."

*McGath*, 848 F. Supp. 2d at 836 (citing Fed. R. Civ. P. 12(c); Fed. R. Civ. P. 7(a); *Housing Auth.*

*Risk Retention Grp., Inc. v. Chicago Housing Auth.*, 378 F.3d 596, 600 (7th Cir. 2004)).  The Court

may also consider "matters of public record, orders, items appearing in the record of the case, and

exhibits attached to the complaint."  *Id.* (quoting *Barany–Snyder v. Weiner*, 539 F.3d 327, 332 (6th

Cir. 2008)).

**B.**     **John has failed to state a claim for relief under Title IX.**

John's Second Amended Complaint sets forth one Title IX claim generally and does not

identify the specific recognized theories under which he seeks relief.  The Sixth Circuit has

recognized four theories under Title IX in cases alleging gender bias in university disciplinary

proceedings:  (1) erroneous outcome; (2) selective enforcement; (3) deliberate indifference; and

(4) archaic assumptions.  *Doe v. University of Dayton*, 766 Fed.Appx.275, 281 (6th Cir. 2019)

(citing *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018)).  The Sixth Circuit has "also

recognized the viability of a fifth theory, hostile environment, in other contexts, though not in the

context of a suit related to disciplinary proceedings."  *Id.*

16595310v3

Here, John's Second Amended Complaint contains one count under the heading "Count 1-Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681-1688."  (Doc. 27, PAGEID# 752.)  Within that count, John does not identify which theory or theories he is pursuing under Title IX.  However, his Second Amended Complaint as a whole does contain, generally, intertwining of theories.  For example, at Paragraph 318, John alleges that "Kenyon reached an erroneous outcome, selectively enforced its disciplinary procedures, applied archaic assumptions, . . . and acted with deliberate indifference . . . ."  (*Id.* at ¶ 318.)  Additionally, it is unclear from the Second Amended Complaint whether John is attempting to raise a claim of hostile environment.  Finally, John does identify a separate count under Title IX for retaliation in Count II.  (*Id.* at PAGEID# 788.)  For completeness, Kenyon addresses each of these theories below.

As argued below, John has failed to state a claim for which this Court can grant him relief Kenyon is entitled to judgment on John's Title IX claim.

### 1.    John has failed to state a claim under an erroneous outcome theory.

John has failed to state a claim of erroneous outcome against Kenyon.  Although the Sixth Circuit only recognized four theories actionable under Title IX in 2018 in *Doe v. Miami University*, *supra*, "erroneous outcome" has been officially recognized in the Circuit since *Mallory v. Ohio University*, 76 F. App'x 634, 638 (6th Cir. 2003) (considering the framework set forth in *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)).  In 2014, this district Court first recognized that a plaintiff raising an erroneous outcome claim must plead, as a minimum, that the disciplinary process was flawed due to the plaintiff's gender.  *Wells v. Xavier Univ.*, 7 F.Supp.3d 746, 751 (S.D. Ohio 2014) (Spiegel, J.) (relying upon *Yusuf*).  The following year, in 2015, this district Court first clearly articulated the two elements a plaintiff must plead for an erroneous outcome claim used today.  *Sahm v. Miami Univ.*, No. 1:14-cv-698, 2015 WL 93631, *5 (S.D. Ohio Jan. 7, 2015) (Dlott, J.) (taking the standard from *Yusuf*).

29

In 2016, the Sixth Circuit officially incorporated the two-prong standard a plaintiff must establish for an erroneous outcome claim in use in this district's Courts and still used today. To state a claim under an "erroneous" outcome theory, "a plaintiff must plead: (1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized . . . causal connection between the flawed outcome and gender bias." *Doe v. Cummins*, 662 F. App'x 437, 542 (6th Cir. 2016) (quoting *Yusuf*, 35 F.3d at 715); *see e.g.*, *Doe v. Oberlin College*, 963 F.3d 580, 586 (6th Cir. 2020) (applying the same two-prong framework for erroneous outcome). In his Second Amended Complaint, John fails to plead sufficient facts to cast some articulable doubt on the outcome of the disciplinary proceeding.

John fails to meet this first prong under an erroneous outcome theory because he has not pled facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding. "An erroneous outcome claim exists when an 'innocent' person was wrongly found to have committed an offense because of his or her gender." *Doe v. Ohio State Univ.*, 239 F.Supp.3d 1048, 1069-70 (S.D. Ohio 2017) (Smith, J.) (citing *Sahm v. Miami Univ.*, 110 F. Supp.3d 774 (S.D. Ohio 2015) (Dlott, J.)).

In *Marshall v. Ohio University*, the district court determined that Marshall, a plaintiff-student, failed to satisfy this prong for violation of the university's sexual misconduct policy for sexual harassment and non-consensual sexual contact in his amended complaint. No. 2:15-cv-775, 2015 WL 7254213, *5-6 (S.D. Ohio Nov. 17, 2015) (Smith, J) . Specifically, as pleaded, the court determined that Marshall did not allege facts sufficient to cast doubt on the accuracy of the disciplinary hearing because his complaint did not dispute that he sent inappropriate text messages underlying the allegations and he affirmatively alleged sending them. *Id.* at *5. The court determined that "Marshall does not allege he was 'innocent' of a Policy violation or that he did

30

not send the offending texts." *Id.* at *6.  The court concluded, "Accordingly, no doubt is cast about the determination that Marshall violated the Policy." *Id.* at *5.

Here, John fails to satisfy this first prong because, as in *Marshall*, he fails to plead sufficient facts that he is "innocent" of the underlying conduct to cast doubt on the determination.  While John's Second Amended Complaint underscores that he is unhappy with the outcome of Kenyon Title IX grievance process, he has not pleaded facts to articulate doubt on the accuracy of the disciplinary proceeding's outcome.

John baldly states in the first paragraph of his Second Amended Complaint that he was subjected to an "erroneous finding of responsibility" and "was falsely accused of violating" Kenyon's Title IX Policy.  These types of broad conclusory statements are disfavored: "[h]owever, not all 'facts' alleged by a Party are considered.  For example, bald self-serving and conclusory allegations may not be considered."  *Walker v. J.P Morgan Chase Bank, N.A.*, No. 3:13-CV-356, 2015 WL 1637618, at *1 (S.D. Ohio, Apr. 13, 2015) (Rose, J.) (citing *Evans v. Jay Instrument and Specialty Co.,* 889 F.Supp. 302, 310 (S.D. Ohio 1995).  When you contrast John's self-serving and conclusory allegations with his more specific factual allegations, these bald statements are undone.  Specifically, John's pleaded descriptions of his actions on January 18, 2019, February 9, 2019, and September 13-14, 2019 do not support that he is innocent of the underlying conduct to cast doubt on the accuracy of the outcome of the Title IX process.  John's allegations do not show that he is "innocent" of the underlying sexual and physical misconduct against Jane that violated Kenyon's Title IX Policy—he just doesn't like the words used to describe his actions or the consequences.  Disliking the words used to describe actions is not sufficient evidence to support John is innocent of the allegations.

31

       **a.**     **John fails to plead sufficient facts to cast an articulable doubt on the accuracy of the outcome of the January 18, 2019 incident.**

John failed to plead that he did not engage in the underlying conduct on January 18, 2019 that violated Kenyon's Title IX Policy. In fact, his conduct as alleged in the Second Amended Complaint meets for the definitions of Physical Harm and/or Intimidation as well as Intimate Partner Violence under Kenyon's Title IX Policy.

As addressed above, any finding of Physical Harm and/or Intimidation under Kenyon's Title IX Policy also constitutes Intimate Partner Violence if it occurs within a dating relationship. (Doc. 27-2, at p. 14 of 33, Section VI.J.) To be found responsible for Intimate Partner Violence, the investigators would need to find by a preponderance of the evidence that: (1) the parties were in a dating relationship and (2) that the responding party engaged in conduct that meeting the definition of Physical Harm and/or Intimidation. The first element is not in dispute. John alleges that he and Jane had been in an exclusive dating relationship for 19 months, since February 2018. (Doc. 27, at ¶ 3.)

The definition of Physical Harm and/or Intimidation "include[s] threatening, or causing physical harm or verbal abuse or other conduct that threatens or endangers the health or safety of another person; or implied threats or acts that cause an unreasonable fear of harm in another." (*Id.* at p. 14 of 33, Section VI.H.)

John's allegations also satisfy the second element, that show that, he engaged in physical harm and/or intimidation of Jane by engaging in conduct that threatened or endangered her health and safety. Specifically, John alleges that he engaged in conduct that threatened or endangered Jane's health and safety by getting so drunk he caused her to fall down a hill. John alleges that "he was drunk that night, and fell several times. Jane fell when she was trying to help him out of a bush, and one point he accidentally fell into Jane and she fell with him. John did not intentionally

grab or push her." (*Id.* at ¶ 219.) John appears to, incorrectly and without support, view his actions as unintentional because of his drunkenness. Actions by a respondent may violate the policy if those actions endanger the health and safety of another person. Even as John himself alleges, due to his own intoxication and choices, John caused Jane to fall down a hill. John does not allege that his actions did not cause Jane to fall down the hill or that falling down the hill did not endanger Jane's health and safety.

Accordingly, even as pleaded by John, his actions towards Jane on January 18, 2019 constitute a violation of Kenyon's Title IX Policy. John fails to plead facts sufficient to cast doubt on the outcome finding him in violation of Kenyon's Title IX Policy for those actions.

> **b.      John fails to plead sufficient facts to cast an articulable doubt on the accuracy of the outcome for the February 9, 2019 incident.**

Similarly, with regards to the incident involving John's "attempted strike" of Jane on February 9, 2019, Plaintiff John alleges that he and Jane "got into an angry argument and were yelling at each other." (Doc. 27, at ¶ 232.) John alleges that he "acknowledged that he damaged some things in his room" around Jane during the argument. (*Id.* at ¶ 233.) John alleges that Jane reported this incident as abuse, reporting that John "struck her," "hit her" or "tried to hit" her. (*Id.* at ¶ 234.)

Regardless, "Physical harm and/or intimidation include threatening, or causing physical harm or verbal abuse or other conduct that threatens or endangers the health or safety of another person; or implied threats or acts that cause an unreasonable fear of harm in another." (Doc. 27-2, at p. 14 of 33, Section VI.H.)

Even taking only John's allegations of events, he has violated Kenyon's Title IX Policy for physical harm and intimidation of Jane. John alleges that, during an "angry argument" with Jane in his room, he damaged items around her. He admits his actions were aggressive, alleging that

16595310v3

he told investigators "he did not direct any aggression toward Jane." (*Id.* at ¶ 233.)  John alleges that Jane reported this as John hitting her or attempting to hit her and reported it to the Title IX Office.  (*Id.* at ¶¶ 231, 234.)  John does not allege that these actions did not endanger Jane's health and safety or did not cause a reasonable fear of harm in Jane.  Despite John's lack of accountability for his actions, as he states them, he has admitted he engaged in conduct that could reasonably be perceived (and John alleges was reported as being perceived as such by Jane) as intimidating, threatening, endangering the health or safety of another person, or implied threats or acts that cause fear in another.

Accordingly, even as pleaded by John, his actions towards Jane on February 9, 2019 constitute a violation of Kenyon's Title IX Policy and he fails to plead facts sufficient to cast doubt on the outcome finding him in violation of Kenyon's Title IX Policy for those actions.

> **c.      John fails to plead sufficient facts to cast an articulable doubt on the accuracy of the outcome for the September 13-14, 2019 incident.**

As detailed above in Kenyon's Title IX Policy and as alleged by John, a respondent violates Kenyon's Title IX policy for non-consensual sexual intercourse where the parties (1) had sexual intercourse, (2) the complainant was incapacitated, and (3) the respondent knew or should have known the complainant was incapacitated.  (*See*, *supra*, Section II.C.3(d), pp. 20-21; Doc. 27, at ¶¶ 165-66.)  As John alleges, the Investigators found, by a preponderance of the evidence, that John had sex with Jane the night of September 13-14, 2019, that Jane had been incapacitated during that sexual encounter, and that John knew or should have known that Jane was incapacitated at that time.  (*Id. at* PAGEID# 735-746.)  John alleges Kenyon's Appeals Officer affirmed this determination.  (*Id.* at ¶ 241).

Here, again, John has not pleaded facts sufficient to cast doubt on the accuracy of the outcome of Kenyon's Title IX process with regards to September 13-14, 2019.

16595310v3

###### i. John does not plead that he did not have sexual intercourse with Jane on September 13-14, 2019.

John asserts that he "was falsely accused of violating Kenyon's Sexual Misconduct and Harassment Policy" (*Id.* at ¶ 1), that he "has consistently denied, and continues to deny, any sexual or physical misconduct towards Jane" (*Id.* at ¶ 42), that he provided a written statement to Investigators "denying Jane's allegations of abuse and rape" (*Id.* at ¶ 146), that he provided a written statement to Investigators that "stated that he had never physically abused Jane or engaged in sexual conduct or contact without her consent" (*Id.* at ¶ 148(a)), and "that he never sexually assaulted Jane" (*Id.* at ¶ 163)."

However, John does not allege that he did *not* have sexual intercourse with Jane during the alleged underlying sexual assault the night of September 13-14, 2019. (Doc. 27, at ¶ 134.) John alleges that, concerned about potential criminal charges at the time of the interview relating the assault of Community Advisor and Jane's alleged "vindictiveness," "he exercised his right to remain silent with respect to the alleged sexual encounter with Jane on September 13/14, 2019." (*Id.*) John alleges that "because John did not state whether or not he and Jane had sex on the night of September 13, the investigators decided he was taking the position that they did not have sex" and that this was unfair and violated his right to silence. (*Id.* at ¶ 162.) As in the investigation, at no time in his Second Amended Complaint does Plaintiff plead that he did not have sexual intercourse with Jane on the night of September 13-14, 2019.

In fact, John alleges that, on the night of September 13-14, "[a]ccording to Jane, John told her they had already had sex, but she claimed not to remember it, purportedly due to a temporary blackout from the alcohol she had consumed." (*Id.* at ¶ 16.) *John also does not deny that he told Jane they had had sex.*

John alleges that Jane told at least one friend at 1:00-2:00 a.m. on September 14, 2019 that John had already told Jane he had "raped her." (*Id.* at ¶ 123(b)(x).) As John alleges, Jane said that during their argument that led to bystander, Community Advisor, Campus Security, and sheriff's deputy's intervention, John repeatedly screamed "I raped you!" (*Id.* at ¶ 182.) John alleges that the Community Advisor reported that she heard "didn't get consent" and "rape" in the argument between John and Jane. (*Id.* at ¶ 123(b)(iv)-(v).)

John also alleges that he described their argument as, "I was explaining to her that if [her statement that she had blacked out] were true, then we could not be together sexually and I should not stay at her house." (*Id.* at ¶ 149.)

John's conclusion that the statements by the Community Advisor have no context, and do not support that John was telling Jane he had raped her, is self-serving and not credible. The Community Advisor was clearly concerned by what she heard and accordingly intervened, as did several other bystanders. The Community Advisor reported that she heard "didn't get consent" -- in the past tense referring to something that had already happened, not a hypothetical future conversation, as John would like to misconstrue her statement to mean.

In sum, John alleges that, according to Jane, they had sexual intercourse the night of September 13-14, 2019 and that Jane was only aware of this because John told her they had sexual intercourse. John does not allege that he did not have sex with Jane on the night of September 13-14, 2019 and he does not deny that he told Jane they had had sex. There is no articulable doubt that the investigators' finding that John engaged in sexual activity with Jane was inconsistent with the other evidence presented to them despite John's decision to not confirm or deny that they had engaged in sexual activity.

### ii. The facts as pleaded by John support that Jane was incapacitated during sexual intercourse under Kenyon's Policy.

John alleges that, if he had sexual intercourse with Jane on the night of September 13-14, 2019, John alleges she could not have been incapacitated as early as 12:15 a.m., because he does not think she appeared incapacitated approximately 50 minutes later on a body camera video from the sheriff's deputy and following violent and sobering intervening incidents: walking across campus, engaging in a fight that led bystanders to intervene, Respondent chest-bumping a female Community Advisor (that led to his arrest), and the involvement of Campus Security and the sheriff's office. However, other facts pled by John—the description of Jane by witnesses, by Jane herself, and by John himself—undo any misdirection and indicate she was incapacitated under Kenyon's Policy.

Kenyon's Title IX Policy, incorporated into John's Second Amended Complaint, contains the following definition of "incapacitation:"

> An individual who is incapacitated lacks the ability to make informed, rational judgments and cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring. In addition, persons with certain intellectual or developmental disabilities may not have the capacity to give consent. Consent cannot be obtained by taking advantage of another individual's Incapacitation.
>
> Where drugs and alcohol are involved, Incapacitation is a state beyond intoxication. The impact of alcohol and other drugs varies from person to person; however, warning signs that a person *may be* approaching Incapacitation *may* include slurred speech, vomiting, unsteady balance, strong odor of alcohol, combativeness, or emotional volatility.
>
> Evaluating Incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects an individual's:
>
> - Decision-making ability;

- Awareness of consequences;
- Ability to make informed judgments;
- Capacity to appreciate the nature and the quality of the act; or
- Level of consciousness.

In other words, a person may be considered unable to give valid consent due to Incapacitation if the person cannot appreciate the who, what, where, when, why, or how of a sexual interaction.

(Doc. 27-2, at p. 16 of 33 (emphasis added).)

The descriptions of Jane that night -- by witnesses, Jane, *and John* – fall squarely within the definition in Kenyon's Title IX Policy for incapacitation. According to John's own timeline, he and Jane arrived back at his apartment from the party at approximately 12:15 a.m. and left at approximately 12:45 a.m. (Doc. 27, at ¶ 123(b)(ii)-(iii).) John disingenuously alleges that, "not one" of the witnesses the night of September 13-14, 2019 "thought Jane was incapacitated or exhibiting sings of incapacitation." (*Id.* at ¶ 35). Regarding the same incident, John later alleges that, "Investigators cited one witness's report that Jane's eyes were 'red, glassy, and her face was puffy like she'd been crying,' and witness statements that she was 'very emotional' after they left John's apartment." (*Id.* at ¶ 207). According to John's own timeline, John and Jane left his apartment at approximately 12:45 a.m. (*Id.* at ¶ 123(b)(ii)-(iii).) The witnesses reported physical signs of Jane's eyes and face that were outwardly noteworthy to them and noted her emotional volatility. (*Id.* at ¶ 207.) These witnesses indicate Jane was exhibiting physical signs of intoxication and was emotional.

John alleges that Jane was upset when they left his apartment because she wanted to stay and have sex. John alleges that Jane claimed John told her they already had sex, but Jane alleged she did not remember because of her alcohol consumption and was confused. Jane's description

is that she was unaware of the where and when of having just had sex with John and lacked the capacity to appreciate the nature of what had occurred or was unconscious.

*As John alleges, he later sent Jane a text message describing her as "blacked out" that night and described her this same way to his friends.* (*Id.* at ¶ 149.)

John's attempts to explain away the events of September 13-14, 2019 undo themselves. John alleges that he described Jane as "blacked out" because that was the language Jane had used and it "shocked him." He alleges that he provided a statement to Investigators stating, "I was explaining to her that if [her statement that she had blacked out] were true, then we could not be together sexually and I should not stay at her house. I never stated that I raped anyone…Any reference to her has having blacked out in my text message to her was based solely on her statement that she had blacked out. I saw no signs of significant intoxication and she was certainly not impaired or incapacitated." (*Id.* at ¶ 149.) But John's allegation of what he told Investigators is problematic from his own pleading. John does not explain why he described Jane as "blacked out" to his friends. John's explanation is contradicted by his allegation that the Community Advisor reported hearing the past-tense phrase "didn't get consent" during the argument between John and Jane. John's allegation about what he reported to Investigators notably does not indicate *when* he alleged he saw no signs of significant intoxication, impairment or incapacitation from 12:15 a.m. to 12:45 a.m., but appears to anchor this observation to the following paragraph discussing how he believes Jane appeared on the sheriff's body camera sometime between 1:07 and 1:17 a.m. (*Id.* at ¶ 150.) Between this time and the sheriff's deputy's video of Jane in which she allegedly appears lucid (which is over 50 minutes after they returned to the apartment), at some time between 1:07 and 1:17 a.m., a series of very sobering events occurred: he and Jane walked across campus, got into a fight that was so emotionally volatile that it led to the intervention of bystanders, a

Community Advisor, Campus Security, and a sheriff's deputy, and included Plaintiff chest bumping a female Community Advisor resulting in John's arrest.

Further, instead of denying that he had sex with Jane that night, John points to other allegations that are irrelevant to the analysis.  Specifically, John alleges that Jane thought he was going to break up with her on September 6, 2019, but he did not break up with her.  John alleges that Jane is vindictive.  John points to statements Jane made to the sheriff's deputy that night and some partial texts in which Jane sent to friends before 5:00 a.m. that morning indicating that she did not think John had raped her that early morning of September 14, 2019.  But John also alleges that Jane called a friend around 1:00-2:00 a.m. wherein she indicated that John said he raped her, and her view on the situation changed as she pieced together the night and as John texted her about her being "blacked out."

As alleged by John, the descriptions of Jane at the time they left John's apartment at around 12:45 a.m. (witnesses described her eyes as "red, glassy, and her face was puffy like she'd been crying" and "very emotional," Jane's confusion about wanting to have sex and not understanding that they had already had sex or had sex earlier in the day on September 13, and John's own text message and descriptions of Jane to friends as "blacked out" that night) all support that Jane was incapacitated under Kenyon's Title IX Policy the night of September 13-14, 2019.  At the very least, John's allegations do not support that Jane was *not* incapacitated under Kenyon's Title IX Policy on the night of September 13-14, 2019 at 12:15 a.m. and before they got into an argument about rape and consent after 12:45 a.m.

> ### iii. John fails to plead sufficient facts that he was not aware or should not have been aware that Jane was incapacitated.

Again, John's own allegations undo any bald statement he makes that he was not aware or should not have been aware that Jane was incapacitated the night of September 13-14, 2019 during

the sexual encounter. Pursuant to Kenyon's Title IX Policy, "Evaluating Incapacitation also requires an assessment of whether a respondent was *or should have been aware* of the reporting party's Incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the respondent's position." (Doc. 27-2, at p. 26 of 33, Section VII.D.) (emphasis added)

As addressed above, John himself sent Jane a text message describing her as "blacked out" the night of September 13-14, 2019 and described her that way to his friends. (*Id.* at ¶ 149.)

John does not deny that he commented to Jane and friends that he referenced Jane as being blacked out in relation to September 13-14, 2019, nor does he explain why he described her that way to friends.

Moreover, John alleges that, prior to the night of September 13-14, 2019, he had dated Jane for approximately 19 months and had been out with her leading up to the time they returned to his apartment at 12:15 a.m. (*Id.* at ¶¶ 3, 10, 12.) John does not deny that he was with Jane while she consumed alcohol. John does not deny that he was with her from the time they went out until they left his apartment at 12:45 a.m.

Further, John touches on some other issues raised in the investigation that further supported that he was aware of Jane's incapacitation. John alleges that Investigators "seized on Jane's reference to a 'name game'" that Jane referenced as a way that they determined if they could consent to sex. (*Id.* at ¶ 214(c).) John alleges that Investigators noted John's "failure to comment" on the name game raised by Jane during the investigation and notes "as if a 'name game' was the only way to determine whether someone can and does consent to sex." (*Id.*) Based on John's allegations, the issue of a name game between John and Jane to determine consent, on which John does not elaborate in his Second Amended Complaint, is not the only way to determine consent,

nor does John allege that Investigators relied upon only that to determine consent. However, John's reference to their name game indicates that Investigators had further reason to believe John was aware or should have been aware that Jane was incapacitated. John does not plead that he and Jane did not play a name game to determine consent or that they played this game and determined consent the night of September 13-14, 2019.

In sum, John has not pled sufficient facts to indicate that he did not have sexual intercourse with Jane while she was incapacitated or that he was not aware of or should not have been aware of incapacitation.

Accordingly, John has failed to plead adequate facts that he is "innocent" of the underlying conduct with Jane that constituted Non-Consensual Sexual Intercourse and Non-Consensual Sexual Contact, Physical Harm and/or Intimidation or Intimate Partner Violence as defined by Kenyon College's Title IX Policy. Because John has not alleged facts to show that the outcome was incorrect, John has failed to plead that the outcome of Kenyon Title IX grievance process was flawed. For these reasons, Kenyon is entitled to judgment on John's Title IX claim under an erroneous outcome theory.

### 2. John fails to state a claim under a deliberate indifference theory.

John fails to plead facts sufficient to state a claim under a deliberate indifference theory because he has failed to state that Kenyon had actual knowledge of his alleged sexual harassment by Jane or that it was severe, pervasive, and objectively offensive and that it effectively barred his access to an educational opportunity or benefit.

"The deliberate indifference theory was designed for plaintiffs alleging *sexual harassment*." *Doe v. Baum*, 903 F.3d 575, 578-88 (6th Cir. 2018) (emphasis original). Under a deliberate indifference theory, a plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures, had actual notice of and was deliberately indifferent

to, the misconduct." *Mallory v. Ohio Univ.*, 76 F. App'x. 634, 638 (6th Cir. 2003). A deliberate-indifference claim "premised on student-on-student misconduct must allege 'harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.'" *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)). "Although sexual harassment is a form of discrimination for purposes of Title IX, we have held to plead a Title IX deliberate indifference claim, the misconduct alleged must be sexual harassment, not just a biased disciplinary process." *Baum*, 903 F.3d at 588 (internal quotation and citation omitted).

In *Doe v. Ohio State University*, the court reaffirmed its dismissal of a plaintiff's deliberate indifference claim for failure to state a claim where he alleged the university was on notice of his sexual harassment by another student, but failed to allege that the misconduct was so severe, pervasive, and objectively offensive that it effectively barred his access to an educational opportunity or benefit. 323 F.Supp.3d 962, 968 (S.D. Ohio 2018) (Smith, J.). Specifically, the plaintiff in that case had alleged that the university had knowledge that the underlying complainant had engaged in sex with plaintiff while he was too intoxicated to consent from the investigation. *Id.* Construing the facts as similar to those in *Doe v. Miami University*, the court noted that the plaintiff did not allege that he complained to the university that he was being harassed, nor was there any allegation that the university ignored his claim of harassment. *Id.*

Here, John alleges that Investigators "acted with deliberate indifference both to Jane's misconduct against John and to its officials' intentional violation of John's rights, all based on John's gender." (Doc. 27, at ¶ 318.) John's Second Amended Complaint largely interweaves his theories under Title IX and most of his claims appear to be directed at the disciplinary process. (*Id.*)

Looking at the entirety of John's Second Amended Complaint, John alleges, after Jane filed her Title IX complaint against him with Kenyon, during the investigation, and in response to Jane's allegations of abuse against John, that John told Investigators:

- Jane was lying about abuse such that he "provided personal and intimate information regarding his relationship with Jane" to contradict "Jane's claim that the relationship was abusive and unhappy" (Doc. 27, at ¶ 383), and

- despite denying the relationship was not abusive or unhappy, it was Jane who abused him: he "gave the Investigators information and evidence that Jane regularly harassed, pressured, and coerced him into sex when he was unwilling (as she was doing the night of September 13), and disparaged him when he could not perform adequately." (*Id.* at ¶ 246.)

Even assuming *arguendo* John had alleged Kenyon had actual knowledge, at no point in his Second Amended Complaint of 415 paragraphs does John allege that Jane's alleged harassment of him was "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Instead, John alleges that he raised this allegation to the Investigators during the investigation in response to Jane's allegations. John dedicates part of one paragraph to this allegation that sits in the middle of other non-harassment allegations against Jane regarding her credibility. (Doc. 27, at ¶ 246, PAGEID# 750-752.) John does not identify any impact this alleged sexual harassment by Jane had on him or any impact on his educational opportunity or benefit. Accordingly, John has failed to plead facts sufficient to allege a claim of deliberate indifference and Kenyon is entitled to judgment on John's Title IX claim.

### 3.     John fails to state a claim under a selective enforcement theory.

"To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Doe v. Univ. of Dayton*, 766 F. App'x. 275, 284 (6th Cir. 2019) (quoting *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016)). In *Doe v. University of Dayton*, the Sixth Circuit affirmed the district court's dismissal of a claim by a male plaintiff accused of sexual assault where he did

not identify any female accused of sexual assault who was not referred to disciplinary proceedings. *Id.* The Sixth Circuit noted, instead, the plaintiff provided, "'[u]pon information and belief, Dayton possess additional documentation evidencing their refusal to discipline female students who were alleged to have sexually assaulted male students.'" *Id.* The Sixth Circuit responded to this assertion, that "[t]he bare allegation, unsupported by facts, does not suffice to state a claim." *Id.*

John does not allege facts to state a claim for relief of selective enforcement. As addressed above, John's theories are interwoven in his Second Amended Complaint, but John was found in violation by Kenyon's Title IX Policy for Non-Consensual Sexual Intercourse and Non-Consensual Sexual Contact for knocking Jane down a hill and attempting to strike her during their dating relationship. (Doc. 27, at ¶ 50.) John does not allege that Jane engaged in Non-Consensual Sexual Intercourse or Non-Consensual Sexual Contact with him, or engaged in Physical Harm or Intimidation/Intimate Partner Violence and was not referred to disciplinary hearings.

Instead, John alleges that he is aware of another male Kenyon student who sued Kenyon in May 2018 "based on its investigation of female students' reports of alleged sexual misconduct by him – even though one's accusations were demonstrably false and the other expressly said she did not want an investigation – and disregard of his reports of policy violations by a female student." (*Id.* at ¶ 379, citing *Doe v. Kenyon College*, No. 2:18-cv-00482 (S.D. Ohio).) Even assuming *arguendo* that allegations in a separate lawsuit by another male were support for a selective enforcement claim, a review of the complaint in *Doe v. Kenyon Coll.* 2018 case shows that the male plaintiff in that case did not allege that a female student was accused of sexual misconduct and treated differently by Kenyon. *Doe v. Kenyon College*, Case No. 2:18-cv-00482,

Complaint, Doc. 1, PAGEID# 3-5. To the extent John intended to rely upon this case to support his selective enforcement theory, his reliance is misplaced.

John's remaining allegations are bald conclusions and insufficient to support a violation under selective enforcement, as in *Doe v. Dayton*. John alleges, "Information concerning sexual misconduct complaints at Kenyon and the outcome of disciplinary proceedings involving male students as compared to female students is in Kenyon's exclusive possession and control. On information and belief, statistics within Kenyon's exclusive possession and control will show a pattern of intentional discriminatory conduct, erroneous outcomes, archaic assumptions, and selective enforcement based on gender." (*Id.* at ¶ 380.) John further alleges, "On information and belief, statistics within Kenyon's exclusive possession and control will show that female students accused of serious sexual or non-sexual misconduct are treated more favorably than male students in general, and John in particular." (*Id.* at ¶ 382.)

John fails to identify a single female who has been accused of Non-Consensual Sexual Intercourse or Physical Harm/Intimidation who was not subjected to the disciplinary process at Kenyon. John fails to identify a single female who has been accused of harming or threatening to harm the physical safety of another in a dating relationship who was not subjected to the disciplinary process at Kenyon. As in *Doe v. Dayton*, John provides only bald assertions that do not suffice to state a claim for selective enforcement. Accordingly, Kenyon is entitled to judgment on John's Title IX claim to the extent he attempts to raise it under selective enforcement.

### 4. John fails to state a claim under an archaic assumption theory.

John fails to plead facts sufficient to state a claim under an archaic assumption theory because he has not alleged that he was denied equal opportunity to participate in athletic program. To the extent John attempts to state a claim under an archaic assumption theory, he fails. Under an archaic assumption theory, a plaintiff "contends that the university's actions were founded on

46

archaic assumptions about men and women." *Doe v. Univ. of Cincinnati*, 173 F.Supp. 3d 586, 606 (S.D. Ohio 2016) (Beckwith, J.) (citing *Sterrett v. Cowa*n, 85 F.Supp.3d 916, 936 (E.D. Mich. 2015)). "Title IX plaintiffs use the archaic-assumptions theory to show that a school denied a student an equal opportunity to participate in an athletic program because of historical assumptions about boys' and girls' physical capabilities." *Doe v. Baum*, 903 F.3d 575, 578-88 (6th Cir. 2018) (citing *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003)). The Sixth Circuit "has never applied the [archaic assumptions] theory outside of the athletic context, and indeed [the Sixth Circuit has] repeatedly refused litigants' requests to do so." *Id.* at 588 (citing *Doe v. Cummins*, 662 F. App'x 437, 451 n. 9 (6th Cir. 2016)). Here, John does not allege that Kenyon denied him equal access to an athletic program. Accordingly, Kenyon is entitled to judgment on any Title IX claims John attempts to raise under a theory of archaic assumption.

### 5. John fails to state a claim for hostile environment under Title IX.

A Title IX hostile-environment claim is analogous to a Title VII hostile-environment claim. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 515 (6th Cir. 1996)). "Under this theory of liability, the plaintiff must allege that his educational experience was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's educational environment." *Id.* (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In *Doe v. Dayton*, the Sixth Circuit affirmed the dismissal of a plaintiff's hostile environment claim in which the plaintiff alleged a series of film screenings and on-campus events amounted to a "campaign of intimidation and insult" by portraying males as "sexual deviants" and using male pronouns. 766 F. App'x. at 283. In rejecting the plaintiff's hostile environment claim, the Sixth Circuit noted that such information on campus, using "male pronouns when highlighting problematic statements," or highlighting sexual assault of women by men does not "negate the

possibilities that women can commit sexual assault or that men can be sexually assaulted." *Id.* That campaigns of this type on campus existed does not cross "the line into 'intimidation, ridicule, and insult.'" *Id.* Moreover, the Court noted the plaintiff in that case failed to "connect those events to his personal educational environment" and his "conclusory allegation that these events 'interfere[] with males' ability to participate in or benefit from various activities including learning on campus" is insufficient." *Id.*

Here, John fails to even allege as much as the unsuccessful plaintiff in *Doe v. Dayton*. John alleges, "Kenyon's discriminatory and one-sided process deprived John, as a male student, of educational opportunities at Kenyon on the basis of sex." (Doc. 27, at ¶ 377.) John's allegation appears to be centered on the disciplinary process under Title IX – John's Second Amended Complaint does not allege that he was subjected to any sexually-harassing conduct throughout his time at Kenyon or outside of the Title IX process involving Jane. John's Second Amended Complaint raises many allegations to the programing and policies at Kenyon, none of which he ties to his own education at Kenyon, that he was aware of any of the programing, or that he experienced any sort of hostile environment while at Kenyon. Accordingly, to the extent John's Title IX count rests upon hostile environment, it fails, and Kenyon is entitled to judgment on this claim.

### C. John fails to state a claim for retaliation.

John fails to allege facts to state a claim for retaliation under Title IX, under Count II of his Second Amended Complaint. In analyzing claims of retaliation raised under Title IX, the Sixth Circuit has applied a Title VII framework. *Bose v. Bea*, 947 F.3d 983, 988–89 (6th Cir. 2020), *cert. denied*, No. 20-216, 2021 WL 78095 (U.S. Jan. 11, 2021) (citing *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017)). To state a claim, a plaintiff must allege: (1) plaintiff engaged in protected activity, (2) the university knew of the protected activity,

(3) plaintiff suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action. *Gordon*, 686 F. App'x at 320; see *Wiler v. Kent State Univ.*, No. 5:20-cv-490, 2021 WL 809350, at *7 (N.D. Ohio Mar. 3, 2021) (noting that plaintiff in Title IX retaliation only need show, not prove the elements for a prima facie case of retaliation to state a claim). Here, John fails to plead facts sufficient to allege a causal connection.

John alleges that, during the Title IX investigation, he "provided personal and intimate information regarding his relationship with Jane" to contradict "Jane's claim that the relationship was abusive and unhappy" and support John's "reports that Jane herself had violated Kenyon's Policy." (Doc. 27, at ¶ 383.) John alleges that the investigators retaliated against him "by refusing to consider the evidence he submitted, falsely saying it was not relevant and suggesting he violated Jane's privacy by submitting it." (*Id.* at ¶ 389.)

To clarify this allegation, John appears to quote the Investigators, and provides, "The majority of the information provided depicts [Jane] in vulnerable and compromising situations, that was likely meant to be kept inside the relationship and not released to third parties." (*Id.*) Confusingly, John alleges that the Investigators should have considered the evidence John provided in John's defense (*Id.* at ¶ 390), yet John's own allegations indicate that the Investigators <u>did</u> consider his evidence and held it against him (*Id.* at ¶ 389).

It is unclear from the Second Amended Complaint whether John is alleging that Investigators' statement regarding the content of the majority of the evidence he provided was the alleged retaliation or that they did not consider the evidence. If the latter, again, John alleges the Investigators did consider it, but determined some of it was not relevant. If John is alleging the retaliation is the determination that he violated Kenyon's Title IX Policy for Non-Consensual Sexual Intercourse and Non-Consensual Sexual Contact for the night of September 13-14, 2019 or

49

for the January 18, 2019 and February 9, 2019 incidents, John has not alleged how the evidence

he produced would have led to a different outcome regarding those findings of violations.

Accordingly, John fails to state a claim under Title IX retaliation and Kenyon is entitled to

judgment on Count II of the Second Amended Complaint.

### D.    John fails to state a claim for relief under state law.

### 1.    John fails to state a claim for breach of contract.

"Contracts for private education have unique qualities and must be construed to allow the

institution's governing body to meet its educational and doctrinal responsibilities." *Valente v.

Univ. of Dayton,* 438 Fed.Appx. 381, 384 (6th Cir. 2011) (quoting *Ray v. Wilmington Coll.,* 667

N.E.2d 39, 42 (Ohio App. 1995)).  "Courts therefore will not interfere with a private university's

right to make regulations, establish requirements . . . and enforce disciplinary rules absent *a clear

abuse of discretion." Id.* (citations and internal quotations omitted) (emphasis in original).  In

determine whether Kenyon abused its discretion, the inquiry is not whether Kenyon should have

believed John's or Jane Roe's version of the events, nor whether it strictly adhered to its procedural

rules.  *See Valente,* 438 Fed.Appx. at 384; *McDade v. Cleveland State Univ.,* No. 14AP-275, 2014

WL 4557015, at *4 (Ohio App. Sept. 16, 2014). Instead, the issue is whether Oberlin "acted

unreasonably, arbitrarily, or unconscionably." *Ray,* 667 N.E.2d at 42.  Or put another way,

"whether the proceedings fell within the range of reasonable expectations of one reading the

relevant rules, an objective reasonableness standard." *Doe v. Univ. of Dayton*, 766 Fed. App'x

275, 285 (6th Cir. 2019).

When construing contractual obligations for private colleges under Title IX, school-

disciplinary committees are entitled to a presumption of impartiality, absent an allegation of actual

bias. *Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043, at *11 (S.D. Ohio

Mar. 3, 2018) (Smith, J.).  "[C]ourts are chary about interfering with academic and disciplinary

decisions made by private colleges and university." *Pierre v. University of Dayton,* No. 3:15 cv 362, 2017 WL 1134510, at *6 (quoting *Doe v. Amherst Coll.*, 3:15-cv-30097, Doc. 38 at p. 23 (D. Mass. Oct. 5, 2015)). "[A]ll that is required is an opportunity to be heard at a meaningful time and in a meaningful manner." *Pierre*, 2017 WL 1134510, at *6 (quoting *Doe v. Cummins*, 662 F. App'x. 437, 451 (6th Cir. 2016)).

In *Pierre v. University of Dayton*, the court determined that the plaintiff had failed to state a claim for breach of contract where he raised a "bevy of purported" contractual violations in his sexual misconduct process, including failure to treat the parties equally and lack of due process because the university complied with its own policies. 2017 WL 1134510, at * 5. Specifically, the plaintiff alleged that the Title IX investigators breached the handbook's requirement that assures fairness and equal treatment of the accuser and accused by "failing to provide Pierre with the same opportunities to present his position and respond to the Complainant's contentions as they provided to the Complainant." *Id.* The plaintiff also alleged that the investigators had not conducted a thorough investigation and claimed "as sequence of unfair and unreasonable conduct throughout the investigation and disciplinary process." *Id.* at *6-7. In reviewing Pierre's claim that he was not provided fairness and equal treatment, the court noted that Pierre "was able to offer evidence and explain his version of the events. He was allowed to submit questions and have a lawyer present at the hearing." *Id.* at *6. In sum, where the plaintiff did not like the process or outcome as applied to him, the court was unwilling to find that the plaintiff pled sufficient facts to state a claim for a breach of contract.

In contrast, in *Schuamleffel v. Muskingum University*, for example, the court was willing to find that the plaintiff had pled sufficient facts to state a claim only where he identified a concrete departure from procedure. No. 2:17-cv-463, 2018 WL 1173043, at *11 (S.D. Ohio Mar. 3, 2018)

51

(Smith, J.).  In *Schaumleffel*, the plaintiff attempted to allege violations of the university's handbook for failing to conduct an impartial investigation and failing to comport with principles of fundamental fairness.  *Id.*  Citing to the presumption of impartiality, absent an allegation of actual bias, the court did not find the plaintiff's allegations sufficient on these grounds.  *Id.* (citing *Pierre*, 2017 WL 1134510, at *7).  However, the court found that the plaintiff alleged that the policy required student members of the disciplinary panel, but alleged that he was denied a student member on his disciplinary panel.  *Id.*  On the basis of this concrete allegation of a departure from policy, the court determined the plaintiff had pled facts sufficient to state a claim for relief under breach of contract.  *Id.*

Here, John's allegations lack any indication of an unreasonable and concrete departure that Kenyon made from its Title IX Policy or Student Handbook in its Title IX disciplinary procedure as it related to him.  Instead, John raises a "bevy of purported" violations based upon bald or contradictory allegations of violations of fundamental fairness.  As a threshold matter, John's attempt to apply the Student Handbook to his Title IX process is misplaced.  As noted above, the Student Handbook refers all matters involving sexual misconduct and intimate partner violence to the Title IX Policy.  The Title IX Policy provides the process for sexual misconduct and intimate partner violence allegations, and the Student Handbook provides the process for other student misconduct.

Under "B. Non-Sexual Assault," the Student Handbook refers to Kenyon's Sexual Misconduct Policy: Title IX, VAWA, Title VII for sexual assault and intimate partner violence and provides, in pertinent part:

> *Note: Sexual assault and intimate partner violence are discussed in the Title IX/VAWA Policy.  See Section W.*

(Doc. 27-1, PAGEID# 799 (italics original, hyperlink to Title IX Policy omitted).)

Under "W. Sexual and Gender-Based Discrimination," the Student Handbook refers to

Kenyon's Sexual Misconduct Policy: Title IX, VAWA, Title VII and provides:

> The College is committed to fostering a climate free from sexual and gender-based discrimination, harassment and violence, intimate partner violence and stalking through clear and effective policies, a coordinated education and prevention program, and prompt and equitable procedures for resolution of reports of conduct prohibited under this policy.  The College encourages all members of its community to participate in the process of creating a safe, welcoming and respectful environment on campus.

> *More information about Kenyon's Sexual Misconduct and Harassment Policy: Title IX, VAWA, Title VII is available at kenyon.edu/title-ix.*

> Sexual and gender-based discrimination, harassment and violence, intimate partner violence and stalking, in any form, are serious violations of College and community standards and values, and will not be tolerated at Kenyon.  The College is committed to taking all appropriate steps to eliminate prohibited conduct, prevent its recurrence and address its effects.  Individuals found responsible under this policy may face disciplinary up to and including dismissal from the College and/or termination of employment.

> The College will not tolerate retaliation against an individual who makes a report or participates in any proceedings under this policy, Kenyon College policy prohibits any form of retaliation, and community members engaging in retaliation will be subject to disciplinary action, whether such acts are implicit or explicit, or committed directly or indirectly.

> This policy provides the Kenyon community with (1) resources and recourse for individuals who experience prohibited conduct,* (2) guidance to a complainant, a respondent or other affected community members, (3) Kenyon's expectations for healthy respectful interpersonal interaction and communication, and (4) a procedural outline for addressing behaviors that are counter to Kenyon's mission and prohibited by this policy.

> All College proceedings under this policy are conducted in compliance with the requirements of Title IX, the Clery Act, as amended by the Violence Against Women Act, the Family Educational Rights and Privacy Act (FERPA), and state and federal law.  No information shall be released from such proceedings except as required or permitted by law and College policy.

*When used in this policy, complainant refers to the individual(s) who experiences Prohibited Conduct, regardless of whether that individual makes a report or seeks formal disciplinary action. A respondent refers to the individual(s) who has been accused of Prohibited Conduct.

(Doc. 27-1, PAGEID# 819-20 (italics in original).)  The Title IX Policy describes, in detail, the process provided for Title IX sexual misconduct matters.  (Doc. 27-2, at pp. 23-30, above at Relevant Facts II.B.)

Other than disagreeing with the results of the application and outcome to him, John does not identify any specific concrete ways in which Kenyon College did not follow its procedures in an unreasonable, arbitrary or capricious manner.

Specifically, John alleges that Kenyon's process lacked "fundamental fairness" because it did not comply with Title IX, related statutes and other state and federal law.  (*Id.* at ¶ 398.)  John provides the following examples of the lack of fundamental fairness by Kenyon, raising myriad allegations that are bald, that he counters with his own allegations, or that in no way touch on the obligations of either Kenyon's Title IX Policy or Student Handbook.  Each is addressed below.

> a. **Paragraph 399(a) – John's bald and self-contradicting allegations that Kenyon "[i]nstigated unwarranted charges and accusations against John, with a goal of having him criminally charged and expelled."**

John's bald allegation is undone by his other allegations in his Second Amended Complaint.  First, John only alleges one criminal charge – an assault charge arising from his conduct with the Community Advisor.  (Doc. 27, at ¶ 123(b)(vi).)  John has in no way tied his criminal matter to Kenyon's Title IX Policy or a provision of Kenyon's Student Handbook.  John does not allege that the separate criminal matter was part of Kenyon's Title IX process—and he could not because it is not.

John alleges that a Campus Safety Officer encouraged the Community Advisor John "chest bumped" to file charges against John. (*Id.* at ¶ 123(b)(vi).) Even assuming *arguendo* the words of the Campus Safety Officer could be imputed to Kenyon for its Title IX process, John does not allege that the Community Advisor was unable to make her own decision about filing charges against John. (*Id.*)

John's second accusation in this allegation is again undone by his other allegations in his Second Amended Complaint. John baldly states that Kenyon instigated unwarranted accusations against him. John does not explain this statement. Rather, John pleads that Jane filed a Title IX complaint and that Kenyon proceeded to investigate it. (*E.g.*, *id.* at ¶¶ 30-31, 33.) The outcome of John's Title IX process was a finding of violation of Kenyon's Title IX Policy for three separate incidents and resulted in the sanction of dismissal from Kenyon. (*Id.* at ¶ 58.) John has not tied his bald allegation to Kenyon or Kenyon's Title IX Policy or Student Handbook.

> **b.** **Paragraph 399(b) – John's facially incorrect allegation that Kenyon "[f]ailed to comply with the legal requirement to provide John with a live hearing with the chance to question parties and witnesses in real time."**

John raises this allegation throughout his Second Amended Complaint as a legal requirement to which he believes he is entitled under *Doe v. Baum* – but his beliefs are unsupported by Kenyon's Title IX Policy or the law in this Circuit. John alleges the complaint against him by Jane was filed in September 2019 and the most recent event she raised against him occurred on the night of September 13-14, 2019. (Doc. 27, at ¶¶ 30-33.) Kenyon's Title IX Policy in effect at that time, and attached by John as Exhibit B to his Second Amended Complaint (Doc. 27-2), does not provide for a live hearing or the chance to questions parties and witness in real time as part of its Title IX process.

16595310v3

Further, *Doe v. Baum*, on which John relies, provides that, under procedural due process, public institutions are required to provide a live, cross-examination hearing in their Title IX processes before findings of responsibility can be determined by the institutions.  903 F.3d 575, 582-85 (6th Cir. 2018).  The Sixth Circuit had not extended this requirement to private institutions, such as Kenyon.  *See, e.g.*, *Doe v. Case Western Reserve Univ.*, 809 F. App'x. 276, 281 (6th Cir. 2020) (noting the Sixth Circuit has not determined how *Doe v. Baum* applies, if at all, to private institutions where "constitutional due process principles lack the same force" and declining to make that decision).  Accordingly, John's reliance on *Doe v. Baum* is misplaced and Kenyon, pursuant to its Title IX Policy at the time, was not required to provide John with a live hearing with questioning of witnesses and parties.

> **c.**   **John's "bevy of purported" contractual violations in the process at Paragraphs 399(c) through (g) and 400 that do not show the process was not fundamentally fair.**

John alleges a sequence of processes and outcomes with which he disagrees.  However, these allegations, like those in *Pierre v. University of Dayton*, do not state a claim that Kenyon failed to follow its policy and procedures.  As addressed above, Kenyon's Title IX Policy outlines the process for the investigation, adjudication, and outcome for the disciplinary process for sexual harassment complaints—including for Non-Consensual Sexual Intercourse and Non-Consensual Sexual Contact, Physical Harm and Threat, and Intimate Partner Violence, for which John was found in violation of the Title IX Policy.

Specifically, in Paragraphs 399(c)-(g), John alleges that Kenyon College:

- "[r]eached a result-driven determination rather than reaching a decision based on a preponderance of all relevant evidence";

- "[m]ade credibility determinations against John and in favor of Jane that were not rationally based on the evidence";

- "[r]elied on snippets of alleged witness testimony, refused to provide John with complete records of their interviews, and failed to give him a meaningful opportunity to challenge the evidence against him";

- "[f]ailed to question Jane's credibility in view of the Investigators' specific rejection of her foundational narrative of abuse and her many demonstrably false and inconsistent statements"; and

- "[s]elected evidence to support Jane's narrative while ignoring evidence of her inconsistencies and false statements."

A review of the pertinent parts of Kenyon's Title IX Policy's process underscores that John fails to allege any violation of process other than his disagreement with determinations made by the Investigators, Adjudicator, and Appeals Officer.

In pertinent part, Kenyon's Title IX Policy provides the following for investigations:

> The investigators will interview the complainant and the respondent to understand the details of the reported incident. The investigators, in their discretion, will conduct other fact finding and/or discussions with any other individuals who may have information relevant to the determination. Witness must have observed the acts in question or have information relevant to the incident and cannot be participating solely to speak about an individual's character. The investigators will also gather any available physical evidence, including documentation, communications between the parties, and other electronic records as appropriate.

> […]

> The complainant and respondent will have an equal opportunity to be heard; submit written questions to ask of the other party or relevant witnesses; submit information and evidence; and identify witnesses who may have relevant information. Investigators will review submitted questions and, in their discretion, may choose which questions are necessary and appropriate to the investigation and conduct any follow-up at they deem relevant.

> All parties and witnesses are expected to provide truthful information. Knowingly providing false or misleading information is a violation of College policy and subject a student or employee to disciplinary action.

(Doc. 27-2, at pp. 25-26 of 33, Section X.F.1.)

Here, Plaintiff does not allege that he was denied any of the above opportunities in the investigation or that the Investigators failed to act in compliance with the above.

Further, Kenyon's Title IX Policy provides the next steps after the investigation, including input from the parties. At the conclusion of the investigation, the investigators prepare a preliminary written investigation report that the parties may review. (*Id.* at p. 26 of 33, Section X.F.2.) In preparing for this initial investigation report, the investigators review all facts gathered to determine whether the information is relevant given the allegation. They also redact information that is irrelevant, more prejudicial than probative, immaterial, or of personal opinion. (*Id.*)

Again, John does not allege that Kenyon did not engage in this process in the investigation—he disagrees with Kenyon's decisions on what was relevant and how it weighed evidence.

Further, after viewing this initial investigation report, the complainant and respondent may request to be re-interviewed. (*Id.* at p. 27 of 33.) Additionally, the complainant and respondent may, in writing, submit any additional comments, witnesses, evidence, or suggested follow-up questions to the investigators within five business days of the opportunity to review the initial investigation report. (*Id.*) After these five business days have lapsed, the investigators conduct any additional follow-up that they deem appropriate. (*Id.*)

John does not allege he was denied these steps in the process.

Next, after completing their follow up from the initial investigation report, the investigators make a determination, by a preponderance of the evidence, whether there is sufficient information to support a finding of responsibility. (*Id.* at page 27 of 33, Section X.F.3.) The investigators include in the final investigation report their findings and rationales for each of the findings. (*Id.*)

The final investigation report is shared with the complainant and respondent by the Title IX Coordinator.  (*Id.*)

John does not deny that he was provided these opportunities.  John baldly states that the investigators did not apply the preponderance of the evidence standard.  However, as John explains, the Investigators stated they applied the preponderance of the evidence standard in the Final Investigative report.  (*Id.* at ¶ 155.)  Throughout his Second Amended Complaint, John clarified that he views "proper application of the preponderance of the evidence standard" as application that "required a finding in John's favor."  (Doc. 27, at ¶ 216; *see also e.g.*, Doc. 27, at ¶ 220.)

Kenyon's Title IX Policy continues, if the investigators determine, by a preponderance of the evidence, that that there is sufficient information to find respondent in violation of Kenyon's Title IX Policy, the matter is referred to an Adjudicator to determine the appropriate sanction.  (*Id.*)  John baldly asserts here that the investigators did not consider all the relevant evidence (again he disagrees with their assessment of relevant) and baldly asserts that the investigators must not have used a preponderance of the evidence standards.

The Adjudicator must be a neutral and impartial decision-maker.  (*Id.* at p. 27 of 33, Section X.F.4.)  The Policy provides that a separate process determines the educational sanction (*Id.* at p. 27 of 33 Section X.F.4.)  If a student is found responsible for violating the Title IX Policy, the parties are informed in writing of the identification of the Adjudicator and provided the opportunity to submit a written request to the Title IX Coordinator to replace the Adjudicator, if there are reasonable articulable grounds to establish bias, conflict of interest or an inability to be fair and impartial.  (*Id.*)  The designated Adjudicator is only replaced if the Title IX Coordinator determines

59

that their bias precludes impartiality or constitutes conflict.  (*Id.*)  John does not allege he was denied any of these opportunities or that the Adjudicator was not fair and impartial.

Finally, in determining the appropriate sanctions, the Adjudicator will:

- afford the complainant and the respondent the opportunity to submit a written impact/mitigation statement to the Adjudicator for consideration within three calendar days of the notice of referral to adjudication;

- consider a sanction(s) designed to eliminate the Prohibited Conduct, prevent its recurrence, and address its effects, while supporting the College's educational mission and Title IX obligations; and

- impose any sanction deemed appropriate after a consideration of all the relevant information.

John does not allege that he was denied any of these opportunities.

In sum, John alleges that he does not like the process, how it was applied to him, or the outcome and disagrees with the determinations made by Kenyon.  John makes general allegations regarding what he perceives as a lack of fundamental fairness.  John does not allege any specific part of the process from investigation through adjudication was not followed or opportunity afforded him.

> **d.    Paragraph 399(h) and (k) – John's internally inconsistent and contradictory allegations that Kenyon "[f]ailed to correctly apply the Policy's definitions of consent and incapacitation" and that Kenyon "[f]ailed to address the evidence that definitively established Jane was not incapacitated on the night of September 13 and [Plaintiff] had no reason to this she was, and based key findings on speculation."**

John raises bald statements regarding the application of the definition of incapacitation that he directly contradicts with other allegations.  Kenyon's Title IX Policy at Section VII Related Definitions and Concepts, defines "incapacitation" as follows:

> An individual who is incapacitated lacks the ability to make informed, rational judgments and cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent because an individual is mentally

and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring.  In addition, persons with certain intellectual or developmental disabilities may not have the capacity to give consent.  Consent cannot be obtained by taking advantage of another individual's Incapacitation.

Where alcohol or other drugs are involved, Incapacitation is a state beyond intoxication.  The impact of alcohol and other drugs varies from person to person; however, warning signs that a person may be approaching Incapacitation may include slurred speech, vomiting, unsteady balance, strong odor of alcohol, combativeness, or emotional volatility.

Evaluating Incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects an individual's:

- Decision-making ability;
- Awareness of consequences;
- Ability to make informed judgments;
- Capacity to appreciate the nature and the quality of the act; or
- Level of consciousness.

In other words, a person may be considered unable to give valid consent due to Incapacitation if the person cannot appreciate the who, what, where, when, why, or how of a sexual interaction.

Evaluating Incapacitation also requires an assessment of whether a respondent was or should have been aware of the reporting party's Incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the respondent's position.

Being intoxicated or impaired by drugs or alcohol is never an excuse for any Prohibited Conduct under this policy and does not diminish one's responsibility to obtain informed and freely given consent.

(Doc. 27-2, Second Amended Complaint Exhibit B, PAGEID# [cut off], at Section VII.D.)

As addressed above, John alleges that he was with Jane while going to a party and through his arrest on the night of September 13-14, 2019.  (Doc. 27, at ¶¶ 10-13, 123(a)(ii), 123(b)(i)-(ii).) John alleges that "Investigators cited one witness's report that Jane's eyes were 'red, glassy, and her face was puffy like she'd been crying,' and witness statements that she was 'very emotional'

after they left John's apartment." (*Id.* at ¶ 207).  John alleges that based on witnesses and Jane's descriptions, Investigators determined that Jane was incapacitated.  John alleges that he disagrees with Investigators' review of witness statements as falling within the definition of incapacitation.

Further, John alleges that Jane appeared lucid and coherent in a range of 37-to-52 minutes (conservatively) – although John disingenuously alleges this occurred "within half an hour" after the alleged sexual encounter.  Jane's statements on the sheriff deputy's camera, however, as alleged by John, evidence confusion about when she and John last had sexual intercourse.  John alleges that his own toxicologist provided that Jane was not incapacitated by the time she was on camera, "that alcohol intake 'can impair memory whether one is over the legal limit or not'; and that a person can have a memory lapse without being 'unconscious in any way and will often appear to be perfectly fine.'"  (Doc. 27, at ¶ 150.)  As discussed above, John's reliance on his expert toxicologist are also misplaced and undone by his other allegations.  John alleges that he "submitted reports by an expert toxicologist, who stated – based on information that Jane provided, the body camera video, and the observations of witnesses – that [Jane] was not incapacitated or even noticeably intoxicated." (*Id.* at ¶ 150.)  John does not allege what information he provided the toxicologist other than the video occurred "less than thirty minutes" after an alleged sexual assault, that "none of the witnesses" described Jane as incapacitated.  John does not allege that the toxicologist met with Jane or received any information outside that curated by John for his own benefit.  For the reasons above, John's allegations about the night of September 13-14, 2019 undo these self-serving descriptions of Jane's state.

As discussed above, despite John's bald allegation that it does not, the description provided by witnesses of Jane fall within the definition of "incapacitation" in the Title IX Policy.  Nothing in John's allegations indicate that, assuming *arguendo* Jane was not incapacitated 37-to-52 minutes

62

after the sexual encounter, conservatively, or that precluded her from being incapacitated 37-to-52 minutes earlier.  John fails to state allegations that state a claim that the investigators misapplied the definition of "incapacitation," that there was "definitive evidence" that she was not incapacitated, or that John shouldn't have known she was incapacitated—he alleges he was with her from dinner through his arrest—both well before and after the alleged sexual assault.

> e.      **Paragraphs 399 (i) and (j) – John's self-contradictory allegations regarding Kenyon failing to consider the history and patterns of the parties' relationships and that Kenyon "[f]ailed to probe the inconsistency between Jane's acknowledged and persistent desire to have sex on September 13 and the conclusion that she could not have consented to sex that same night."**

John contradicts himself on allegations he attempts to raise regarding the use of history and patterns in the parties' relationship and fails to state a claim.  The portion providing for the investigators' consideration of the history and patterns of the parties and past sexual history provides:

> The sexual history of the complainant and respondent will never be used to prove character or reputation.  Moreover, **evidence related to prior sexual history of either of the parties is generally not relevant to the determination of a policy violation and will only be considered in very limited circumstances.**  For example, if the existence of consent is at issue, the sexual history between the parties *may* be relevant to help understand the manner and nature of communications between the parties and the context of the relationship, which may have bearing on whether consent was sought and given during the incident in question.  However, even in the context of a relationship, *consent to one sexual act does not, by itself, constitute consent to another sexual act, and consent on one occasion does not, by itself constitute consent on a subsequent occasion*.  In addition, under very limited circumstances, prior sexual history may be relevant to explain the presence of a physical injury or to help resolve another question raised by the report.
>
> Any party seeking to introduce information about prior sexual history or pattern evidence should bring this information to the attention of the investigators at the earliest opportunity.  While the investigators may explore relevant areas of inquiry, the Title IX Coordinator has the discretion to make the final determination

63

whether evidence of prior sexual history or other misconduct is
relevant to the determination regarding responsibility.

[…]

(Doc. 27-2, at p. 25-26 of 33, Section X.F.1.)

Here, John appears to allege that he provided what he describes as "personal and intimate
information regarding his relationship with Jane" and alleges that investigators failed to probe
"Jane's acknowledged and persistent desire to have sex on September 13 and the conclusion that
she could not have consented to sex that same night." John appears to allege that he was provided
the opportunity and availed himself of providing "information about prior sexual history or pattern
evidence" of Jane to the investigators. John appears to disagree with how that evidence was
handled at the discretion of the Title IX Coordinator and the relevancy and weight given it by the
investigators. Confusingly, John appears to allege that Jane was not incapacitated and, because
Jane indicated a desire to have sex on September 13, 2019 before the encounter in John's apartment
on September 14, 2019 between 12:15 and 12:45 a.m., and Jane again indicated a desire to have
sex with John when they left the apartment after 12:45 a.m., then the Investigators' finding that
Jane would not have consented to sex between 12:15 and 12:45 a.m. is contrary to Kenyon's Title
IX Policy. Nothing in Kenyon's Title IX Policy above prohibits Investigators from finding a
sexual encounter lacked consent where a complaining party expressed a desire to have sex before
and after the nonconsensual encounter. John's allegations do not present procedure contrary to the
Title IX Policy.

      **f.**      **Paragraphs 399(l) and 400 – John's allegation that Kenyon
"[m]ade improper and speculative inferences from John's
silence, and used a manufactured inconsistency to find him
incredible across the board."**

John's claim here is unclear—John alleges throughout his Second Amended Complaint
that he did not exercise "silence" in the process, but, as he alleges, provided many statements and

evidence about the night of September 13-14, 2019 and other allegations. Specifically, John alleges that he submitted to investigators: an initial statement regarding the events of September 13-14, 2019 and other accusations by Jane (Doc. 27, at ¶ 146); (submitted a 57-page response to the initial support in which he "[s]tated that he never physically abused Jane or engaged in sexual conduct or contact without her consent" (*id.* at ¶ 148(a)), "[s]tated, and provided documentary evidence" regarding his sexual relationship with Jane (*id.* at ¶ 148(b)), "[s]tated that his efforts to end the relationship" motivated Jane to make false accusations against him; and "submitted a statement explaining the things he had said to Jane and to friends after Jane told him she blacked out were a shocked reaction to Jane's claim[…]" (*Id.* at ¶ 149). Moreover, John alleges he submitted video, text, and photographic documentation to the investigators as well as reports by an expert toxicologist he hired. (Doc. 14, at ¶¶ 148-150.)

Pursuant to the Student Handbook, respondents in non-Title IX matters have "The right to remain silent; silence is not construed as culpability." (Doc. 27-1, p. 34 of 48.) John's assertion that the Student Handbook applies to his Title IX process is unsupported by the language of the Student Handbook: Under "B. Non-Sexual Assault," the Student Handbook refers to Kenyon's Sexual Misconduct Policy: Title IX, VAWA, Title VII for sexual assault and intimate partner violence and provides, in pertinent part:

> *Note: Sexual assault and intimate partner violence are discussed in*
> *the Title IX/VAWA Policy. See Section W.*

(Doc. 27-1, PAGEID# 799, p. 4 of 48 (italics original, hyperlink to Title IX Policy omitted).) Under "W. Sexual and Gender-Based Discrimination," the Student Handbook refers to Kenyon's Sexual Misconduct Policy: Title IX, VAWA, Title VII. (*Id.* at PAGEID# 819, p. 24 of 48.) The Student Handbook proceeds to discuss its process for non-Title IX conduct violations, which includes the portion referenced by Respondent on silence. (*Id.* at PAGEID# 827-829, pp. 32-34.)

Regardless, John alleges that he did not confirm or deny that he had sex with Jane in the encounter at issue.  John has not identified any portion of the Student Handbook or Title IX Policy that provides that absence of or incomplete evidence (i.e., due to silence of a party) is not factored in weighing a preponderance of the evidence when there is evidence to the contrary in the record provided by another party.  Specifically, John has not identified any document that supports that Kenyon could not consider Jane's account of events in the absence of John providing an account of the same event.  For these reasons, John has failed to state a claim for relief.

> **g.** **Paragraph 399(m), 401, and 402 – John baldly alleges differential treatment.**

John fails to state a claim for differential treatment.  Specifically, John alleges that Kenyon College: "[t]reated the parties differently based on their gender, in violation of Kenyon's own definition of discrimination and the examples of improper differential treatment included in the Policy," (*id.* at ¶ 399(m)) and disregarded John's reports of Policy violations by Jane, Kenyon failed to give him support, assistance, and procedural protections, and failed to investigate and adjudicate his reports (*id.* at ¶ 401).

As addressed above, John alleges, "Kenyon does not require individuals alleging potential violations of its Policy to make formal complaints, but commits to actions it will take in 'every case'." (*Id.* at ¶ 69.)  John further alleges that, with regards to support to a person bringing a Title IX complaint, Kenyon gave Jane support "when she complained about John, but not John when he told Investigators of her conduct and false claims." (*Id.* at ¶ 102(g).)

Even assuming *arguendo* John's claims are true at the investigation level of the process, John's further allegations underscore that Kenyon provided John with ability to raise these claims and that he did not avail himself of them. John alleges, "when John raised this point in his appeal, the Appeals Officer's response was that he could make a complaint now.  The Appeal Officer did

not address Kenyon's failure to honor its Policy obligations when he first reported Jane's misconduct." (*Id.* at ¶ 72.) John does not allege that he decided to pursue his claims in response to the Appeal Officer or that he did and was denied process and support by Kenyon at this stage of the process.

Accordingly, John fails to state a claim for relief for differential treatment in the Title IX process.

### h.    Paragraph 402 - John baldly alleges retaliation.

John appears to allege that he provided documentation in his defense to the Investigators and they retaliated against him for the content of that documentation. To clarify this allegation, John appears to quote the Investigators, and provides, "The majority of the information provided depicts [Jane] in vulnerable and compromising situations, that was likely meant to be kept inside the relationship and not released to third parties." (*Id.*) John alleges that the Investigators should have considered the evidence John provided in John's defense, (*id.* at ¶ 390), and that their statement was a chastisement of John in retaliation.

Even assuming *arguendo* that the statement attributed to the Investigators was to "chastise" John (*id.* at ¶ 73), John's own allegations do not support that the Investigators did not consider the documentation he provided. John alleges that Investigators "falsely said the evidence was not relevant" after reviewing it. (*Id.* at ¶ 73.) As the Title IX Policy provides, the Investigators are required to consider all *relevant* evidence.

"Moreover, evidence related to the prior sexual history of either of the parties is generally not relevant to the determination of a policy violation and will only be considered in very limited circumstances." (Doc. 27-2, at p. 26 of 33.) The Title IX Policy provides discretion for the Investigators in determining relevant evidence to include in the report and they are tasked with summarizing and determining "relevant information" and redacting "irrelevant" information. (*Id.*)

67

John's own allegations underscore that the Investigators considered the relevant evidence he provided and that they exercised their discretion under the Title IX Policy to limit information that they did not consider relevant. John's own allegations indicate that the Investigators did consider his evidence. John simply disagrees with their relevancy determination. (Doc. 27, at ¶ 389). John's allegations show that the Investigators complied with the Title IX Policy and that he had no contractual right or expectation that all evidence be considered.

### i. Paragraph 403 - Appeals Officer failed to correct procedural errors and erroneous outcome in the process.

A complainant and respondent may each appeal the outcome, including the investigators' finding of responsibility (or no responsibility). (Doc. 27-2, at p. 30 of 33, Section X.G.) In a request for an appeal, the burden of proof lies with the party requesting the appeal. (*Id.*) A party's dissatisfaction with the outcome of the investigation is not grounds for appeal. (*Id.*) Grounds for appeal are limited to: procedural error(s) that materially affected the outcome; new information unavailable at the original proceeding, which shall be set forth in the appeal; or the decision of the investigators and/or adjudicator was clearly erroneous based on the evidence in the record. (*Id.*)

In appeals of cases in which the respondent is a student, the Appeals Officer is the Vice President of Student Affairs, or if the Vice President cannot serve, the Provost. (*Id.*) As in the case of the Adjudicator, the Appeals Officer must be a neutral and impartial decision-maker. (*Id.*) Likewise, the parties will be informed, in writing and in advance of the appellate review, the identity of the designated Appeals Officer and permitted to submit a written request to the Title IX Coordinator to request a replacement if there are reasonable articulable grounds to establish a bias, conflict of interest or an inability to be fair and impartial. (*Id.*)

Here, John does not allege that he was denied any of the opportunities or process available – he alleges he disagreed with the decision of the investigator, the adjudicator, and the appeals officer.

### 2.     John has failed to state a claim for promissory estoppel.

The existence of a valid and enforceable contract generally precludes a claim of promissory estoppel arising from claims related to the contract.  *O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007).  "However, Ohio courts permit promissory estoppel claims to be pleaded alternatively to breach of contract claims, although damages cannot be awarded for the same wrong under both claims."  *Schaumleffel v. Muskingum*, No. 2:17-cv-463, 2018 WL 1173043, at *18 (S.D. Ohio Mar. 3, 2018) (Smith, J.) (citing *Bonner Farms, Ltd. v. Power Gas Mktg. & Transmission*, No. 5:04-2188, 2007 WL 2463247, at *7 (N.D. Ohio Aug. 28, 2007)).

"In order to establish a claim for promissory estoppel under Ohio law a plaintiff must establish the following elements:  (1) a clear and unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance was injured as a result of the reliance on the promise."  *Doe. v. Case W. Res. Univ.*, No. 1:17 CV 414, 2017 WL 3840418, at *13 (N.D. Ohio Sept. 1, 2017) (Nugent, J.) (citing *Stewart v. Everywhere Global, Inc.*, 68 F.Supp.3d 759, 766 (S.D. Ohio 2014) (Graham, J.)).

Assuming *arguendo* Kenyon's Title IX Policy and Student Handbook do not constitute contracts under Ohio law, John's promissory estoppel claims would fail.  Specifically, John alleges that he relied on the promise that Kenyon's Title IX Policy and process would be conducted "in compliance with the requirements of Title IX, the Clery Act, as amended by the Violence Against Women Act, the Family Educational Rights and Privacy Act (FERPA), and state and federal law."

(Doc. 27, at ¶ 408.)  But John raises no allegations in his Second Amended Complaint that Kenyon's Title IX Policy did not comply with the Clery Act, VAWA, FERPA, or state law.

As discussed above, John alleged that Kenyon's Title IX Policy violates Title IX and federal law because it did not provide a live cross-examination hearing and he did not think it was fundamentally fair.  As discussed above, John's allegations fail to state a claim that Kenyon did not follow its processes or that the processes were not fundamentally fair.  Accordingly, Kenyon is entitled to judgment on John's claim for promissory estoppel.

## IV.     CONCLUSION

For the foregoing reasons, Defendant Kenyon College respectfully asks this Court to grant its Motion for Judgment on the Pleadings and dismiss Plaintiff John Doe's Second Amended Complaint in its entirety.

Respectfully submitted,

/s/ *Joshua D. Nolan*
JOSHUA D. NOLAN* (0084592)
   *Trial Attorney*
Bricker & Eckler LLP
1001 Lakeside Avenue E.
Cleveland, Ohio 44114
(216) 523-5405
(216) 523-7071 (facsimile)
jnolan@bricker.com

ERIN E. BUTCHER (0087278)
LINDSEY A. ROBERTS (0096979)
Bricker & Eckler LLP
100 S. Third Street
Columbus, Ohio 43215
(614) 227-2303
(614) 227-7714
(614) 227-2390 (facsimile)
ebutcher@bricker.com
lroberts@bricker.com

70

16595310v3

## CERTIFICATE OF SERVICE

This will certify that the foregoing *Defendant's Motion for Judgment on the Pleadings* was filed electronically on July 19, 2021.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ *Joshua D. Nolan*
JOSHUA D. NOLAN (0084592)

71